1  Y. Gloria Park (*pro hac vice*)
2  SUSMAN GODFREY L.L.P.
   1301 Ave. of the Americas
3  32nd Floor
   New York, NY 10019
4  Telephone: (212) 336-8330
5  gpark@susmangodfrey.com

6  *Attorney for Plaintiffs*

7
                    **UNITED STATES DISTRICT COURT**
8                   **CENTRAL DISTRICT OF CALIFORNIA**

9   BERNADINE GRIFFITH,                    Case No. 5:23-cv-00964-SB-E
10  PATRICIA SHIH, RHONDA
    IRVIN, JACOB WATTERS,
11  individually and on behalf of all
12  others similarly situated,             **DECLARATION OF Y. GLORIA**
                        Plaintiffs,        **PARK**
13
14  vs.
15  TIKTOK, INC., a corporation;
    BYTEDANCE, INC., a corporation
16
                        Defendants.
17
18
19
20
21
22
23
24
25
26
27
28

1

2      I, Y. Gloria Park, hereby declare under penalty of perjury that the following is

3  true and correct:

4      1.    I am over the age of twenty-one (21) years and employed as an associate

5  at Susman Godfrey L.L.P. and counsel of record of Plaintiffs in the above-captioned

6  litigation. I submit this Declaration in support of Plaintiffs' Motion to Enforce the

7  November 27, 2023 Court Order on One-Day Sample Data and for Evidentiary

8  Sanctions.

9      2.    I am competent to testify to the matters stated in this Declaration and

10  have personal knowledge of the facts and statements in this Declaration.

11      3.    Attached as Exhibit 1 is a true and correct copy of the Court's Order

12  Continuing Deadlines in the Case Management Order, dated January 2, 2024.

13      4.    Attached as Exhibit 2 is a true and correct copy of an e-mail I sent to

14  Defendants' counsel on December 15, 2023 regarding "Griffith/TikTok – Incomplete

15  One-Day Sample Data Production."

16      5.    Attached as Exhibit 3 is a true and correct copy of an e-mail I sent to

17  Defendants' counsel on January 11, 2024 regarding "Griffith v. TikTok – Meet and

18  Confer on [Plaintiffs'] Motion to Enforce Court's Order."

19      6.    Attached as Exhibit 4 is a true and correct copy of an e-mail I sent to

20  Defendants' counsel on January 14, 2024 regarding "Griffith v. TikTok – Meet and

21  Confer on [Plaintiffs'] Motion to Enforce Court's Order."

22      7.    Attached as Exhibit 5 is a true and correct copy of an e-mail I sent to

23  Defendants' counsel on January 18, 2024 regarding "Griffith v. TikTok – Meet and

24  Confer on [Plaintiffs'] Motion to Enforce Court's Order" and memorializing the

25  parties' January 17, 2024 conference.

26      8.    Attached as Exhibit 6 is a true and correct copy of Defendants TikTok

27  Inc. and ByteDance Inc.'s Amended Responses and Objections to Plaintiffs' Third

28  Set of Interrogatories (No. 15), dated January 19, 2024.

1

2      9.      Attached as Exhibit 7 is a true and correct copy of an e-mail from

3  Defendants' counsel Kelly Yin on January 26, 2024 regarding "Griffith v. TikTok –

4  Meet and Confer on [Plaintiffs'] Motion to Enforce Court's Order."

5      10.     Attached as Exhibit 8 is a true and correct copy of a transcript of the

6  October 20, 2023 hearing on Plaintiffs' Motion to Compel Discovery Regarding

7  Websites with TikTok SDK Installed, Damages Calculation, and Custodians before

8  Magistrate Judge Charles F. Eick.

9      11.     Attached as Exhibit 9 is a true and correct copy of a transcript of the

10 September 8, 2023 hearing of the Mandatory Scheduling Conference before Judge

11 Stanley Blumenfeld, Jr.

12

13      Executed in New York, New York, on the 14th day of February, 2024.

14                                          */s/ Gloria Park*
                                            Gloria Park
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

| | |
|---|---|
| BERNADINE GRIFFITH, PATRICIA SHIH; RHONDA IRVIN; JACOB WATTERS, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        vs.<br><br>TIKTOK, INC, a corporation; BYTEDANCE, INC., a corporation,<br><br>        Defendants. | CASE NO. 5:23-cv-00964-SB-E<br><br>**ORDER CONTINUING DEADLINES IN THE CASE MANAGEMENT ORDER**<br><br>Date:    January 19, 2024<br>Time:   8:30 a.m.<br>Crtrm.:  6C<br><br>Assigned to Hon. Stanley Blumenfeld, Jr.<br>Courtroom 6C<br><br>Orig. Compl.:  May 26, 2023<br>Orig. Resp. Pldg.: July 24, 2023 |

Having considered Plaintiffs' unopposed motion to continue the deadlines in the case management order (CMO), Dkt. No. 82, and Defendants' statement of non-opposition, Dkt. No. 84, the Court hereby GRANTS the motion and modifies the CMO by adopting the Proposed Dates in the table below. The January 19 hearing on the motion to continue is VACATED.

3910437.2

| Event | Prior Dates | Current Dates | Proposed Dates |
|---|---|---|---|
| **Trial** | None | 09/30/24 | 11/25/24 |
| **Pretrial Conf.** | None | 09/13/24 | 11/08/24 |
| **Motion to Amend Pleadings** | None | None | None |
| **Motion for Class Certification due** | None | 02/09/24 | 05/03/24 |
| **Opposition to Motion for Class Certification due** | None | 02/23/24 | 05/17/24 |
| **Reply Brief ISO Motion for Class Certification due** | None | 03/01/24 | 05/24/24 |
| **Hearing on Motion for Class Certification** | None | 03/15/24 | 06/07/24 |
| **Initial Expert Disclosure due** | None | 04/26/24 | 07/19/24 |
| **Rebuttal Expert Disclosure due** | None | 05/10/24 | 08/09/24 |
| **Fact Discovery Cutoff** | None | 05/10/24 | 08/09/24 |
| **Expert Discovery Cutoff** | None | 06/07/24 | 08/23/24 |
| **Discovery Motion Hearing Cutoff** | None | 06/07/24 | 08/23/24 |
| **Non-Discovery Motion Hearing Cutoff** | None | 06/21/24 | 08/23/24 |
| **Settlement Conf. Deadline** | None | 07/05/24 | 08/30/24 |
| **Joint Post-settlement Status Conference Report due** | None | 07/12/24 | 09/06/24 |
| **Post-Settle. Conf.** | None | 07/19/24 | 09/13/24 |
| **Trial Filings (1st Set)** | None | 08/16/24 | 10/11/24 |
| **Trial Filings (2nd Set)** | None | 08/30/24 | 10/25/24 |

The parties should not expect any further extensions of these deadlines absent a showing of good cause.


Dated:     January 2, 2024


_____
**Stanley Blumenfeld, Jr.**
**United States District Judge**

# EXHIBIT 2

| From: | Gloria Park |
|---|---|
| To: | Mancall-Bitel, Sophie; Yin, Kelly; Hsu, Sarah; Torrez, Shallen; Weibell, Tony; Jih, Victor; Young, Joseph |
| Cc: | Christopher J. Lee; Ekwan E. Rhow; Greg Fisk; Gregory B. Linkh; Houston Davidson; Jessica D. Kinsey; Jonathan Rotter; K. Wolke; Kalpana Srinivasan; Marc E. Masters; Michael Gervais; Nicholas Loaiza; Steven Sklaver; John McCauley; Gloria Park |
| Subject: | Griffith/TikTok - Incomplete One-Day Sample Data Production |
| Date: | Friday, December 15, 2023 7:12:47 PM |

Counsel,

We write to follow up on Defendants' production in response to the Court's order that Defendants produce by December 11 "a sample of non-TikTok user data that Defendants collect, generate, and process on a single day." We understand TIKTOK-BG-000008271, TIKTOK-BG-000008272, TIKTOK-BG-000008273 to be the responsive data and that the day that Defendants chose is November 30, 2023.

Our review of the spreadsheets thus far raises concerns that the production is incomplete.

First, the Court's order granting the motion to compel required Defendants to produce not only collected data but also "generated" and "processed" data. Plaintiffs explained in their briefing that the request, which the Court granted, encompasses "all data that is generated (e.g., new data created by combining non-TikTok user data collected with other information) and processed (e.g., all copies of the data that is initially collected for downstream uses)." Defendants do not appear to have produced any generated or processed data. If it is Defendants' position that they have done so, please identify in detail where in the production that data is.

Second, this production appears to be only a subset of data collected on November 30, 2023 and specifically the subset of data generated from iOS devices and some desktop devices. It also appears to be data from only standard events and no custom events. Have Defendants produced **all** data collected on November 30, 2023 as required by the Court order? If not, how did Defendants select this sample set of data to selectively produce?

Third, there appear to be redactions in the production. Of the 121 high-level fields of data produced, well over half of the fields contain "Null," "0" or "blank" values. These fields appear to include IP address, various IDs, cookies, matching fields, email, external ID, and phone. Did Defendants redact this data from the production? If so, did Defendants redact the data during the normal

course of business or for this litigation? If redacted during the normal course of business, how long is each field retained in Defendants' data logs before it is redacted? Finally, in light of the heavy redactions, Plaintiffs request that Defendants provide descriptions of the 121 fields produced so that we can understand what data fields TikTok collects through the TikTok SDK.

Best,
Gloria

EXHIBIT 3

| From: | Gloria Park |
|-------|-------------|
| To: | Mancall-Bitel, Sophie; Hsu, Sarah; Christopher J. Lee; aweibell@mayerbrown.com |
| Cc: | Ekwan E. Rhow; Marc E. Masters; Jonathan Rotter; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana Srinivasan; Steven Sklaver; Michael Gervais; Greg Fisk; Nicholas Loaiza; Jih, Victor; Yin, Kelly; John McCauley; Gloria Park |
| Subject: | Griffith v. TikTok - Meet and Confer on Pltfs" Motion to Enforce Court"s Order |
| Date: | Thursday, January 11, 2024 2:17:43 PM |

Counsel,

Plaintiffs plan to file a motion to enforce the Court's November 27, 2023 order requiring Defendants to produce, in part, a sample of non-TikTok user data that Defendants collect, generate, and process on a single day. Dkt. 74. The Court ordered Defendants to produce this data by December 11, 2023. The data that Defendants produced on that day is deficient, at least for the reasons outlined in my December 15 email. To date, Defendants have failed to produce supplemental data or even to answer the questions that Plaintiffs asked about the deficiencies in the month since the production. Defendants are in violation of the Court's order. Please provide your availability this week or early next week to meet and confer on Plaintiffs' motion.

Best,
Gloria

**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information. If you received this message in error, please notify the sender and delete it immediately.

# EXHIBIT 4

| From: | Gloria Park |
|---|---|
| To: | Mancall-Bitel, Sophie; Hsu, Sarah; Christopher J. Lee; aweibell@mayerbrown.com |
| Cc: | Ekwan E. Rhow; Marc E. Masters; Jonathan Rotter; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana Srinivasan; Steven Sklaver; Michael Gervais; Greg Fisk; Nicholas Loaiza; Jih, Victor; Yin, Kelly; John McCauley; Gloria Park |
| Subject: | RE: Griffith v. TikTok - Meet and Confer on Pltfs" Motion to Enforce Court"s Order |
| Date: | Sunday, January 14, 2024 5:56:00 PM |
| Attachments: | image001.png |
|  | image002.png |
|  | image003.png |
|  | image004.png |
|  | image005.png |
|  | image006.png |

Counsel,

TikTok's reading of the Court's order is inconsistent with the parties' briefing on the issue, which expressly stated that "a sample of non-TikTok user data that Defendants collect, generate, and process on a single day" encompasses the following: "not just the non-TikTok user data that is *collected* on a single day but also such data that is *generated* or *processed* on a single day. The request covers all data that is generated (*e.g.*, new data created by combining non-TikTok user data collected with other information) and processed (*e.g.*, all copies of the data that is initially collected for downstream uses)." Dkt. 77. TikTok's reading of the Court's order "as requiring one snapshot of the data table containing event-level Pixel and Events API data that has been collected and processed, and from which aggregated analyses may be generated from time to time" is unsupported and confirms Plaintiffs' serious concerns about TikTok's failure to comply with the Court's order. Even more concerning is the fact that Plaintiffs laid out our reading of the scope of the Court's order in our December 15 email. If Defendants had a good-faith disagreement about that scope, they should have flagged the disagreement promptly, rather than waiting for a month and providing a belated, retroactive interpretation only after Plaintiffs expressed their plan to move to enforce the order.

As the record reflects, TikTok produced the initial data on December 11, and Plaintiffs analyzed the data within days and followed up with concerns about its deficiency on December 15. In the month since then, Defendants have failed to address a single question that Plaintiffs have raised. While we appreciate your position that producing the data is "not as simple as pushing a button," it is unclear why answering basic questions (like why there are redactions in the production and whether Defendants can provide descriptions of the 121 data fields) should take over a month.

Finally, as you know, this one-day sample data isn't just important in its own

right but also informs other outstanding discovery disputes. For instance, many of the data fields reflected in the one-day sample data refers to Pangle, notwithstanding Defendants' representation that they do not use data collected through the Pixel and Events API for any purpose related to Pangle.

The parties have a scheduled meet and confer on Wednesday, January 17. Please be prepared to discuss this issue on that call.

Best,
Gloria

---

**From:** Mancall-Bitel, Sophie <smancallbitel@wsgr.com>
**Sent:** Friday, January 12, 2024 5:12 PM
**To:** Gloria Park <GPark@susmangodfrey.com>; Hsu, Sarah <sarah.hsu@wsgr.com>; Christopher J. Lee <clee@birdmarella.com>; aweibell@mayerbrown.com
**Cc:** Ekwan E. Rhow <erhow@birdmarella.com>; Marc E. Masters <mmasters@birdmarella.com>; Jonathan Rotter <jrotter@glancylaw.com>; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana Srinivasan <ksrinivasan@SusmanGodfrey.com>; Steven Sklaver <ssklaver@SusmanGodfrey.com>; Michael Gervais <MGervais@susmangodfrey.com>; Greg Fisk <GFisk@susmangodfrey.com>; Nicholas Loaiza <NLoaiza@susmangodfrey.com>; Jih, Victor <vjih@wsgr.com>; Yin, Kelly <kyin@wsgr.com>; John McCauley <JMcCauley@susmangodfrey.com>
**Subject:** RE: Griffith v. TikTok - Meet and Confer on Pltfs' Motion to Enforce Court's Order

EXTERNAL Email

Gloria:

TikTok strongly disagrees that its production of a 24-hour data table snapshot does not meet the Court's November 27 order.  We read the Court's order as requiring one snapshot of the data table containing event-level Pixel and Events API data that has been collected and processed, and from which aggregated analyses may be generated from time to time.  That is what TikTok produced.  In practicality, we do not believe a sample of raw, pre-processed data would provide Plaintiffs any meaningful new information and are happy to discuss this on a meet-and-confer.

With respect to Plaintiffs' other questions, as we have previously explained, the process of identifying and querying 24 hours' worth of unmatched Pixel and Events API data is complex, requiring input from multiple people at the company.  It is not as simple as pushing a button.  Given this complexity, it has taken our client time to work through your follow-up questions.

We would appreciate scheduling a meet-and-confer towards the end of next week in the hopes that we can reach resolution and focus on the outstanding discovery on both sides.

Kind regards,

Sophie

## WILSON SONSINI

Sophia (Sophie) Mancall-Bitel

**(she/her)**
**direct: 323.210.2993**
**mobile: 310.709.6432**
smancallbitel@wsgr.com

_____

**Wilson Sonsini Goodrich & Rosati**
1900 Avenue of the Stars, 28th Floor
Los Angeles, CA 90067

www.wsgr.com



---

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Thursday, January 11, 2024 11:18 AM
**To:** Mancall-Bitel, Sophie <smancallbitel@wsgr.com>; Hsu, Sarah <sarah.hsu@wsgr.com>;
Christopher J. Lee <clee@birdmarella.com>; aweibell@mayerbrown.com
**Cc:** Ekwan E. Rhow <erhow@birdmarella.com>; Marc E. Masters <mmasters@birdmarella.com>;
Jonathan Rotter <jrotter@glancylaw.com>; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana
Srinivasan <ksrinivasan@SusmanGodfrey.com>; Steven Sklaver <ssklaver@SusmanGodfrey.com>;
Michael Gervais <MGervais@susmangodfrey.com>; Greg Fisk <GFisk@susmangodfrey.com>;
Nicholas Loaiza <NLoaiza@susmangodfrey.com>; Jih, Victor <vjih@wsgr.com>; Yin, Kelly
<kyin@wsgr.com>; John McCauley <JMcCauley@susmangodfrey.com>; Gloria Park
<GPark@susmangodfrey.com>
**Subject:** Griffith v. TikTok - Meet and Confer on Pltfs' Motion to Enforce Court's Order

EXT - gpark@susmangodfrey.com

---

Counsel,

Plaintiffs plan to file a motion to enforce the Court's November 27, 2023 order
requiring Defendants to produce, in part, a sample of non-TikTok user data that
Defendants collect, generate, and process on a single day. Dkt. 74. The Court
ordered Defendants to produce this data by December 11, 2023. The data that
Defendants produced on that day is deficient, at least for the reasons outlined in
my December 15 email. To date, Defendants have failed to produce
supplemental data or even to answer the questions that Plaintiffs asked about
the deficiencies in the month since the production. Defendants are in violation
of the Court's order. Please provide your availability this week or early next

week to meet and confer on Plaintiffs' motion.

Best,
Gloria


**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695

1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the
sender and delete it immediately.


This email and any attachments thereto may contain private, confidential, and privileged material for
the sole use of the intended recipient. Any review, copying, or distribution of this email (or any
attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please
contact the sender immediately and permanently delete the original and any copies of this email and
any attachments thereto.

# EXHIBIT 5

| From: | Gloria Park |
|---|---|
| To: | Mancall-Bitel, Sophie; Hsu, Sarah; Christopher J. Lee; aweibell@mayerbrown.com |
| Cc: | Ekwan E. Rhow; Marc E. Masters; Jonathan Rotter; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana Srinivasan; Steven Sklaver; Michael Gervais; Greg Fisk; Nicholas Loaiza; Jih, Victor; Yin, Kelly; John McCauley; Gloria Park |
| Subject: | RE: Griffith v. TikTok - Meet and Confer on Pltfs" Motion to Enforce Court"s Order |
| Date: | Thursday, January 18, 2024 2:08:00 PM |
| Attachments: | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |

Counsel,

We write to memorialize and follow up on yesterday's meet and confer on, among other things, the deficiencies in Defendants' production of one-day sample data.

As the record reflects, on November 27, 2023, the Court ordered Defendants to produce, by December 11, 2023, "a sample of non-TikTok user data that Defendants collect, generate, and process on a single day." The parties' briefing made clear that this encompasses the following: "not just the non-TikTok user data that is *collected* on a single day but also such data that is *generated* or *processed* on a single day. The request covers all data that is generated (*e.g.*, new data created by combining non-TikTok user data collected with other information) and processed (*e.g.*, all copies of the data that is initially collected for downstream uses)."

On December 11, Defendants produced three spreadsheets. On December 15, Plaintiffs followed up flagging numerous deficiencies in Defendants' production, including (1) that Defendants failed to produce any "generated" data, (2) that Defendants produced only a subset of data collected from some iOS devices and some desktop devices and produced only data from standard events and no custom events, and (3) that over half of the 121 data fields contain "Null," "0" or "blank" values. Plaintiffs further asked whether Defendants redacted the data during the normal course of business or for this litigation and requested descriptions of the 121 data fields in light of the heavy redactions.

Despite numerous follow-ups since December 15, Defendants did not produce supplemental data or even answer the questions presented in the December 15 email. On January 12, Defendants for the first time offered their own interpretation of the Court order, asserting that the order only "requir[es] one

snapshot of the data table containing event-level Pixel and Events API data that has been collected and processed, and from which aggregated analyses may be generated from time to time." While Plaintiffs strongly disagree with this interpretation, even under Defendants' own interpretation, their production is severely deficient for the reasons articulated in our December 15 email.

On yesterday's meet and confer, Defendants represented that they are working on "re-querying" the data to provide a supplemental production that includes data from all devices and not just those using iOS, data from all events and not just standard events, and data that does not have fields nulled or zeroed out. Defendants however would not provide any specific deadline by which they would do so, noting that it may take a "few weeks" but not committing even to that timeframe. The Court's order required Defendants to produce this data by December 11, and Plaintiffs reserve all rights related to Defendants' delay and failure to abide by the Court-imposed deadline.

Defendants further declined to produce descriptions of the 121 data fields, noting that such descriptions will not be necessary once Defendants get around to producing the supplemental data but once again without providing any timeframe by which they would do so. Defendants also represented that the data fields are "self-explanatory" and asked whether there are specific data fields on which Plaintiffs would like more information. These are the subset of fields on which we request more information by no later than **Friday, January 26**:

- "event" – Does this field include both custom and standard events? How do these events map to publicly disclosed events in https://ads.tiktok.com/help/article/standard-events-parameters?lang=en?

- "user_type" – This field contains numerical values. What do the numerical values mean?

- "country", "city", "locale" – Are these fields locations of the user or advertiser?

- Please provide a full list of sub-fields for the following: "properties", "predicted_properties", "intelligent_properties"

- Please provide an explanation or description of the following fields:

"pixel_inspection", "received_dc", "tt_id_experimental_users", "idc",
"is_compliant", "is_onsite", "is_standard", "is_user_level", "uid",
"union_uuid", "req_id", "clue_id", "vid", "gab_am_users",
"pm_pc_users", "auto_email", "auto_phone_number",
"collector_version", "compliance_tags", "detection_uv",
"is_event_inferred", "flags_version", "is_first", "orit", "rit",
"should_counted", "tenant", "product_level3_id", "product_level5_id",
"pangle_am_matched_users", "pangle_cookie_users",
"pangle_id_experimental_users", "pangle_pm_matched_users",
"pangle_pm_users"

With regard to the portion of the Court's order that required Defendants to
produce data generated on a single day, Defendants maintained on the call that
the order does not require Defendants to produce documents showing how they
combined the data collected with other information to generate new data or to
make use of the collected data. Defendants also asked whether it would be
sufficient if they produced a few samples of the type of aggregated analysis that
is run from the non-user data that is collected.

Defendants' proposal is insufficient because Defendants have stated to the
Court that they do not merely conduct "aggregated analysis" with non-user
data. Rather, Defendants also use the data for machine learning and algorithm
improvement. Accordingly, Plaintiffs believe that the Court order encompasses
the production of at least the following:

- All the processing pipelines after the non-user data is collected, including
  (1) the pipeline names, names of machine learning algorithms, and names
  of aggregation tools, (2) technical documentation that shows how non-
  user data is used by these pipelines (for example, training machine
  learning algorithms, how data is aggregated) and what the results are, and
  (3) a sample of the output data or results from each pipeline; and

- Product requirement documents, technical design documents (including
  machine learning models and training strategies), and product and/or
  feature launch documents that reflect how Defendants use the non-user
  data.

Of course, these categories of documents are also encompassed in other
discovery requests that Plaintiffs have served and should be produced even if

Defendants maintain that they are not covered by the Court's November 27 order. To the extent that Defendants do not have documentary evidence of the above, please so confirm.

Best,
Gloria

---

**From:** Mancall-Bitel, Sophie <smancallbitel@wsgr.com>
**Sent:** Thursday, January 18, 2024 12:33 PM
**To:** Gloria Park <GPark@susmangodfrey.com>; Hsu, Sarah <sarah.hsu@wsgr.com>; Christopher J. Lee <clee@birdmarella.com>; aweibell@mayerbrown.com
**Cc:** Ekwan E. Rhow <erhow@birdmarella.com>; Marc E. Masters <mmasters@birdmarella.com>; Jonathan Rotter <jrotter@glancylaw.com>; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana Srinivasan <ksrinivasan@SusmanGodfrey.com>; Steven Sklaver <ssklaver@SusmanGodfrey.com>; Michael Gervais <MGervais@susmangodfrey.com>; Greg Fisk <GFisk@susmangodfrey.com>; Nicholas Loaiza <NLoaiza@susmangodfrey.com>; Jih, Victor <vjih@wsgr.com>; Yin, Kelly <kyin@wsgr.com>; John McCauley <JMcCauley@susmangodfrey.com>
**Subject:** RE: Griffith v. TikTok - Meet and Confer on Pltfs' Motion to Enforce Court's Order

EXTERNAL Email
Gloria:

But for a few data processing questions, TikTok has already complied with the Court's November 27 order.

You asked about the fields with "null," "0" or blank fields and about the scope of included devices/events. TikTok has been working on those questions, which came in right before the holidays. As you know, the production of a "one-day snapshot" is not something TikTok does as part of its normal business processes; it has required it to specify new queries, create tools, and implement them. TikTok is treating this as a high-priority request, but it requires a significant amount of human-hours and coordination across different groups to address. We hope to have answers and, if necessary, to produce a re-run "snapshot" in the next few weeks. TikTok is not refusing to comply—it simply takes time.

Your requests for multiple "snapshots," however, goes beyond what the Court ordered. That order specified one "snapshot." At no point in the parties' discussions or briefing on this matter, did Plaintiffs identify the need for multiple "snapshots" nor did the Court specify what those different versions would be. The November 27 order certainly says nothing about a separate production of "raw" or "generated" snapshots. Data that is sent to TikTok undergoes automatic cleaning, validation, quality control, de-duplication and aggregation of event data—that data can then be queried or placed in reports.

TikTok does not use the "raw" unprocessed data and it is not clear why Plaintiffs need a "snapshot"

of the data in that form.  Although we do not believe it is required by the Court's order, we will try to produce a "raw" version.

The request for a snapshot of "generated" data, however, makes no sense.  There is no "generated" data in the sense you seek and it is not a part of TikTok's automated processing.  In yesterday's discussions, your focus seemed to concern instead the "use" of the data.  Any routine use is covered by other discovery requests and TikTok has already produced samples of the types of reports advertisers may see.  TikTok has no "snapshot" for any ad hoc queries of the data.

Needless to say, we believe there is no merit nor reason for a motion to compel at this point.  We hope to address the data processing questions in the near future and to get you a version of the "raw" data.

Kind regards,
Sophie

## WILSON SONSINI

### Sophia (Sophie) Mancall-Bitel

**(she/her)**
**direct: 323.210.2993**
**mobile: 310.709.6432**
smancallbitel@wsgr.com

**Wilson Sonsini Goodrich & Rosati**
1900 Avenue of the Stars, 28th Floor
Los Angeles, CA 90067

www.wsgr.com

🌐 👤 in 𝕏 f

---

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Sunday, January 14, 2024 2:57 PM
**To:** Mancall-Bitel, Sophie <smancallbitel@wsgr.com>; Hsu, Sarah <sarah.hsu@wsgr.com>; Christopher J. Lee <clee@birdmarella.com>; aweibell@mayerbrown.com
**Cc:** Ekwan E. Rhow <erhow@birdmarella.com>; Marc E. Masters <mmasters@birdmarella.com>; Jonathan Rotter <jrotter@glancylaw.com>; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana Srinivasan <ksrinivasan@SusmanGodfrey.com>; Steven Sklaver <ssklaver@SusmanGodfrey.com>; Michael Gervais <MGervais@susmangodfrey.com>; Greg Fisk <GFisk@susmangodfrey.com>; Nicholas Loaiza <NLoaiza@susmangodfrey.com>; Jih, Victor <vjih@wsgr.com>; Yin, Kelly <kyin@wsgr.com>; John McCauley <JMcCauley@susmangodfrey.com>; Gloria Park <GPark@susmangodfrey.com>
**Subject:** RE: Griffith v. TikTok - Meet and Confer on Pltfs' Motion to Enforce Court's Order

EXT - gpark@susmangodfrey.com

Counsel,

TikTok's reading of the Court's order is inconsistent with the parties' briefing on the issue, which expressly stated that "a sample of non-TikTok user data that Defendants collect, generate, and process on a single day" encompasses the following: "not just the non-TikTok user data that is *collected* on a single day but also such data that is *generated* or *processed* on a single day. The request covers all data that is generated (*e.g.*, new data created by combining non-TikTok user data collected with other information) and processed (*e.g.*, all copies of the data that is initially collected for downstream uses)." Dkt. 77. TikTok's reading of the Court's order "as requiring one snapshot of the data table containing event-level Pixel and Events API data that has been collected and processed, and from which aggregated analyses may be generated from time to time" is unsupported and confirms Plaintiffs' serious concerns about TikTok's failure to comply with the Court's order. Even more concerning is the fact that Plaintiffs laid out our reading of the scope of the Court's order in our December 15 email. If Defendants had a good-faith disagreement about that scope, they should have flagged the disagreement promptly, rather than waiting for a month and providing a belated, retroactive interpretation only after Plaintiffs expressed their plan to move to enforce the order.

As the record reflects, TikTok produced the initial data on December 11, and Plaintiffs analyzed the data within days and followed up with concerns about its deficiency on December 15. In the month since then, Defendants have failed to address a single question that Plaintiffs have raised. While we appreciate your position that producing the data is "not as simple as pushing a button," it is unclear why answering basic questions (like why there are redactions in the production and whether Defendants can provide descriptions of the 121 data fields) should take over a month.

Finally, as you know, this one-day sample data isn't just important in its own right but also informs other outstanding discovery disputes. For instance, many of the data fields reflected in the one-day sample data refers to Pangle, notwithstanding Defendants' representation that they do not use data collected through the Pixel and Events API for any purpose related to Pangle.

The parties have a scheduled meet and confer on Wednesday, January 17. Please be prepared to discuss this issue on that call.

Best,
Gloria

---

**From:** Mancall-Bitel, Sophie <smancallbitel@wsgr.com>
**Sent:** Friday, January 12, 2024 5:12 PM
**To:** Gloria Park <GPark@susmangodfrey.com>; Hsu, Sarah <sarah.hsu@wsgr.com>; Christopher J. Lee <clee@birdmarella.com>; aweibell@mayerbrown.com
**Cc:** Ekwan E. Rhow <erhow@birdmarella.com>; Marc E. Masters <mmasters@birdmarella.com>; Jonathan Rotter <jrotter@glancylaw.com>; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana Srinivasan <ksrinivasan@SusmanGodfrey.com>; Steven Sklaver <ssklaver@SusmanGodfrey.com>; Michael Gervais <MGervais@susmangodfrey.com>; Greg Fisk <GFisk@susmangodfrey.com>; Nicholas Loaiza <NLoaiza@susmangodfrey.com>; Jih, Victor <vjih@wsgr.com>; Yin, Kelly <kyin@wsgr.com>; John McCauley <JMcCauley@susmangodfrey.com>
**Subject:** RE: Griffith v. TikTok - Meet and Confer on Pltfs' Motion to Enforce Court's Order

EXTERNAL Email
Gloria:

TikTok strongly disagrees that its production of a 24-hour data table snapshot does not meet the Court's November 27 order. We read the Court's order as requiring one snapshot of the data table containing event-level Pixel and Events API data that has been collected and processed, and from which aggregated analyses may be generated from time to time. That is what TikTok produced. In practicality, we do not believe a sample of raw, pre-processed data would provide Plaintiffs any meaningful new information and are happy to discuss this on a meet-and-confer.

With respect to Plaintiffs' other questions, as we have previously explained, the process of identifying and querying 24 hours' worth of unmatched Pixel and Events API data is complex, requiring input from multiple people at the company. It is not as simple as pushing a button. Given this complexity, it has taken our client time to work through your follow-up questions.

We would appreciate scheduling a meet-and-confer towards the end of next week in the hopes that we can reach resolution and focus on the outstanding discovery on both sides.

Kind regards,
Sophie

**WILSON SONSINI**

Sophia (Sophie) Mancall-Bitel

**(she/her)**
**direct: 323.210.2993**
**mobile: 310.709.6432**
smancallbitel@wsgr.com
_____

**Wilson Sonsini Goodrich & Rosati**

1900 Avenue of the Stars, 28th Floor
Los Angeles, CA 90067

[www.wsgr.com](http://www.wsgr.com)



**From:** Gloria Park <[GPark@susmangodfrey.com](mailto:GPark@susmangodfrey.com)>
**Sent:** Thursday, January 11, 2024 11:18 AM
**To:** Mancall-Bitel, Sophie <[smancallbitel@wsgr.com](mailto:smancallbitel@wsgr.com)>; Hsu, Sarah <[sarah.hsu@wsgr.com](mailto:sarah.hsu@wsgr.com)>;
Christopher J. Lee <[clee@birdmarella.com](mailto:clee@birdmarella.com)>; [aweibell@mayerbrown.com](mailto:aweibell@mayerbrown.com)
**Cc:** Ekwan E. Rhow <[erhow@birdmarella.com](mailto:erhow@birdmarella.com)>; Marc E. Masters <[mmasters@birdmarella.com](mailto:mmasters@birdmarella.com)>;
Jonathan Rotter <[jrotter@glancylaw.com](mailto:jrotter@glancylaw.com)>; [kwolke@glancylaw.com](mailto:kwolke@glancylaw.com); [glinkh@glancylaw.com](mailto:glinkh@glancylaw.com); Kalpana
Srinivasan <[ksrinivasan@SusmanGodfrey.com](mailto:ksrinivasan@SusmanGodfrey.com)>; Steven Sklaver <[ssklaver@SusmanGodfrey.com](mailto:ssklaver@SusmanGodfrey.com)>;
Michael Gervais <[MGervais@susmangodfrey.com](mailto:MGervais@susmangodfrey.com)>; Greg Fisk <[GFisk@susmangodfrey.com](mailto:GFisk@susmangodfrey.com)>;
Nicholas Loaiza <[NLoaiza@susmangodfrey.com](mailto:NLoaiza@susmangodfrey.com)>; Jih, Victor <[vjih@wsgr.com](mailto:vjih@wsgr.com)>; Yin, Kelly
<[kyin@wsgr.com](mailto:kyin@wsgr.com)>; John McCauley <[JMcCauley@susmangodfrey.com](mailto:JMcCauley@susmangodfrey.com)>; Gloria Park
<[GPark@susmangodfrey.com](mailto:GPark@susmangodfrey.com)>
**Subject:** Griffith v. TikTok - Meet and Confer on Pltfs' Motion to Enforce Court's Order

EXT - [gpark@susmangodfrey.com](mailto:gpark@susmangodfrey.com)

Counsel,

Plaintiffs plan to file a motion to enforce the Court's November 27, 2023 order requiring Defendants to produce, in part, a sample of non-TikTok user data that Defendants collect, generate, and process on a single day. Dkt. 74. The Court ordered Defendants to produce this data by December 11, 2023. The data that Defendants produced on that day is deficient, at least for the reasons outlined in my December 15 email. To date, Defendants have failed to produce supplemental data or even to answer the questions that Plaintiffs asked about the deficiencies in the month since the production. Defendants are in violation of the Court's order. Please provide your availability this week or early next week to meet and confer on Plaintiffs' motion.

Best,
Gloria

**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
[gpark@susmangodfrey.com](mailto:gpark@susmangodfrey.com)

This e-mail may contain privileged and confidential information. If you received this message in error, please notify the sender and delete it immediately.

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

EXHIBIT 6

1   VICTOR JIH, State Bar No. 186515
    SOPHIA M. MANCALL-BITEL, State Bar No. 337002
2   Email: vjih@wsgr.com; smancallbitel@wsgr.com
    WILSON SONSINI GOODRICH & ROSATI
3   Professional Corporation
    1900 Avenue of The Stars, 28th Floor
4   Los Angeles, CA 90067
    Telephone: (424) 446-6900
5   Facsimile:  (866) 974-7329

6   ANTHONY J WEIBELL, State Bar No. 238850
    Email: aweibell@wsgr.com
7   WILSON SONSINI GOODRICH & ROSATI
    Professional Corporation
8   650 Page Mill Road
    Palo Alto, California 94304-1050
9   Telephone:  (650) 493-9300
    Facsimile:  (866) 974-7329

10
    *Attorneys for Defendants*
11  *TikTok Inc. and ByteDance Inc.*

12                    UNITED STATES DISTRICT COURT

13                   CENTRAL DISTRICT OF CALIFORNIA

14

15   BERNADINE GRIFFITH;            Case No. 5:23-cv-0964-SB-E
     PATRICIA SHIH; RHONDA
16   IRVIN; JACOB WATTERS,          **DEFENDANTS TIKTOK INC. AND**
     individually and on behalf of all   **BYTEDANCE INC.'S AMENDED**
17   others similarly situated,     **RESPONSES AND OBJECTIONS TO**
                                     **PLAINTIFFS' THIRD SET OF**
18              Plaintiffs,          **INTERROGATORIES (NO. 15)**

19         v.                        Judge: Hon. Stanley Blumenfeld Jr.

20   TIKTOK INC., et al.,

21              Defendants.

22

23

24   PROPOUNDING PARTY:  PLAINTIFFS BERNADINE GRIFFITH ET. AL.

25   RESPONDING PARTY:   DEFENDANTS TIKTOK INC. AND BYTEDANCE

26                       INC.

27   SET NO.:            THREE (NO. 15)

28

Pursuant to Rules 26 and Rule 33 of the Federal Rules of Civil Procedure, Defendants TikTok Inc. ("TikTok") and ByteDance Inc. ("ByteDance"), by and through their attorneys, submit the following amended responses and objections to the Third Set of Interrogatories ("Interrogatories") served by Plaintiffs on November 30, 2023.[1] The following General Objections apply to each and every separately numbered Interrogatory and are incorporated therein by reference as if set forth in full:

## **GENERAL OBJECTIONS**

TikTok makes the following General Objections, whether or not separately set forth in response to each Interrogatory, Definition or Instruction. Although TikTok may repeat some of these General Objections in a specific response, because they are particularly applicable, such specific citations are not to be construed as a waiver of any other General Objections applicable to the Interrogatory. These General Objections are incorporated in each response to each Interrogatory as if fully set forth in each of the individual responses below.

1.    TikTok objects to the Interrogatories to the extent they purport to impose obligations beyond those required under the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Central District of California, or any order by this Court.

2.    TikTok objects to the Interrogatories to the extent they seek information not within TikTok's possession, custody, or control, or that cannot be found in the course of a reasonable search. Any agreement to provide responsive information is an agreement to produce information within TikTok's possession, custody, or control and that can be found in the course of a reasonable search,

---

[1] Plaintiffs served the Interrogatories on both TikTok and ByteDance. ByteDance incorporates the objections herein in full. However, because the Interrogatories appear to seek information that would reside in TikTok's possession, if anywhere, the remainder of the written objections and responses to the Interrogatories are focused on TikTok specifically.

1  subject to any objections stated herein; such an agreement does not necessarily

2  mean that there is responsive information or that TikTok will be able to find it after

3  a reasonable search.

4        3.      TikTok objects to the Interrogatories to the extent they lack a

5  reasonably limited temporal scope. Such Interrogatories are overly broad, unduly

6  burdensome, and seek discovery not relevant to a party's claim or defense or

7  proportional to the needs of the case.

8        4.      TikTok objects to the Interrogatories to the extent that they seek

9  information protected from disclosure by the attorney-client privilege, the work

10 product doctrine, the self-critical analysis privilege, the consulting expert privilege,

11 any applicable joint defense privileges, any applicable common interest privileges,

12 and/or any other privileges and immunities ("Privileged Information"). Any

13 inadvertent disclosure of such information shall not be deemed a waiver of any

14 such privilege, and TikTok expressly requests that the receiving party immediately

15 return and not make use of any inadvertently disclosed privileged information. In

16 particular, TikTok objects to paragraph 5 of the Instructions on the grounds that

17 they seek information that is not relevant to the assertion of privilege, is unduly

18 burdensome, and is harassing. TikTok also objects to the Interrogatories to the

19 extent they seek to require the collection, production or logging of the work

20 product of or attorney-client privileged communications with outside counsel hired

21 in connection with this litigation or duplicate files maintained by outside counsel.

22       5.      TikTok objects to the Interrogatories to the extent they seek

23 confidential, trade secret, or proprietary information ("Confidential Information").

24 TikTok will produce its Confidential Information subject to the terms of the

25 parties' protective order entered by the Court. TikTok also may not be able to

26 produce Confidential Information belonging to third parties or that is subject to

27 confidentiality obligations without a court order or prior notice to the affected third

28 party.

6.    TikTok objects to the Interrogatories to the extent they seek personal private information that would impinge on any protected right to privacy of individuals, including any statutory, constitutional, or common law right of privacy ("Private Information"). TikTok reserves the right to redact such Private Information.

7.    TikTok objects to the Interrogatories to the extent that they are vague, ambiguous, indefinite, unintelligible, or otherwise unclear as to the information they seek.

8.    In complying with the Interrogatories, TikTok does not intend to waive any position or objection, including, but not limited to, any objection to the competency, relevance, materiality, or admissibility of any of the requested information, TikTok's responses, or their subject matter. Further, no admissions (incidental, implied, or otherwise) are intended by any such responses, including, without limitation, that any statement or characterization in the Interrogatories is accurate or complete. In addition, the fact that TikTok may comply with the Interrogatories should not be taken as an admission that TikTok accepts or admits the existence of any information presumed by the Interrogatories. The fact that TikTok may comply with part or all of the Interrogatories is not intended to be, and shall not be construed to be, a waiver by TikTok of any part of any objection.

9.    TikTok reserves the right to assert additional objections as appropriate and to supplement these objections and responses if TikTok deems necessary. The subject matter of the Interrogatories is under continuing investigation. TikTok expressly reserves the right to use or rely upon information not provided in response to the Interrogatories if such information is uncovered during the course of its ongoing investigation, and TikTok expressly reserves the right pursuant to Fed. R. Civ. P. 26(e) to change or modify any of the following responses as it becomes aware of new knowledge relevant to the Interrogatories and/or additional facts are ascertained, legal research is completed, or contentions are made. TikTok

also reserves the right to supplement its response to each Interrogatory that is deemed premature, not relevant or beyond the scope of discovery when and if they become timely, relevant, or fall within the bounds of discovery, as set forth by the rules and orders of this Court.

## OBJECTIONS TO THE DEFINITIONS

1.    TikTok objects to the definition of "TikTok" to the extent it purports to encompass more than TikTok Inc.

2.    TikTok objects to the definition of "ByteDance" to the extent that it purports to encompass more than ByteDance Inc.

3.    TikTok objects to the definitions of "You," "Your," and "Defendants" because these terms are overly broad, vague, and ambiguous, and purport to encompass numerous persons and entities. TikTok will interpret "You," "Your," or "Defendants" to mean TikTok Inc., its direct and indirect subsidiaries, officers, directors, employees, and agents acting on behalf of TikTok.

4.    TikTok objects to the definition of "TikTok SDK." Plaintiffs refer to a "TikTok SDK," but TikTok does not actually offer an SDK for use by websites. The only tools it offers to advertisers are a Pixel and an Events API.  The Pixel can be installed on websites.  The Event API is not installed on or used by websites.

## AMENDED RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 15:

Please describe in detail the current operation of Pangle, Global App Bundle ("GAB"), and/or any similar technology that facilitates ad placement on non-TikTok Websites and/or apps (collectively, "the Products"), including (a) whether there has been any alpha release and/or beta release of the Products, (b) the geographical segmentation of the Products, including whether advertisers operating from a Pangle- or GAB-supported jurisdiction like Mexico or Canada can advertise to a person located in the U.S. and whether a U.S. resident who temporarily travels to a Pangle- or GAB-supported jurisdiction outside the U.S. can be served ads via

1  the Products or via advertisers using the Products while in that jurisdiction; and (c)

2  whether and how non-TikTok user Data collected, generated, and/or processed

3  through the TikTok SDK (including Data that results from Defendants' subsequent

4  aggregation and/or analysis of non-TikTok user Data collected, generated, and/or

5  processed through the TikTok SDK) have been or currently are used in any way

6  related to the Products.

7  **AMENDED RESPONSE TO INTERROGATORY NO. 15:**

8       TikTok objects to the Interrogatory to the extent the information sought

9  contains Confidential Information or Privileged Information.  TikTok objects to the

10  Interrogatory because the phrase "similar technology" is vague.  TikTok objects to

11  the extent the Interrogatory is duplicative of Request No. 82.  TikTok objects to the

12  Interrogatory because it purports to seek only information regarding Pangle and the

13  Global App Bundle, which do not allow advertisers to display ads off of the

14  TikTok platform in the United States, and thus it seeks only information that is

15  irrelevant to any claim or defense.

16       TikTok will not respond to this Interrogatory except to state that TikTok

17  does not use unmatched Pixel or Events API data for any purposes relating to

18  Pangle or Global App Bundle.

19

20  Dated:  January 19, 2024        WILSON SONSINI GOODRICH & ROSATI

21                             Professional Corporation

22

23                             By: */s/ Sophia M. Mancall-Bitel*

24                             Sophia M. Mancall-Bitel

25                             *Attorneys for Defendants*
                                *TikTok Inc. and ByteDance Inc.*

26

27

28

## **VERIFICATION**

I, Dan Kirchgessner, declare:

I work for TikTok Inc.  My title is the Global Product Strategy and Operations Lead.  I am authorized to make this verification on behalf of TikTok Inc. and ByteDance Inc.  I have read Defendants TikTok Inc. and ByteDance Inc.'s Amended Responses and Objections to Plaintiffs' Third Set of Interrogatories (No. 15), and the matters set forth herein are true to the best of my personal knowledge (including based on my review of company documents and discussions with others at TikTok), information, and belief.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 19, 2024

By: _____

Dan Kirchgessner

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I certify that on January 19, 2024, I caused a copy of the foregoing Defendants TikTok Inc. and ByteDance Inc.'s Amended Responses and Objections to Plaintiffs' Third Set of Interrogatories (No. 15) to be delivered via email, pursuant to the parties' mutual agreement to accept service via email, to the following individuals:

Ekwan E. Rhow (CA SBN 174604)
Marc E. Masters (CA SBN 208375)
Christopher J. Lee (CA SBN 322140)
**BIRD, MARELLA, BOXER,
WOLPERT, NESSIM,
DROOKS, LINCENBERG &
RHOW, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
erhow@birdmarella.com
mmasters@birdmarella.com
clee@birdmarella.com

Kalpana Srinivasan (CA SBN 237460)
Steven Sklaver (CA SBN 237612)
Michael Gervais (CA SBN 330731)
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
ksrinivasan@susmangodfrey.com
ssklaver@susmangodfrey.com
mgervais@susmangodfrey.com

Jonathan M. Rotter (CA SBN 234137)
Kara M. Wolke (CA SBN 241521)
Gregory B. Linkh (pro hac vice)
**GLANCY PRONGAY &
MURRAY, LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067-2561
Telephone: (310) 201-9150
jrotter@glancylaw.com
kwolke@glancylaw.com
glinkh@glancylaw.com

Y. Gloria Park (pro hac vice)
**SUSMAN GODFREY L.L.P.**
1301 Avenue of the Americas, 32nd
Floor
New York, NY 10019
Telephone: (212) 336-8330
gpark@susmangodfrey.com

Greg Fisk
Nicholas Loaiza
**SUSMAN GODFREY L.L.P.**
gfisk@susmangodfrey.com
NLoaiza@susmangodfrey.com

1    Dated: January 19, 2024          WILSON SONSINI GOODRICH & ROSATI
2                                     Professional Corporation
3
4                                     By:/s/   *Alexandra Bautista*
                                      Alexandra Bautista
5
6                                     *For Defendants*
                                      TIKTOK INC. and BYTEDANCE INC.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 7

| | |
|---|---|
| **From:** | Yin, Kelly |
| **To:** | Gloria Park; Mancall-Bitel, Sophia; Hsu, Sarah; Christopher J. Lee; aweibell@mayerbrown.com |
| **Cc:** | Ekwan E. Rhow; Marc E. Masters; Jonathan Rotter; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana Srinivasan; Steven Sklaver; Michael Gervais; Greg Fisk; Nicholas Loaiza; Jih, Victor; John McCauley |
| **Subject:** | RE: Griffith v. TikTok - Meet and Confer on Pltfs" Motion to Enforce Court"s Order |
| **Date:** | Friday, January 26, 2024 7:38:02 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |

EXTERNAL Email

Counsel:

TikTok is working as quickly as possible to produce a new snapshot of the processed data that addresses Plaintiffs' concerns.  As you know, this is a complex and technologically difficult process. TikTok is also working as quickly as possible to produce a snapshot of the raw data.  TikTok has offered to produce the raw data snapshot in order to reach a resolution of Plaintiffs' concerns, although we continue to believe that it will not be useful to Plaintiffs and is not required by the Court's order.

We are working on the descriptions for the data fields you identified as well as answers to the questions you raised for the specified data fields.  We intend to provide those to you in the next couple weeks.

On "use" of the Pixel, the Court's order plainly does not encompass Plaintiffs' new interpretation of "generated" data, which Plaintiffs now propose covers the names of all the processes, technical documents, sample outputs of every single "use," PRDs, release docs, etc. To the extent that those documents are covered by other RFPs, as Plaintiffs suggest, then you already have our position on them. That said, in aid of discovery, TikTok will agree to produce samples of aggregated reports for data pertaining to the websites identified in the First Amended Complaint.  That is currently in progress.

Regards,
Kelly

**Kelly H. Yin | Wilson Sonsini Goodrich & Rosati**
mobile: 323.547.3985 | kyin@wsgr.com

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Thursday, January 18, 2024 11:09 AM
**To:** Mancall-Bitel, Sophie <smancallbitel@wsgr.com>; Hsu, Sarah <sarah.hsu@wsgr.com>; Christopher J. Lee <clee@birdmarella.com>; aweibell@mayerbrown.com
**Cc:** Ekwan E. Rhow <erhow@birdmarella.com>; Marc E. Masters <mmasters@birdmarella.com>; Jonathan Rotter <jrotter@glancylaw.com>; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana Srinivasan <ksrinivasan@SusmanGodfrey.com>; Steven Sklaver <ssklaver@SusmanGodfrey.com>; Michael Gervais <MGervais@susmangodfrey.com>; Greg Fisk <GFisk@susmangodfrey.com>;

Nicholas Loaiza <NLoaiza@susmangodfrey.com>; Jih, Victor <vjih@wsgr.com>; Yin, Kelly
<kyin@wsgr.com>; John McCauley <JMcCauley@susmangodfrey.com>; Gloria Park
<GPark@susmangodfrey.com>
**Subject:** RE: Griffith v. TikTok - Meet and Confer on Pltfs' Motion to Enforce Court's Order

EXT - gpark@susmangodfrey.com

Counsel,

We write to memorialize and follow up on yesterday's meet and confer on,
among other things, the deficiencies in Defendants' production of one-day
sample data.

As the record reflects, on November 27, 2023, the Court ordered Defendants to
produce, by December 11, 2023, "a sample of non-TikTok user data that
Defendants collect, generate, and process on a single day." The parties' briefing
made clear that this encompasses the following: "not just the non-TikTok user
data that is *collected* on a single day but also such data that is *generated* or
*processed* on a single day. The request covers all data that is generated (*e.g.*,
new data created by combining non-TikTok user data collected with other
information) and processed (*e.g.*, all copies of the data that is initially collected
for downstream uses)."

On December 11, Defendants produced three spreadsheets. On December 15,
Plaintiffs followed up flagging numerous deficiencies in Defendants'
production, including (1) that Defendants failed to produce any "generated"
data, (2) that Defendants produced only a subset of data collected from some
iOS devices and some desktop devices and produced only data from standard
events and no custom events, and (3) that over half of the 121 data fields
contain "Null," "0" or "blank" values. Plaintiffs further asked whether
Defendants redacted the data during the normal course of business or for this
litigation and requested descriptions of the 121 data fields in light of the heavy
redactions.

Despite numerous follow-ups since December 15, Defendants did not produce
supplemental data or even answer the questions presented in the December 15
email. On January 12, Defendants for the first time offered their own
interpretation of the Court order, asserting that the order only "requir[es] one
snapshot of the data table containing event-level Pixel and Events API data that

has been collected and processed, and from which aggregated analyses may be generated from time to time." While Plaintiffs strongly disagree with this interpretation, even under Defendants' own interpretation, their production is severely deficient for the reasons articulated in our December 15 email.

On yesterday's meet and confer, Defendants represented that they are working on "re-querying" the data to provide a supplemental production that includes data from all devices and not just those using iOS, data from all events and not just standard events, and data that does not have fields nulled or zeroed out. Defendants however would not provide any specific deadline by which they would do so, noting that it may take a "few weeks" but not committing even to that timeframe. The Court's order required Defendants to produce this data by December 11, and Plaintiffs reserve all rights related to Defendants' delay and failure to abide by the Court-imposed deadline.

Defendants further declined to produce descriptions of the 121 data fields, noting that such descriptions will not be necessary once Defendants get around to producing the supplemental data but once again without providing any timeframe by which they would do so. Defendants also represented that the data fields are "self-explanatory" and asked whether there are specific data fields on which Plaintiffs would like more information. These are the subset of fields on which we request more information by no later than **Friday, January 26**:

- "event" – Does this field include both custom and standard events? How do these events map to publicly disclosed events in https://ads.tiktok.com/help/article/standard-events-parameters?lang=en?

- "user_type" – This field contains numerical values. What do the numerical values mean?

- "country", "city", "locale" – Are these fields locations of the user or advertiser?

- Please provide a full list of sub-fields for the following: "properties", "predicted_properties", "intelligent_properties"

- Please provide an explanation or description of the following fields: "pixel_inspection", "received_dc", "tt_id_experimental_users", "idc",

"is_compliant", "is_onsite", "is_standard", "is_user_level", "uid",
"union_uuid", "req_id", "clue_id", "vid", "gab_am_users",
"pm_pc_users", "auto_email", "auto_phone_number",
"collector_version", "compliance_tags", "detection_uv",
"is_event_inferred", "flags_version", "is_first", "orit", "rit",
"should_counted", "tenant", "product_level3_id", "product_level5_id",
"pangle_am_matched_users", "pangle_cookie_users",
"pangle_id_experimental_users", "pangle_pm_matched_users",
"pangle_pm_users"

With regard to the portion of the Court's order that required Defendants to
produce data generated on a single day, Defendants maintained on the call that
the order does not require Defendants to produce documents showing how they
combined the data collected with other information to generate new data or to
make use of the collected data. Defendants also asked whether it would be
sufficient if they produced a few samples of the type of aggregated analysis that
is run from the non-user data that is collected.

Defendants' proposal is insufficient because Defendants have stated to the
Court that they do not merely conduct "aggregated analysis" with non-user
data. Rather, Defendants also use the data for machine learning and algorithm
improvement. Accordingly, Plaintiffs believe that the Court order encompasses
the production of at least the following:

- All the processing pipelines after the non-user data is collected, including
  (1) the pipeline names, names of machine learning algorithms, and names
  of aggregation tools, (2) technical documentation that shows how non-
  user data is used by these pipelines (for example, training machine
  learning algorithms, how data is aggregated) and what the results are, and
  (3) a sample of the output data or results from each pipeline; and

- Product requirement documents, technical design documents (including
  machine learning models and training strategies), and product and/or
  feature launch documents that reflect how Defendants use the non-user
  data.

Of course, these categories of documents are also encompassed in other
discovery requests that Plaintiffs have served and should be produced even if
Defendants maintain that they are not covered by the Court's November 27

order. To the extent that Defendants do not have documentary evidence of the above, please so confirm.

Best,
Gloria

---

**From:** Mancall-Bitel, Sophie <smancallbitel@wsgr.com>
**Sent:** Thursday, January 18, 2024 12:33 PM
**To:** Gloria Park <GPark@susmangodfrey.com>; Hsu, Sarah <sarah.hsu@wsgr.com>; Christopher J. Lee <clee@birdmarella.com>; aweibell@mayerbrown.com
**Cc:** Ekwan E. Rhow <erhow@birdmarella.com>; Marc E. Masters <mmasters@birdmarella.com>; Jonathan Rotter <jrotter@glancylaw.com>; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana Srinivasan <ksrinivasan@SusmanGodfrey.com>; Steven Sklaver <ssklaver@SusmanGodfrey.com>; Michael Gervais <MGervais@susmangodfrey.com>; Greg Fisk <GFisk@susmangodfrey.com>; Nicholas Loaiza <NLoaiza@susmangodfrey.com>; Jih, Victor <vjih@wsgr.com>; Yin, Kelly <kyin@wsgr.com>; John McCauley <JMcCauley@susmangodfrey.com>
**Subject:** RE: Griffith v. TikTok - Meet and Confer on Pltfs' Motion to Enforce Court's Order

EXTERNAL Email
Gloria:

But for a few data processing questions, TikTok has already complied with the Court's November 27 order.

You asked about the fields with "null," "0" or blank fields and about the scope of included devices/events. TikTok has been working on those questions, which came in right before the holidays. As you know, the production of a "one-day snapshot" is not something TikTok does as part of its normal business processes; it has required it to specify new queries, create tools, and implement them. TikTok is treating this as a high-priority request, but it requires a significant amount of human-hours and coordination across different groups to address. We hope to have answers and, if necessary, to produce a re-run "snapshot" in the next few weeks. TikTok is not refusing to comply—it simply takes time.

Your requests for multiple "snapshots," however, goes beyond what the Court ordered. That order specified one "snapshot." At no point in the parties' discussions or briefing on this matter, did Plaintiffs identify the need for multiple "snapshots" nor did the Court specify what those different versions would be. The November 27 order certainly says nothing about a separate production of "raw" or "generated" snapshots. Data that is sent to TikTok undergoes automatic cleaning, validation, quality control, de-duplication and aggregation of event data—that data can then be queried or placed in reports.

TikTok does not use the "raw" unprocessed data and it is not clear why Plaintiffs need a "snapshot" of the data in that form. Although we do not believe it is required by the Court's order, we will try to

produce a "raw" version.

The request for a snapshot of "generated" data, however, makes no sense.  There is no "generated" data in the sense you seek and it is not a part of TikTok's automated processing.  In yesterday's discussions, your focus seemed to concern instead the "use" of the data.  Any routine use is covered by other discovery requests and TikTok has already produced samples of the types of reports advertisers may see.  TikTok has no "snapshot" for any ad hoc queries of the data.

Needless to say, we believe there is no merit nor reason for a motion to compel at this point.  We hope to address the data processing questions in the near future and to get you a version of the "raw" data.

Kind regards,
Sophie

## WILSON SONSINI

### Sophia (Sophie) Mancall-Bitel

**(she/her)**
**direct: 323.210.2993**
**mobile: 310.709.6432**
smancallbitel@wsgr.com

**Wilson Sonsini Goodrich & Rosati**
1900 Avenue of the Stars, 28th Floor
Los Angeles, CA 90067

www.wsgr.com



---

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Sunday, January 14, 2024 2:57 PM
**To:** Mancall-Bitel, Sophie <smancallbitel@wsgr.com>; Hsu, Sarah <sarah.hsu@wsgr.com>; Christopher J. Lee <clee@birdmarella.com>; aweibell@mayerbrown.com
**Cc:** Ekwan E. Rhow <erhow@birdmarella.com>; Marc E. Masters <mmasters@birdmarella.com>; Jonathan Rotter <jrotter@glancylaw.com>; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana Srinivasan <ksrinivasan@SusmanGodfrey.com>; Steven Sklaver <ssklaver@SusmanGodfrey.com>; Michael Gervais <MGervais@susmangodfrey.com>; Greg Fisk <GFisk@susmangodfrey.com>; Nicholas Loaiza <NLoaiza@susmangodfrey.com>; Jih, Victor <vjih@wsgr.com>; Yin, Kelly <kyin@wsgr.com>; John McCauley <JMcCauley@susmangodfrey.com>; Gloria Park <GPark@susmangodfrey.com>
**Subject:** RE: Griffith v. TikTok - Meet and Confer on Pltfs' Motion to Enforce Court's Order

EXT - gpark@susmangodfrey.com

Counsel,

TikTok's reading of the Court's order is inconsistent with the parties' briefing on the issue, which expressly stated that "a sample of non-TikTok user data that Defendants collect, generate, and process on a single day" encompasses the following: "not just the non-TikTok user data that is *collected* on a single day but also such data that is *generated* or *processed* on a single day. The request covers all data that is generated (*e.g.*, new data created by combining non-TikTok user data collected with other information) and processed (*e.g.*, all copies of the data that is initially collected for downstream uses)." Dkt. 77. TikTok's reading of the Court's order "as requiring one snapshot of the data table containing event-level Pixel and Events API data that has been collected and processed, and from which aggregated analyses may be generated from time to time" is unsupported and confirms Plaintiffs' serious concerns about TikTok's failure to comply with the Court's order. Even more concerning is the fact that Plaintiffs laid out our reading of the scope of the Court's order in our December 15 email. If Defendants had a good-faith disagreement about that scope, they should have flagged the disagreement promptly, rather than waiting for a month and providing a belated, retroactive interpretation only after Plaintiffs expressed their plan to move to enforce the order.

As the record reflects, TikTok produced the initial data on December 11, and Plaintiffs analyzed the data within days and followed up with concerns about its deficiency on December 15. In the month since then, Defendants have failed to address a single question that Plaintiffs have raised. While we appreciate your position that producing the data is "not as simple as pushing a button," it is unclear why answering basic questions (like why there are redactions in the production and whether Defendants can provide descriptions of the 121 data fields) should take over a month.

Finally, as you know, this one-day sample data isn't just important in its own right but also informs other outstanding discovery disputes. For instance, many of the data fields reflected in the one-day sample data refers to Pangle, notwithstanding Defendants' representation that they do not use data collected through the Pixel and Events API for any purpose related to Pangle.

The parties have a scheduled meet and confer on Wednesday, January 17. Please be prepared to discuss this issue on that call.

Best,
Gloria

---

**From:** Mancall-Bitel, Sophie <smancallbitel@wsgr.com>
**Sent:** Friday, January 12, 2024 5:12 PM
**To:** Gloria Park <GPark@susmangodfrey.com>; Hsu, Sarah <sarah.hsu@wsgr.com>; Christopher J. Lee <clee@birdmarella.com>; aweibell@mayerbrown.com
**Cc:** Ekwan E. Rhow <erhow@birdmarella.com>; Marc E. Masters <mmasters@birdmarella.com>; Jonathan Rotter <jrotter@glancylaw.com>; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana Srinivasan <ksrinivasan@SusmanGodfrey.com>; Steven Sklaver <ssklaver@SusmanGodfrey.com>; Michael Gervais <MGervais@susmangodfrey.com>; Greg Fisk <GFisk@susmangodfrey.com>; Nicholas Loaiza <NLoaiza@susmangodfrey.com>; Jih, Victor <vjih@wsgr.com>; Yin, Kelly <kyin@wsgr.com>; John McCauley <JMcCauley@susmangodfrey.com>
**Subject:** RE: Griffith v. TikTok - Meet and Confer on Pltfs' Motion to Enforce Court's Order

EXTERNAL Email
Gloria:

TikTok strongly disagrees that its production of a 24-hour data table snapshot does not meet the Court's November 27 order. We read the Court's order as requiring one snapshot of the data table containing event-level Pixel and Events API data that has been collected and processed, and from which aggregated analyses may be generated from time to time. That is what TikTok produced. In practicality, we do not believe a sample of raw, pre-processed data would provide Plaintiffs any meaningful new information and are happy to discuss this on a meet-and-confer.

With respect to Plaintiffs' other questions, as we have previously explained, the process of identifying and querying 24 hours' worth of unmatched Pixel and Events API data is complex, requiring input from multiple people at the company. It is not as simple as pushing a button. Given this complexity, it has taken our client time to work through your follow-up questions.

We would appreciate scheduling a meet-and-confer towards the end of next week in the hopes that we can reach resolution and focus on the outstanding discovery on both sides.

Kind regards,
Sophie

## WILSON SONSINI

### Sophia (Sophie) Mancall-Bitel

**(she/her)**
**direct: 323.210.2993**
**mobile: 310.709.6432**
smancallbitel@wsgr.com

---

**Wilson Sonsini Goodrich & Rosati**

1900 Avenue of the Stars, 28th Floor
Los Angeles, CA 90067

www.wsgr.com



---

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Thursday, January 11, 2024 11:18 AM
**To:** Mancall-Bitel, Sophie <smancallbitel@wsgr.com>; Hsu, Sarah <sarah.hsu@wsgr.com>;
Christopher J. Lee <clee@birdmarella.com>; aweibell@mayerbrown.com
**Cc:** Ekwan E. Rhow <erhow@birdmarella.com>; Marc E. Masters <mmasters@birdmarella.com>;
Jonathan Rotter <jrotter@glancylaw.com>; kwolke@glancylaw.com; glinkh@glancylaw.com; Kalpana
Srinivasan <ksrinivasan@SusmanGodfrey.com>; Steven Sklaver <ssklaver@SusmanGodfrey.com>;
Michael Gervais <MGervais@susmangodfrey.com>; Greg Fisk <GFisk@susmangodfrey.com>;
Nicholas Loaiza <NLoaiza@susmangodfrey.com>; Jih, Victor <vjih@wsgr.com>; Yin, Kelly
<kyin@wsgr.com>; John McCauley <JMcCauley@susmangodfrey.com>; Gloria Park
<GPark@susmangodfrey.com>
**Subject:** Griffith v. TikTok - Meet and Confer on Pltfs' Motion to Enforce Court's Order

EXT - gpark@susmangodfrey.com

---

Counsel,

Plaintiffs plan to file a motion to enforce the Court's November 27, 2023 order
requiring Defendants to produce, in part, a sample of non-TikTok user data that
Defendants collect, generate, and process on a single day. Dkt. 74. The Court
ordered Defendants to produce this data by December 11, 2023. The data that
Defendants produced on that day is deficient, at least for the reasons outlined in
my December 15 email. To date, Defendants have failed to produce
supplemental data or even to answer the questions that Plaintiffs asked about
the deficiencies in the month since the production. Defendants are in violation
of the Court's order. Please provide your availability this week or early next
week to meet and confer on Plaintiffs' motion.

Best,
Gloria

---

**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

EXHIBIT 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(EASTERN DIVISION - RIVERSIDE)

| | | |
|---|---|---|
| BERNADINE GRIFFITH, | ) | CASE NO: 5:23-cv-00964-SB-E |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| TIKTOK, INC, ET AL, | ) | Friday, October 20, 2023 |
| | ) | |
| Defendants. | ) | (9:30 a.m. to 10:43 a.m.) |

HEARING RE:

PLAINTIFF'S MOTION TO COMPEL DISCOVERY REGARDING WEBSITES
WITH TIKTOK SDK INSTALLED, DAMAGES CALCULATION, AND CUSTODIANS
[DKT.NO.50]

BEFORE THE HONORABLE CHARLES F. EICK,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:            SEE PAGE 2

Court Reporter [ECRO]:   CourtSmart

Courtroom Deputy:        Valencia Munroe

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES</u>:


For Plaintiff:                  YOONHEE G. PARK, ESQ.
                                Susman Godfrey
                                1301 Avenue of the Americas,
                                32nd Floor
                                New York, NY 10019
                                212-336-8330

                                MICHAEL GERVAIS, ESQ.
                                Susman Godfrey
                                1900 Avenue of the Stars
                                Suite 1400
                                Los Angeles, CA 90067
                                310-789-3100

                                JONATHAN M. ROTTER, ESQ.
                                Glancy Prongay & Murray
                                1925 Century Park East
                                Suite 2100
                                Los Angeles, CA 90067
                                310-201-9150

For Defendants:                 SOPHIA MANCALL-BITEL, ESQ.
                                VICTOR H. JIH, ESQ.
                                Wilson Sonsini Goodrich & Rosati
                                1900 Avenue of the Stars
                                28th Floor
                                Los Angeles, CA 90067
                                424-446-6900

1      **Los Angeles, California; Friday, October 20, 2023; 9:30 a.m.**

2                           **(Call to Order)**

3                  **THE CLERK:**  Calling Case Number EDCV 23-964-SB,

4      *Bernadine Griffith versus TikTok, Inc., et al.*

5                  Counsel, please state your appearances.

6                  **MS. PARK:**  Good morning, Your Honor, Gloria Park of

7      Susman Godfrey for the Plaintiff.

8                  **THE COURT:**  Thank you.

9                  **MR. ROTTER:**  Good morning, Your Honor, Jonathan

10     Rotter of Glancy Prongay and Murray also for the Plaintiff.

11                 **THE COURT:**  Thank you.

12                 **MR. GERVAIS:**  Good morning, Your Honor, Michael

13     Gervais of Susman Godfrey for the Plaintiffs.

14                 **THE COURT:**  Thank you.

15                 **MR. JIH:**  Good morning, Your Honor, Victor Jih for

16     the Defendants.

17                 **THE COURT:**  Thank you.

18                 **MS. MANCALL-BITEL:**  Good morning, Your Honor, Sophia

19     Mancall-Bitel from Wilson Sonsini for the Defendants.

20                 **THE COURT:**  Thank you.

21                 This matter is before the Court for a hearing on

22     Plaintiff's Motion to Compel.  I've read all of the papers

23     filed in connection with the motion and I am prepared to hear

24     argument.  First, for the moving party, please.

25                 **MS. PARK:**  Thank you, Your Honor, Gloria Park of

4

1    Susman Godfrey.  Plaintiff seeks four categories of documents

2    in the motion to compel and as to all four categories,

3    Defendants have not disputed the relevance of the documents

4    sought.  Instead, they complained that the discovery requests

5    are premature or burdensome or that they're working on it.

6            Respectfully, Your Honor, the requests are not

7    premature and in light of class certification motion that is

8    due in less than four months in early February, the Court

9    should order Defendants to produce these documents now.

10           **THE COURT:**  Some of your requests are relevant only

11   to the class issues.  Would you agree?

12           **MS. PARK:**  Your Honor, by "class issues," do you mean

13   class certification issues?

14           **THE COURT:**  Well, I mean, issues beyond the

15   Plaintiff's -- the named Plaintiff's individual claims.

16           **MS. PARK:**  Your Honor, I think they're relevant both

17   to class issues and issues that go specifically to the named

18   Plaintiff.

19           **THE COURT:**  But the scope of some of your requests

20   would be relevant only to class issues, correct?  For example,

21   asking for a list of websites that are customers of TikTok that

22   the named Plaintiff never visited.

23           **MS. PARK:**  Your Honor, respectfully, we think that

24   actually is relevant to the named Plaintiff's allegations and

25   here is why.  The full list of websites is relevant -- directly

5

1    relevant to learn what other websites Defendants have

2    intercepted data on the named Plaintiff from.  So we know about

3    the three that are named in the complaint but given --

4            **THE COURT:**  All right.  Then let me rephrase my

5    question.  Asking for information concerning websites that the

6    named Plaintiff knows she never visited.

7            **MS. PARK:**  Yes, Your Honor.  We -- it's our

8    understanding that the TikTok SDK is on hundreds of thousands

9    of websites.  And, yes, we don't know that the named Plaintiff

10   has visited all hundreds of thousands of websites but I --

11           **THE COURT:**  Right.  And so your -- the scope of your

12   requests includes but is not limited to discovery that would be

13   relevant only to the class issues, correct?

14           **MS. PARK:**  Correct, Your Honor.

15           **THE COURT:**  All right.  Have you, do you believe, met

16   your burden of advancing a prima facie showing that the class

17   action requirements of Rule 23 are satisfied or that the

18   discovery is likely to produce substantiation of the class

19   allegations?  That's the *Mantolete* standard.

20           **MS. PARK:**  Yes, Your Honor.  We believe we have met

21   the standard and I'm happy to go --

22           **THE COURT:**  Your papers don't even discuss the

23   standards under Rule 23; do they?

24           **MS. PARK:**  They do not, Your Honor.

25           **THE COURT:**  All right.  But you believe you've met

1   the showing required by something that's not in your papers?

2          **MS. PARK:**  Yes, Your Honor, because I believe our

3   papers lay out why all four categories of documents we're

4   seeking are directly relevant to class discovery and to merits

5   discovery.  And I'm happy to go through each of those

6   categories if your -- if that would be helpful, Your Honor.

7          **THE COURT:**  No.  The relevance is not at issue.  What

8   issue -- at issue is whether the Court should allow this kind

9   of broad class discovery pre-certification.  Now, the Court has

10  discretion to do it regardless of your failure to demonstrate a

11  prima facie case but in trying to determine whether I'm going

12  to exercise that discretion, I wanted to know what you thought

13  of the issues.

14         **MS. PARK:**  Yes, Your Honor.  So two points -- one,

15  Judge Blumenfeld has not bifurcated discovery here between

16  class discovery and merits discovery.  And he's actually set an

17  expedited schedule with all of these deadlines, class

18  certification deadlines and fact discovery deadlines coming up

19  within the next six, seven months.

20         **THE COURT:**  Do you think that his October 6th ruling

21  has any impact on this motion?

22         **MS. PARK:**  Yes, Your Honor, it does.

23         **THE COURT:**  What impact?

24         **MS. PARK:**  So one of the arguments that the

25  Defendants have advanced is that discovery needs to be limited

1   to the three websites that the Plaintiff knows she has visited.

2   But that position is directly contradicted by Judge

3   Blumenfeld's October 6th ruling because that order upheld the

4   invasion of privacy claims directly recognizing that we alleged

5   that Plaintiff has visited numerous websites on which the

6   TikTok SDK, that TikTok design is installed and TikTok can then

7   assemble the data from all of those websites to create a

8   "comprehensive profile" on the Plaintiff.

9         So I think the fact that our invasion of privacy and

10  seclusion upon intrusion claim survived shows that we are

11  entitled to discovery not just on the three websites but to all

12  websites that have the SDK installed.

13        **THE COURT:**  The Defendants haven't limited their

14  discovery to just those three websites; have they?

15        **MS. PARK:**  Well, that's their argument as to why

16  they're not producing --

17        **THE COURT:**  My question is, they have not limited the

18  discovery they've produced to you to just those three websites;

19  have they?

20        **MS. PARK:**  At times, they have, Your Honor.

21        **THE COURT:**  And at times, they haven't?

22        **MS. PARK:**  Correct.

23        **THE COURT:**  In your supplemental memorandum, you say

24  that they promise to produce a spreadsheet of advertisers by

25  October 6 -- advertisers that have used the code, the SDK,

8

1  whatever you call it, the pixel, advanced API.  Did they

2  provide that spreadsheet to you yet?

3      **MS. PARK:**  We received an email from them last night

4  saying they'll produce a list today which we haven't received

5  yet.  We immediately asked for clarification, whether that list

6  is going to be a complete list of all websites and we haven't

7  heard any sort of response yet.  We'll obviously see what they

8  produce but at this point, we don't have any assurance that the

9  complete list is coming.

10      **THE COURT:**  You said in your supplemental memorandum

11  that some of the information you had for the thousands of

12  advertisers contained abbreviations and incomplete names such

13  that you couldn't decipher what it was that you had.  Is that

14  still a problem?

15      **MS. PARK:**  They again told us yesterday that they

16  will produce something to help us out there but we haven't

17  received it yet.

18      **THE COURT:**  Apart from putting it in your

19  supplemental memorandum, did you do anything toward reaching

20  out to Defense side for help interpreting the documents?

21      **MS. PARK:**  Yes, Your Honor.  We have continued to ask

22  them for updates on their investigations and -- for these

23  documents and --

24      **THE COURT:**  That's not my question -- help

25  interpreting the abbreviations and incomplete names on

1    documents you already had.  Have you asked them for help doing

2    that?

3             **MS. PARK:**  Yes, we have.

4             **THE COURT:**  And what did they say?

5             **MS. PARK:**  They said they're investigating a way to

6    help us and the update received is what I told Your Honor

7    about, that they'll produce something to help us out.

8             **THE COURT:**  So that I can understand the materiality

9    of some of this discovery you seek, let's posit that you get a

10   complete listing of all of the advertisers in question, all of

11   TikTok's customers in question and you say that's relevant to,

12   among other things, identifying the class members, would you be

13   able to, from that list, identify class members?

14            **MS. PARK:**  I think it would one input into

15   identifying class members.

16            **THE COURT:**  Say that again.  I'm sorry.

17            **MS. PARK:**  It would be one input into identifying

18   class members.

19            **THE COURT:**  One input but it wouldn't be sufficient

20   in and of itself?

21            **MS. PARK:**  No, I don't think so, Your Honor.

22            **THE COURT:**  How would you go about using that as an

23   input to identify class members?

24            **MS. PARK:**  Because then we would know which websites

25   the SDK has been installed.  So --

1          **THE COURT:**  Right.  But you still wouldn't know who

2    visited the websites and whether those visitors were TikTok

3    users or not?

4          **MS. PARK:**  That's correct, Your Honor, but I think

5    that list would be a starting point so that we can then seek

6    third-party discovery to reach out to the websites on which the

7    SDK installed to get further discovery on class member

8    identification.

9          **THE COURT:**  You are asking for all of the negotiated

10   contracts that TikTok has with its advertisers; is that right?

11         **MS. PARK:**  Yes, Your Honor.

12         **THE COURT:**  Why do you need all of those?

13         **MS. PARK:**  We need those agreements, Your Honor,

14   because Defendants have made that issue relevant by relying on

15   these -- what they call "bespoke data terms" to say that our

16   class is not certifiable.  So if you look at the fourth page of

17   Defendants' supplemental memorandum, they actually preview that

18   they're going to attack certifiability using these data terms

19   but then they're not producing them.

20         So, Your Honor, we believe that's highly prejudicial

21   to us and they can't have it both ways.  If they're going to

22   make this argument about variations on data terms, then they

23   need to produce those terms to us or if they're not going to

24   produce those terms, then they should be precluded from making

25   any sort of arguments that relies on the supposed variation

1   across data terms of the websites.

2       **THE COURT:**  Request Number 23 asks not only for the

3   agreements but also for representations to third-party websites

4   concerning the TikTok SDK.  What does that mean,

5   "representations to"?

6       **MS. PARK:**  Yes, Your Honor.  So what we had in mind

7   was, again, because Defendants have emphasized that the

8   websites are the ones that have the relationship with the

9   website visitors and their privacy policies go toward issues

10  like their consent defense, what we're seeking is some sort of

11  communications or warning letters or something that makes sure

12  that the Defendants are enforcing or making sure that the

13  websites are enforcing their privacy policies with the users.

14      **THE COURT:**  Your request is not limited by subject

15  matter.  It would ask for any representation on any subject --

16  well, concerning the TikTok SDK.  That's the subject matter

17  limitation -- the only subject matter limitation, correct?

18      **MS. PARK:**  Yes, Your Honor.  That is the subject

19  matter limitation.

20      **THE COURT:**  So you think any representation

21  concerning the TikTok SDK would be relevant?

22      **MS. PARK:**  We do think so, Your Honor.  And, again,

23  to the extent that these are TikTok advertisers, we're not

24  seeking representations with regard to advertising on TikTok or

25  any other relationship between TikTok and the websites.  We're

12

1   asking specifically for the TikTok SDK which we believe is

2   appropriately tailored.

3          **THE COURT:**  As to some of these requests, the Defense

4   complains about the lack of a temporal limitation.  Do you

5   think there should be a reasonable temporal limitation as to

6   any of these requests?

7          **MS. PARK:**  Your Honor, I believe the temporal

8   limitation is set by when TikTok released the SDK.  So the SDK

9   has two different trackers within it.  The earlier release of

10  the tracker, which is the pixel, was released in 2020.  So we

11  wouldn't be seeking documents as to RFP 23 from before whatever

12  the pixel was --

13         **THE COURT:**  I'm sorry.  You lost me there.  Go ahead.

14         **MS. PARK:**  Oh, Your Honor, the pixel, we believe, was

15  released in 2020.  So I believe that sets a natural temporal

16  limitation.

17         **THE COURT:**  And there were -- there was a different

18  SDK released later?

19         **MS. PARK:**  Yes.  The event's API, I believe, was

20  released after the pixel.  So as to the event's API, it would

21  be even a narrower temporal scope.

22         **THE COURT:**  I wanted to ask you about Request 18,

23  please.  That one asks for documents sufficient to identify all

24  revenues or profits or projections thereof that Defendant made

25  or anticipated making through the collection of Plaintiff's

1   data.  As I understand their response, they do not sell

2   collected data and, consequently, there is no revenue or

3   profits resulting from the collection of the data.

4          Why doesn't that response mean that there aren't any

5   documents responsive to Request Number 18?

6          **MS. PARK:**  Your Honor, you're correct that they've

7   said they don't sell user data and even if that's true, they

8   have acknowledged that they still use the data and they've said

9   that they used the data for things like machine learning and

10  improving their algorithms.

11         **THE COURT:**  Right.

12         **MS. PARK:**  And those things, improving their

13  algorithms, that is a big revenue generator for TikTok.  That

14  is how TikTok makes money, by being able to predict what users

15  -- what kind of ads users want to see, what kind of videos they

16  want to watch and then tailoring content to their audience.

17  And so to the --

18         **THE COURT:**  Right.  You're saying it improves their

19  operation.  It may, what, enable them to charge more for

20  advertising on TikTok?

21         **MS. PARK:**  That's one way that the data would improve

22  their revenue, yes, Your Honor.

23         **THE COURT:**  Okay.  Well, then take that hypothetical

24  and that's -- and I have said that they use it in various ways

25  and that it might enable them to improve their operations and

14

become an even more successful business.  Still, when you look
at Request 18, how in the world are they going to identify a
document or documents sufficient to show some sort of revenue
result from the use of Plaintiff's data?

       **MS. PARK:**  Your Honor, I acknowledge that there may
not be one single document out there that shows the revenue --

       **THE COURT:**  No, my point is, wouldn't -- if you're
arguing some very indirect relationship between business
success and this data collection, it might be arguable but if
you're asking for documents sufficient to demonstrate some sort
of a causal connection other than all of the documents
reflecting their business operations for the last X number of
years, I mean, what are they going to identify?

       **MS. PARK:**  Your Honor, that's why we have asked them
for documents that show how they're using --

       **THE COURT:**  That's a different request.  I'm just
asking about 18.

       **MS. PARK:**  With regard to 18, Your Honor, we believe
a subset would be documents that just identify the specific
algorithms, the specific programs, the specific services and
processes that's using the non-user data.

       **THE COURT:**  I wouldn't think so because that's asking
for revenues or profits or projections and the documents you
just described don't do that.

       But let's move on.  I want to ask you about Number

1    50, please.  And this is closer to what you're talking about, I

2    think.  50 asks for all documents concerning any way in which

3    they have benefited from the conduct alleged in the lawsuit.

4         Now, understanding that they use collective data for

5    certain purposes, even so, realistically, how can you expect

6    them to produce all documents that concern all the ways in

7    which they arguably benefited from the use of the collective

8    data?  Again, wouldn't that be essentially under your theory

9    every document that concerns their business operation?

10        **MS. PARK:**  Your Honor, so, yes, the request may -- I

11   acknowledge that the request could have been drafted in a more

12   tighter way but I think the documents that we're seeking here

13   -- and documents that they have not produced at all, not even a

14   single document -- is documents showing how they're using the

15   data.  These -- they've now acknowledged that they used the

16   data but they're simultaneously taking the position that no

17   documents exist showing that use and we just don't think that's

18   realistic.

19        **THE COURT:**  Wait a minute.  You're saying that they

20   take the position that their -- they have no documents that

21   demonstrate how they used collective data to check the -- check

22   their advertising or improve their algorithms or they reflect

23   any of the other uses?

24        **MS. PARK:**  Yes, so two examples.  In their briefing,

25   they say that this request that Plaintiff is making, we're

1   seeking documents on imaginary, secret uses of data.  And I

2   think that kind of language --

3        THE COURT:  No, I'm just talking about what they've

4   acknowledged they've done with the data.

5        MS. PARK:  Yes.  So yesterday evening, this email

6   that they sent to us told us -- well, let me take a step back,

7   Your Honor.  They acknowledge in this briefing and previously

8   they've acknowledged to us that they used the non-user data for

9   machine learning and to improve certain algorithms.

10        THE COURT:  All right.

11        MS. PARK:  But then yesterday evening, they sent us

12   an email and one of the updates in that email is there are no

13   documents that exist to show those uses that they've

14   acknowledged.  And that we find hard to believe, Your Honor.

15        THE COURT:  Well, I don't have the document in front

16   of me that you reference because you only received it last

17   night but it is, I suppose, difficult to believe that data was

18   used in a particular way for particular purposes and there

19   would be no evidence, digital paper or otherwise showing that

20   that was done.  But I'll hear from Defense later.

21        Well, let me ask you a question about that.  All

22   right.  You -- let's say machine learning, improving

23   algorithms, what documents would you expect to exist that would

24   reflect that -- those uses?

25        MS. PARK:  So, Your Honor, I think there would be

1    emails and there would be descriptions of the specific

2    algorithms or the specific products, services, processes that

3    are getting this non-user data input.  But there has to be

4    internal documentation of the algorithms they're improving of

5    the programs that they're developing using this non-user data.

6    So I think that would just be one example of the documents that

7    would exist.

8           And if I may, Your Honor, on this category, I think

9    the history of the meet-and-confer is illuminating because at

10   our very first meet-and-confer, Defendants categorically said

11   that they don't see or use the data.  And with significant

12   probing from us, they've now acknowledged that they, in fact,

13   do use the data but they don't have documents on it.  And so

14   it's a shifting target and I believe that they need to produce

15   the documents showing their own acknowledged uses of the data.

16          **THE COURT:**  So you think if they say, we don't have

17   any documents reflecting these uses and they say that to you,

18   then if the Court orders them to produce the documents that

19   reflect the uses, they're just going to suddenly say, oh, here

20   they all are?

21          Ordinarily when a party represents in response to a

22   request for discovery that no responsive documents exist,

23   that's the end of the matter and the Court doesn't ordinarily

24   compel them to produce that which they say they cannot.  Do you

25   think I should vary from the usual procedure here because why,

```
 1   because you're suspicious by reason of the history of your

 2   meet-and-confer negotiations?

 3           MS. PARK:  It's not just suspicion from the meet-and-

 4   confer negotiations although their positions have shifted

 5   dramatically in that -- in those negotiations.  But as Your

 6   Honor said earlier, they have acknowledged uses of the data

 7   and --

 8           THE COURT:  Because it's simply a little hard to

 9   believe that there wouldn't be a paper trail.  It's just a

10   matter of common sense.

11           MS. PARK:  Yes.

12           THE COURT:  Let me ask you about a couple of other

13   requests, please.  Number 14 asks to identify all current and

14   former officers, directors, managers, employees and consultants

15   with knowledge of the conduct of Defendants described in the

16   operative complaint.

17           They respond at one point that the conduct described

18   in the operative complaint is so broad in nature that every

19   current and former officer, director, manager, employee and

20   consultant would have some knowledge as to something that's

21   alleged in the complaint.

22           Is that a fair point and if it is, isn't Request

23   Number 14 meaningless?

24           MS. PARK:  Your Honor, that is a fair point and the

25   parties met and conferred on the issues and the parties agreed
```

1   to narrow that to officers, directors, managers, employees,

2   consultants with knowledge on the TikTok SDK's collection of

3   non-user data.

4           And then in order to speed things along even more, we

5   asked them to please investigate whether there are

6   organizational charts and please just produce the

7   organizational charts.

8           **THE COURT:**  Well, they said they don't have any.

9           **MS. PARK:**  And now they've said they don't have

10  either formal or informal organizational charts.

11          **THE COURT:**  So what are you asking the Court to do

12  with respect to Request Number 14?

13          **MS. PARK:**  To the extent that there are other

14  documents that lay out the persons with knowledge and their

15  supervisory relationships within the corporate -- or within the

16  corporation, we believe the Defendants should produce those

17  documents.

18          **THE COURT:**  Their knowledge of what?

19          **MS. PARK:**  The knowledge of the TikTok SDK's

20  collection of non-user data which is how the parties narrowed

21  the request in meet-and-confers.

22          And, Your Honor, with regard to this final category

23  of documents, they have now said they don't have organizational

24  charts and then they also say, well, we shouldn't have to

25  produce any documents responsive to these four requests because

1    we gave you an interrogatory response that identifies eight

2    persons with knowledge.

3          But we do not believe that that interrogatory

4    response is a substitute for responsive documents to these four

5    requests.  For example, the interrogatory responses, that does

6    not include information on the person within TikTok who came up

7    with the idea of the TikTok SDK or the engineers that wrote the

8    code for the SDK or tested it or persons in charge of marketing

9    and making sure it's privacy-compliant interacting with the

10   websites and who those personnel supervisors are.

11         And as Your Honor can see, other requests within this

12   category also seek committee or board meetings -- board meeting

13   minutes and these are all documents that they have not disputed

14   the relevance of.  Yet they say they don't have to produce

15   because they don't keep org charts and because they gave us

16   this interrogatory response that identifies eight people with

17   knowledge.

18         **THE COURT:**  To the extent the Court grants your

19   motion, you've asked for a deadline for compliance with the

20   order seven days hence.  Given the breadth of the request at

21   issue, do you think that's realistic?

22         **MS. PARK:**  We do, Your Honor, because we served these

23   requests in late June and they've been outstanding for months

24   and they have represented --

25         **THE COURT:**  But they will not know until I rule what

21

1    part of the request or the part -- is the part to which they're

2    going to have to respond.

3            **MS. PARK:**  Yes, Your Honor, but if you look at their

4    response, they say they're working on all of it or they're --

5    they have already agreed to produce all of it.  So it is our

6    hope and expectation that they have already been doing the

7    investigation into all of these categories of documents.  So it

8    won't be a surprise to them that they have to produce these

9    documents that they haven't challenged the relevance of.

10           **THE COURT:**  Well, what's the urgency?

11           **MS. PARK:**  Your Honor, the urgency is that our class

12   certification motion is due in early February which is less

13   than four months from now and we don't have some of these

14   foundational pieces of discovery, like the list of websites

15   that have the SDK installed.  So we have a lot of work to do

16   between now and February 9th.  And the documents that we're

17   seeking in this motion are some of the most basic foundational

18   pieces of discovery that we need.

19           **THE COURT:**  Do the documents you're seeking have

20   anything to do with a plan to move to amend by the deadline for

21   such motions?

22           **MS. PARK:**  So, Your Honor, Judge Blumenfeld gave us

23   until today to file an amended complaint and we will do so.  We

24   believe we've, frankly, been prejudiced by having to do that

25   without any of this discovery that we've sought and so we will

22

1  file the amended complaint today but I think all of this

2  discovery is necessary to be able to determine whether we need

3  to move for leave to amend a second time.  I don't think that's

4  out of the question.

5          **THE COURT:**  So you're saying you think part of the

6  urgency is that you may want to move to amend and there's a

7  deadline for such motions in -- what is it -- November 13 or

8  something like that?

9          **MS. PARK:**  Actually, Your Honor, that deadline has

10 passed.  That deadline was last week, October 13th, but along

11 with Judge Blumenfeld's motion-to-dismiss opinion, he gave us

12 until October 20th, which is today, to file an amended

13 complaint.

14         **THE COURT:**  Just a minute, please.

15         **MS. PARK:**  Oh, Your Honor, November 13th is the

16 hearing date for any motion for leave to amend.

17         **THE COURT:**  Okay.  That's what confused me.  But you

18 would have to file it, obviously, well in advance.

19         All right.  Anything further before I hear from the

20 Defendants?

21         **MS. PARK:**  No, Your Honor.  Thank you for your time.

22         **THE COURT:**  Thank you.

23         Argument for the Defendants, please.

24         **MR. JIH:**  Thank you, Your Honor.  I'm going to handle

25 two of the issues in terms of the list of advertisers and then

23

1    the agreements.  And then my colleague is going to handle the

2    issues about uses among user data and individuals that might

3    have knowledge.

4            **THE COURT:**  Go over that again, please.

5            **MR. JIH:**  Okay.  So I will cover the first two

6    topics, the list of advertisers and agreements with

7    advertisers.  And the remaining issues, I think, specifically

8    uses of non-user data and people with knowledge, my colleague

9    is going to handle.

10           **THE COURT:**  All right.

11           **MR. JIH:**  So on the list of advertisers, what we

12   produced -- we produced to the Plaintiffs three weeks ago a

13   list beyond the three websites identified in the complaint of

14   all --

15           **THE COURT:**  Let me ask you this.  In response to

16   Request Number 1, you promised to produce non-privileged

17   documents sufficient to show all third-party websites that use

18   or have used the pixel or advanced APL.  That's in your

19   response.  Have you done that?

20           **MR. JIH:**  In two phases and as of today, we will be

21   -- we will have produced everything we have.  So --

22           **THE COURT:**  Have you done that?

23           **MR. JIH:**  We've done a part and we'll complete it

24   today.  So let me explain --

25           **THE COURT:**  Why has it taken you so long?

1          **MR. JIH:**  Because that data requires our engineers to

2  create special tools to export the information.  It doesn't

3  exist in a way that the Plaintiffs want because we don't use

4  the data in that way.  So we -- there hasn't been any

5  resistance on our part.  It's been --

6          **THE COURT:**  You don't know who your advertisers are?

7          **MR. JIH:**  Not in a comprehensive list.  We can do

8  individual queries.  So the list we gave three weeks ago were

9  the advertisers who are current that go back for the ones that

10 use this year.  They wanted to go into the past.  So we had to

11 create a tool --

12         **THE COURT:**  Well, if I grant the motion and order you

13 to produce the documents responsive to Request Number 1 within

14 seven days, you've got no problem with that?

15         **MR. JIH:**  The reality is we would have already

16 complied.  We produced 88,000 websites three weeks ago and

17 we've produced over half a million as of today.  And that's the

18 extent of our data that goes back 900 days and it includes

19 everyone that uses the SDK the way they defined it.  And it

20 includes, since they wanted it, a URL where they can go in and

21 type in themselves to see the website.  That's something we

22 custom added in.

23         So as of today, they will have a list of over 600,000

24 websites that use the TikTok SDK including the URL that they

25 want.  And we think we've actually -- I mean, I don't think

1    that's a record of delay, Your Honor.  I think we've gone way

2    beyond the three websites named in the complaint and we've

3    worked really hard to get it done this quickly.

4           And they knew we were going to do it.  I think they

5    just wanted the threat of an order over our head.  But we did

6    it.  We're going to have it done.  It's in the process of being

7    produced today.  And I think it's more than sufficient.

8    Anything beyond that, Your Honor, I think is disproportionate

9    to the needs of the case, especially since this is supposed to

10   be a class.

11          **THE COURT:**  I'm -- I don't understand what you're

12   arguing.

13          **MR. JIH:**  So I'm thinking we've complied, Your Honor.

14   I don't think there's any basis for an order against us on that

15   request.  We're basically giving virtually --

16          **THE COURT:**  The basis is that you didn't comply

17   before the order -- before the motion was filed during the

18   meet-and-confer process and that you didn't comply afterward

19   and that you opposed the motion.

20          **MR. JIH:**  What we said, Your Honor, is they filed the

21   motion even though they acknowledge we said we are about to

22   give it to you, the list we have immediately.

23          **THE COURT:**  You said, among other things, the

24   discovery sought is not proportional to the needs of the case.

25   That's Number 16 on the joint stipulation.

1      **MR. JIH:**  But we agreed --

2      **THE COURT:**  So why did you argue that in opposition

3  to the motion if you were going to fulfill your promise to

4  produce the documents responsive to Request Number 1?

5      **MR. JIH:**  Because that, Your Honor, gives us cover

6  for the fact that it's taking us a little bit longer than they

7  would like and the fact that we've got the most accessible to

8  them first is just a reflection of the fact that the additional

9  data they wanted took longer.

10     **THE COURT:**  So this great burden that you complain

11  about to produce whatever it was that was requested not only in

12  Number 1 but in the other request -- this great terrible burden

13  that causes so much time, I presume, and so much money and so

14  much delay, where is the evidence before the Court to support

15  your contention of disproportionality to support your

16  contention of burden?

17     **MR. JIH:**  Your Honor, we have not --

18     **THE COURT:**  You don't have any admissible evidence

19  before the Court concerning the extent of the burden; do you?

20     **MR. JIH:**  Because we focused on producing it and

21  that's why we're not trying to --

22     **THE COURT:**  The answer to my question is you have no

23  admissible evidence before the Court to support your argument

24  regarding burden and disproportionality, correct?

25     **MR. JIH:**  What -- because we're not arguing that for

1    the list of advertisers here today.  We've decided to comply --

2          **THE COURT:**  You're not arguing it.  You're arguing it

3    on Page 16 of the joint stipulation.

4          **MR. JIH:**  But despite that objection, Your Honor, I'm

5    here to tell the Court that we are complying and --

6          **THE COURT:**  And the answer to my question regarding

7    disproportionality and burden is no admissible evidence before

8    the Court?

9          **MR. JIH:**  Well, no.  I think what is admissible, Your

10   Honor, is that we have the list of 88,000 websites beyond the

11   three.  And the question -- even if it just takes time to

12   print, printing this list is excessive compared to what benefit

13   it gives them.  And the fact that we took another half a

14   million --

15         **THE COURT:**  Your representations are not evidence,

16   not admissible evidence.

17         **MR. JIH:**  No, but it's in the argument, Your Honor,

18   that we've produced the list.

19         **THE COURT:**  It's in an argument.  There is a

20   declaration from counsel and a declaration is -- does -- is not

21   -- does not have admissible evidence.  It's dependent upon

22   hearsay, what somebody told counsel.

23         **MR. JIH:**  Your Honor, we didn't --

24         **THE COURT:**  So you have nothing.

25         **MR. JIH:**  That's not true, Your Honor.  We have both

28

1    sides acknowledging it in the joint stipulation.  So it's in

2    the stipulation.  We are not disputing it in evidentiary --

3            **THE COURT:**  You have both sides acknowledging what --

4            **MR. JIH:**  That we've produced a list --

5            **THE COURT:**  -- the disproportionality of the request?

6            **MR. JIH:**  No, that we've produced a list of 88,000

7    with more to come and that's not in dispute.

8            **THE COURT:**  For all I know, as far as admissible

9    evidence is concerned, you produced that list with one stroke

10   -- one key stroke.

11           **MR. JIH:**  Your Honor, I guess the reason why I'm

12   having a disconnect here is we're not asking you to not --

13   we're not asking you to say we don't have to produce it because

14   we're producing it.  Add it's literally coming today.  And it's

15   six times this list of --

16           **THE COURT:**  My point is you should not have opposed

17   the motion as to Request Number 1 and argued disproportionality

18   of the request --

19           **MR. JIH:**  The reason we had --

20           **THE COURT:**  -- because you had promised already to

21   produce the responsive documents and unless you were reneging

22   on that promise, you shouldn't have opposed the motion.

23           **MR. JIH:**  The reason was that the motion --

24           **THE COURT:**  And if you were going to oppose the

25   motion and argue disproportionality and burden, you should have

1    provided some admissible evidence to support the argument.

2            So let's move on.  What's your next point?

3            **MR. JIH:**  Okay.  Your Honor, the next point is in

4    terms of the agreements.  Again, we argue it was

5    disproportionate and not relevant.  The three websites

6    identified by the named Plaintiff, we've produced the

7    agreements for those three.

8            **THE COURT:**  Your response to Request Number 23 was

9    that you would produce any non-privileged responsive documents.

10   That's what you said in your request -- I'm sorry -- in your

11   response.

12           **MR. JIH:**  So Number 23 states that we object -- the

13   phrases are too broad but we would --

14           **THE COURT:**  The last sentence, "TikTok will produce

15   any non-privileged responsive documents."  Have you done that?

16           **MR. JIH:**  I don't -- Number 23 -- let me just look

17   real quick to make sure this is the page.  Well, we said we

18   would produce subject to our objections and we objected to the

19   fact that it's extremely burdensome because it's not relevant

20   to her claims.  So subject to that limitation --

21           **THE COURT:**  Oh, oh, you meant in your response that

22   when you said TikTok will produce any non-privileged responsive

23   documents -- what you really meant was TikTok will produce any

24   non-privileged responsive documents that it considers

25   proportional to the needs of the case?

1          **MR. JIH:**  Well, I acknowledge that it may be a little

2   ambiguous but in the meet-and-confer, they clarified.  We

3   stated our position and so they understood and that's why their

4   motion --

5          **THE COURT:**  Yes, in the meet-and-confer, you

6   retreated from the position that you expressed in your

7   response.  At least that's the way it appears to the Court.

8          **MR. JIH:**  It was not the way it was intended and it

9   certainly was -- they were never under any impression that we

10  promised to produce all agreements.  It was very clear that we

11  had a dispute over that.  And what we told them was we thought

12  anything beyond the three websites goes too far because they

13  don't need it.  None of the issues depend on us claiming a

14  website breached a promise to us or breached a representation.

15  It's not a defense.

16         **THE COURT:**  They claim that you foreshadow your

17  defense to the anticipated class certification motion in a way

18  that requires that they see the terms of negotiated agreements.

19         **MR. JIH:**  And it grossly misstates --

20         **THE COURT:**  Why is that wrong?

21         **MR. JIH:**  -- what we said.  What we said was, we

22  don't think it's relevant and to the extent it is or they claim

23  it is, it only shows an additional individualized issue.  Well,

24  we took the position is you don't need it and if you think it's

25  relevant, that doesn't help you with class certification.  It

31

1   hurts you on class certification.  But we've never in any way

2   in this case asserted a defense based on the --

3           **THE COURT:**  Well, whether it helps them or it hurts

4   them, it's relevant.

5           **MR. JIH:**  But that's the quote they're taking out of

6   context.  We did not foreshadow that we're going to argue

7   individual issues on agreements with websites to be the basis

8   for not class -- for not having class certification.  They

9   can't quote that.  The quote that they're referring to just

10  says, to the extent you think it's relevant, we think it's

11  further individualized but we don't think it's relevant.  So I

12  don't think we've made that concession.

13          And certainly what individual websites may have said

14  to their users may be relevant but nothing about any

15  representation or discussion between us and the websites has

16  anything to do with any of the defenses or the issues in this

17  case and they haven't articulated why it might.  So I think

18  we've complied.

19          And by the way, they have the standard form

20  provisions on the SDK.  They want us --

21          **THE COURT:**  Have you searched for representations

22  that you made to your advertisers concerning the pixels, the

23  SDK, the whatever?

24          **MR. JIH:**  We've certainly, with respect to the three

25  websites, followed up on any kind of discussion with the

1  websites about the use of non-user data -- non-TikTok user

2  data.  We didn't identify any but we have not gone through

3  individual negotiation files for all of the other advertisers.

4  Nor do we have any reason to believe there would be.

5          Even in the three they identified, when we pulled up

6  their agreements which are not just about the SDK -- they're

7  all agreements.  In fact, there isn't even a Hulu agreement.

8  The agreement is a Disney agreement which applies to Hulu.

9  They have maybe some provisions that might relate to SDK and in

10  those three provisions, there were no changes from the standard

11  SDK form they already have.

12          So we gave them the form SDK provisions and then the

13  three we looked for, because the three are mentioned in the

14  complaint, have no deviation from the standard and yet they say

15  we have to go chase down every single possible deviation but we

16  don't remember any, don't think they would be and it's not

17  relevant to any of the issues in the case.

18          **THE COURT:**  How many separately negotiated agreements

19  are there?

20          **MR. JIH:**  Two thousand three hundred and ninety.  And

21  there are over, of course like I said, historically 600,000

22  users of the pixel and the SDK as we defined it.  And out of

23  those, most just don't have any agreement.  And in 2,390 --

24          **THE COURT:**  I'm sorry.  You lost me.  Most don't have

25  any agreement.  Most what?

33

1          **MR. JIH:**  No, they don't have an individually

2    negotiated bespoke agreement.

3          **THE COURT:**  Oh, okay.

4          **MR. JIH:**  They have the standard --

5          **THE COURT:**  So 2,390 individually negotiated

6    agreements?

7          **MR. JIH:**  Correct.  That doesn't mean they have any

8    deviation on the SDK terms.  It just means they have an

9    agreement that covers all aspects of the relationship.

10         **THE COURT:**  How many deviations?

11         **MR. JIH:**  We've got -- we don't know of any

12   deviations but we haven't reviewed individual agreements.  But

13   we're not relying on any deviations.  They're not -- it's not

14   something that normally comes up.  So we don't know unless we

15   look and we're saying it's burdensome to go investigate.  We

16   wouldn't even know where to start.

17         **THE COURT:**  And you haven't looked for

18   representations, correspondence --

19         **MR. JIH:**  Well, we looked --

20         **THE COURT:**  -- setting up what you were going to do

21   and what they were going to do?

22         **MR. JIH:**  Well, that's set forth by the way our SDK

23   works and also the -- that's why I said the standard doesn't

24   change.  And we have not gone through to look for individual

25   correspondence on individual agreements that are not the three

34

1    websites that are at issue in the complaint directly.

2           And I don't think they've -- nobody has ever raised

3    the issue of representations.  We've always said we're not

4    actually relying on any representations by the websites to us.

5           **THE COURT:**  Well, they're entitled to discovery

6    that's relevant not only to your defenses but to their claims.

7           **MR. JIH:**  But we've asked how it's relevant to the

8    claims as well.  Their claims are not turning on some kind of

9    third-party beneficiary doctrine of an agreement between a

10   website and TikTok.  Their whole argument is that their users

11   -- that these website visitors didn't even know TikTok was

12   there.

13          So the fact that there may have been representations

14   between the website and TikTok has nothing to do the claim.

15   They disclaim, in fact.  They say they had no idea about

16   TikTok.

17          **THE COURT:**  Well, I mean, this probably didn't happen

18   in the real world but what if in negotiation with one of your

19   advertisers, the advertiser balked at doing what you wanted to

20   do in regard to putting your code on their website to collect

21   information and you then corresponded with them and explained

22   why it was important to you to do that and collect data and how

23   valuable this was to your operation?

24          It probably didn't happen but if there was

25   correspondence like that, that would be relevant to Plaintiff's

35

1  claims; wouldn't it?

2       **MR. JIH:**  It may or may not but I think all of that

3  is on the website.  I mean, we would direct them to the website

4  that explains what the SDK or the pixel and what they do and if

5  they want to do it.  And if they balk on it, they just wouldn't

6  use it.  I mean, the website -- the code is just available for

7  websites to incorporate if they want to.

8       There's -- we have no -- I mean, we don't have the

9  leverage with the advertisers.  We want the advertisers to

10  advertise on our platform and if they don't want to use that

11  tool and they don't think it's useful, they just don't use it.

12  I mean, that's not something we want to force them to --

13       **THE COURT:**  It's not something as to which you can

14  insist in the real world.

15       **MR. JIH:**  Nor is there any reason we would want to,

16  Your Honor.  As we've tried to explain, we only use the pixel

17  to help advertisers determine if their ads are effective.

18  That's it to the -- and they only appear to non-TikTok -- I

19  mean, they only appear to TikTok users.

20       **THE COURT:**  What about your use in regard to machine

21  learning and improving your algorithms?

22       **MR. JIH:**  That's another kind of distortion of what

23  we've said.  When we talk about algorithms --

24       **THE COURT:**  I thought those words were out of your

25  papers.

```
1          MR. JIH:  No, no, but I've explained in the context

2   of what we're referring to.  We're not talking about trying to

3   match or better tailor viewing habits or what people look at on

4   the TikTok app.  When we're talking algorithms, we're talking

5   about how to match the data to see if it's actually a TikTok

6   user or not.  We're talking about getting rid of bad data like

7   bots.  Like, one of the things we might look at the data is if

8   the advertiser says, this looks funny.  The numbers don't look

9   right.

10         And we might look at the data to say, oh, yeah, that

11  looks like it's all coming from a bot.  How do we get rid of

12  that?  But it's not some kind of systemic use to improve what

13  we do.  It's more just to get rid of the bad data.

14         And then in terms of our use of it, yes, we have

15  aggregated reports that will let an advertiser know how many of

16  the people who, let's say, did something on their website were

17  TikTok users who saw their ad.  That's it.  There's no -- you

18  can't even tell anything about non-user data because you don't

19  know who they are.

20         It's just reflected in certain reports because it's

21  data and it just shows that if we only have 10 percent people

22  matched, yes, the aggregated report reflects that only 10

23  percent were matched; 90 percent were not.  But that's the use

24  we're talking about.  That's why there are no documents talking

25  about the garbage data that we exclude but it reflects it.
```

1            That's the disconnect where they're trying to say

2    that because it uses it in a very broad sense --

3            **THE COURT:**  So then the non-user garbage data that's

4    not matched, you don't do anything with it?

5            **MR. JIH:**  We discard it after 14 days.  We look at it

6    to try to get a match.  Obviously, we are digesting it and then

7    sometimes the advertiser will say, hey, it looks like the data

8    is not coming through or something like that.  We may want to

9    try to look at it again.  Did we miss something or do we need

10   to improve something in our matching process?  But we don't use

11   the data to, like, commercially benefit from it.

12           We don't sell it.  We get rid of it once -- after a

13   certain period it goes stale.  We just get rid of it because

14   we're trying to get to the matched data.  And that's important

15   because the only thing that's relevant to advertisers are

16   people who saw the ads.  And only TikTok users see the ads

17   because the ads only appear on TikTok.  So we're trying to get

18   rid of it to isolate who the TikTok users are.

19           **THE COURT:**  So you're saying that you do not use the

20   non-TikTok user-collected data for any purpose whatsoever other

21   than to exclude it --

22           **MR. JIH:**  Yes, or --

23           **THE COURT:**  -- from the advertisers' consideration?

24           **MR. JIH:**  -- or to report that, of all the hits that

25   we got on something, we could only match a certain percentage

 1    to TikTok users.  That's the aggregated use that we're talking

 2    about.  We might look at data just to see if there's a

 3    better --

 4              **THE COURT:**  No, no, no.  That's the aggregated use.

 5              **MR. JIH:**  Right.

 6              **THE COURT:**  I'm talking about all uses because it

 7    appeared from the papers there was this aggregated report

 8    use --

 9              **MR. JIH:**  Yep.

10              **THE COURT:**  -- for purposes of the advertisers'

11    interests and there was a use to improve your algorithms for

12    purposes I didn't understand and to improve -- or for machine

13    learning, whatever that means in this context.

14              **MR. JIH:**  And what I'm saying is both of those uses

15    are related to the matching process for advertisers.  So the

16    machine learning would be we might need to -- we might learn,

17    oh, hey, if we can exclude this kind of data or look for this

18    data, we can do a better match.  Or this is how we can decide

19    if something is a bot from Russia or that's not actually a

20    human, that's actually a consumer.  Like, how do we identify

21    bad data or fraudulent data to exclude it?  We're not using it

22    in any other way.

23              So, yes, you're right, Your Honor.  It's not

24    aggregated use, per se, but it's like part of our processing of

25    the data to try to separate the useful from the un-useful.

39

1   That's what it's referring to -- all three of them.  So that's

2   why I think there's some frustration over they're not being

3   documents because we're acknowledging that we might handle or

4   we have to evaluate the data to try to see who we can match.

5          So we do use it in that sense but we're not using it

6   in a way that you would expect a P&L sheet or, like, a document

7   explaining the process.  These are ad hoc things we're trying

8   to do to tweak, is what we're trying to do in a given

9   situation.

10         THE COURT:  Well, even so, why wouldn't there be some

11  sort of a paper trail regarding the matching, non-matching

12  algorithm improvement --

13         MR. JIH:  Well, there --

14         THE COURT:  -- excluding bot process, all of that?

15         MR. JIH:  -- well, there isn't -- there is a general

16  procedure explaining that we try to match data and that we get

17  rid of all of that.  That's not even at issue because we peruse

18  that.  A lot of that is publicly available.  The question is,

19  is there any kind of specific document that says, ah, you used

20  the data you don't want to do that?  No.  That -- this isn't

21  written that way because we don't want that data.

22         In an ideal world, if we can snap our fingers and

23  only get TikTok-user data, we'd be thrilled but that just isn't

24  how the data comes in.  We have to find a way to separate it

25  and, yes, in the general sense about the matching process, we

40

1    certainly have documents that we're producing -- they're

2    publicly available that talk about that.  And then, obviously,

3    our deponents are ready to talk about it.

4            But the actual specific documents, we used non-user

5    data, that's just not the way the company thinks about this

6    data because we don't use it in that way.  We don't -- we're

7    not in the business of trying to get the non-user data.

8            **THE COURT:**  It doesn't matter how you think about it.

9            **MR. JIH:**  Well, I'll say the documents don't exist.

10           **THE COURT:**  What matters is what is available --

11           **MR. JIH:**  Yeah.

12           **THE COURT:**  -- in your files, digital files and

13   otherwise that would reflect how you use the data.

14           **MR. JIH:**  And, Your Honor, I agree with you.  I was

15   just saying that to explain why we wouldn't have those

16   documents because the company doesn't think of it -- of we were

17   wanting to use non-user data.  That's why documents don't exist

18   that talk about non-use or don't talk about how we don't use it

19   or how we exclude it other than the general which we were not

20   -- we've already given them what's publicly available.

21           **THE COURT:**  All right.  Do you want to hand off the

22   argument now?

23           **MR. JIH:**  Yeah.  You can go ahead now.

24           **MS. MANCALL-BITEL:**  Thank you, Your Honor.  The next

25   category -- and I'll group a few together but they largely fall

1    within RFP 18.  These are the documents about the revenues and

2    profits, projections.  As Victor explained, these are tools

3    that are used in conjunction with ads.  Those ads are served

4    only to TikTok users.  So there's -- there can be no revenue

5    from advertising based on non-user TikTok -- non-TikTok-user

6    data.  So those documents simply just don't exist.

7          **THE COURT:**  Well, they're not talking about revenue

8    -- they're not restricting their request to revenues from

9    advertising.  Their theory is that in the long run, you

10   improved your business operations through the use of non-TikTok

11   user data collection and there have to some kind of documents

12   that would reflect that.

13         **MS. MANCALL-BITEL:**  Right, Your Honor, and I would

14   push back on the speculation that there are documents that

15   reflect that.  That is a very tenuous sort of connection

16   between the two things.  As Victor said, it would not show up

17   on something like a P&L sheet or, like, an asset list or

18   anything like that.  We get rid of it.  We're not making money

19   off of it.  We're not using it in ways that are money-making.

20         **THE COURT:**  And you're using it simply to exclude it?

21         **MS. MANCALL-BITEL:**  We're using it -- first, we're

22   using it to match to see of all the data who comes in who's

23   even a TikTok user, whose data would be useful to us.

24         Once we've sorted out who's a TikTok user with useful

25   data versus floating event data that is unmatched, we may use

42

1    it for the -- in the ways that Victor explained which would be

2    sort of defensively, right, identifying.  Are there 50 IP

3    addresses -- or are there 50 clicks per second from one IP

4    address?  Because that would suggest that that's a bot farm.

5    How do we exclude that?  How do we recognize that?

6         Or, for example, similar, if the data looks off, they

7    may call the advertiser and say, hey, I don't think you've

8    programmed your pixel right because you're missing data that

9    should be here or you're sending double data, things like that.

10        **THE COURT:**  And doing that is helpful to your

11   operation?

12        **MS. MANCALL-BITEL:**  It is helpful so that advertisers

13   can get a real sense of how their ads are doing on the

14   platform.

15        **THE COURT:**  And if you didn't do that, your -- you

16   wouldn't be able to provide information as accurate as you do

17   to the advertisers?

18        **MS. MANCALL-BITEL:**  Well, we have to be able to

19   match.  That's right.  There's no way to figure out who's a

20   TikTok user and who is not before the data comes in and we can

21   try that matching process.

22        **THE COURT:**  Okay.  And so in the long run by doing

23   what you're doing, you're what, enabling your operation to

24   charge more for advertising in the future or at least you're

25   able to maintain the business of the particular advertiser and

43

1  keep the advertiser satisfied?

2         **MS. MANCALL-BITEL:**  We are certainly doing all of

3  this to help our advertisers understand what's on the platform

4  and what their ads are doing on the platform, who's clicking on

5  them and who's buying things, things like that so we're not

6  inundating them with data that's not useful to them.

7         But we don't keep the data.  We're not -- the goal of

8  it is to identify what's useful for the advertisers to know.

9         **THE COURT:**  So if you were asked to -- as I guess you

10  are asked to in these requests, to identify documents and

11  produce documents that reflect how you benefit from your use or

12  maybe you would want to say "exclusion" of the data collected

13  from non-TikTok users, how would you be able to do that?

14         **MS. MANCALL-BITEL:**  Well, that's the problem, Your

15  Honor.  I don't think we would be able to.  It's hard to

16  imagine a type of document that would say, we helped -- we

17  found a bot farm, so Build-A-Bear's count is a little

18  inaccurate and, therefore, down the line, we charged

19  Build-A-Bear a dollar more or whatever it might be.  It's hard

20  to understand how those documents --

21         **THE COURT:**  It's too indirect --

22         **MS. MANCALL-BITEL:**  It's too indirect.

23         **THE COURT:**  -- and nonspecific a benefit to be

24  reflected in a particular document?

25         **MS. MANCALL-BITEL:**  That's correct.

44

1          THE COURT:  Would you look at Number 49, please?

2          MS. MANCALL-BITEL:  Yes, Your Honor, the modification

3  and improvement of services?

4          THE COURT:  Right.

5          MS. MANCALL-BITEL:  This goes to what Victor was just

6  talking about as well, right.  We improve our learning in our

7  rhythms to do things like identify bot farms and to do things

8  like identify pixel misfires.  These are ad hoc uses.  We have

9  not learned of any documents and that makes sense because a lot

10  of this would just be someone -- to the extent that this

11  happens, someone picking up the phone and saying, hey, I think

12  your pixel misfired.  Why do we have so much data on this?

13  It's nothing systemic.

14          THE COURT:  But if it happened, wouldn't there be

15  something to memorialize it having happened?

16          MS. MANCALL-BITEL:  There may or may not be a

17  document saying, hey, I fixed Build-A-Bear's pixel because I

18  was looking at the data but that is a far cry from ways that we

19  improved our product and services.  There are not, for example,

20  newly developed products where we say, hey, we looked at all

21  this non-user data and guess what?  We could actually build

22  this into a tool that does Y.

23          THE COURT:  Well, your response to this request and

24  some of the others -- your responses are somewhat confusing.

25  It appears what you're arguing now is there simply aren't any

1    documents responsive to the request but that's not what your

2    original response says.

3            What your response argues in the objections is

4    something to the contrary that the request is so broad, it

5    would bring in so many documents, et cetera, that without a

6    temporal limitation that it would be overly -- it would be

7    unduly burdensome to produce all of the responsive documents

8    and that you're willing to discuss narrowing the request.

9            **MS. MANCALL-BITEL:**  That --

10           **THE COURT:**  That seems like a very silly response

11   given what you're now telling me.

12           **MR. JIH:**  Your Honor, we share your frustration.

13           **THE COURT:**  Please, one person argue at a time.

14   You've argued already.

15           **MS. MANCALL-BITEL:**  Yes, Your Honor.  That's -- the

16   request as drafted we believe to be very overly broad which is

17   why we wanted to meet and confer and understand what they were

18   really looking for.

19           **THE COURT:**  A request isn't overly broad if there are

20   no documents responsive to it within your possession, custody

21   or control which is what you're now arguing.

22           **MS. MANCALL-BITEL:**  That's right because it took time

23   to investigate this issue and they moved while they knew we

24   were doing --

25           **THE COURT:**  So you fired off your objections without

46

1    knowing what you were saying?

2          **MS. MANCALL-BITEL:**  It took time to find the right

3    people to look through these ad hoc -- and understand these

4    ad hoc uses.  It took more time and we've continued to

5    investigate.  That's -- and so we have now told them we have

6    found no such documents.

7          **THE COURT:**  What about Number 54?  Are there any

8    documents that reflected plans to collect the data -- collect

9    or use?

10         **MS. MANCALL-BITEL:**  Yes, Your Honor.  So to the

11   extent that this is -- that this fits within Plaintiff's motion

12   and the category that she put this in, which is documents about

13   use, the same issue applies.  We don't use the data in the ways

14   that she speculates and we don't profit from it.  So those

15   documents --

16         **THE COURT:**  That doesn't matter -- "use" means how

17   you use it, not how they think maybe you used it.  So you do

18   use the data in certain ways.  Do you have any documents that

19   reflect plans to do so?

20         **MS. MANCALL-BITEL:**  We have not found documents that

21   reflect plans to use the data in the ways that we've been

22   talking about which is the fraud and identifying pixel misfires

23   as, again, those are quite ad hoc issues.  It's not a

24   comprehensive systematic thing.

25         With respect to general planning documents, a lot of

1    these have nothing to do with how we use or how we use the data

2    which is the subject of this motion.  There's no argument about

3    that and, in fact, we have agreed to produce these planning

4    documents.

5              THE COURT:  You've agreed to produce what planning

6    documents?

7              MS. MANCALL-BITEL:  To the extent that -- if they

8    exist, right.  If they exist, we have agreed to produce

9    business plans, technical architecture documents which are very

10   technical documents and spending plans if they exist but that

11   does not reflect any use.  That just reflects the building of

12   the tool.

13             THE COURT:  That's planned collection, right?

14             MS. MANCALL-BITEL:  Planned collection.

15             THE COURT:  The request asks for documents relating

16   to collection and/or use.

17             MS. MANCALL-BITEL:  That's right, Your Honor, but the

18   use -- again, the use documents don't exist because there is no

19   use in the way that Plaintiff speculates there is.

20             THE COURT:  The collection planning documents do

21   exist?

22             MS. MANCALL-BITEL:  We are searching for them and we

23   intend to produce them to the extent that they exist, generally

24   speaking.

25             THE COURT:  Why haven't you produced your committee

48

1    and board meeting minutes discussing your collection of data

2    through the third-party websites?  That's Number 17.

3             MS. MANCALL-BITEL:  Sorry, Your Honor, one second.

4    We have not -- well, we haven't found any yet.  We are

5    continuing to look.  The problem is that while the pixel may be

6    discussed at board meetings and committee meetings, we've been

7    told it's highly unlikely that specifically the collection and

8    "use" of non-user data is discussed in any detail because,

9    again --

10            THE COURT:  Hold it.

11            MS. MANCALL-BITEL:  -- not useful --

12            THE COURT:  So you're drawing a distinction between a

13   committee meeting minute that reflects something about putting

14   pixels on customers' websites that, in fact, function in this

15   manner and you're drawing a distinction between those minutes

16   and the hypothetical minutes that would say, "And we're using

17   this to collect the data of non-TikTok users"?

18            MS. MANCALL-BITEL:  That's right, Your Honor, because

19   the --

20            THE COURT:  I would suggest to you that the former is

21   also responsive to Request Number 17.

22            MS. MANCALL-BITEL:  We would say the goal of the

23   pixel and what is typically discussed is how to collect and use

24   TikTok user data.  That is the thrust of all of -- almost all

25   of the conversations of the company about the pixel.  So we are

49

1    drawing a distinction because they want to know about --

2              **THE COURT:**  I wouldn't draw a distinction as to

3    Request 17 because the pixels collect not only TikTok users'

4    data but also non-TikTok users' data.

5              **MS. MANCALL-BITEL:**  Understood, Your Honor, and we

6    can produce all of them -- all of them that talk about the

7    pixel.

8              **THE COURT:**  To the extent the Court grants all or any

9    part of this motion, what deadline for compliance do you think

10   would be realistic?

11             **MS. MANCALL-BITEL:**  Two weeks would probably be

12   realistic, Your Honor.

13             **THE COURT:**  Thank you.

14             Anything further?

15             **MS. PARK:**  Your Honor, very quickly on the documents

16   showing the use of the non-user data --

17             **THE COURT:**  I meant, anything further from the

18   Defense.

19             **MS. PARK:**  I apologize.

20             **MS. MANCALL-BITEL:**  No, Your Honor.

21             **THE COURT:**  Anything further from the Plaintiff side?

22   If so, briefly, please.

23             **MS. PARK:**  Yes, Your Honor.  In terms of documents

24   that would show the use of the non-user data, there would be

25   engineering documents on the matching process, on the pixel

50

1   misfires, on the bot-excluding process.  They have said that

2   these are things that the Defendants engage in.  So there has

3   to be engineering documents on them.

4           **THE COURT:**  Why does there have to be?

5           **MS. PARK:**  Because by their own admission, the

6   matching process --

7           **THE COURT:**  If they're ad hoc and they're done when

8   issues come up because of the numbers of visits to the website

9   reported and somebody just uses matching and unmatched data to

10  draw certain conclusions about the existence of bots or

11  misfiring pixels or whatever, why would there necessarily be

12  engineering documents reflecting that?

13          **MS. PARK:**  There would, at a minimum, have to be the

14  code that the engineers are writing to exclude the bots or to

15  deal with the pixel misfires.  In order to do this, even if

16  there's ad hoc, even if they're not systematic, they need to

17  write the source code.  And while they're writing the code,

18  they may be sending emails or sending chats to other engineers

19  discussing the process.

20          So just by their admission that they are engaging in

21  the matching process, the pixel misfires, the bot exclusion,

22  the source code to do those functions are documents.

23          **THE COURT:**  The source code has been modified to

24  pixels.  Is that what you're saying?

25          **MS. PARK:**  Yes, source code to engage in the examples

1    that they gave Your Honor about how they use the data.

2         **THE COURT:**  So you're asking for the production of

3    all -- of information concerning all modifications that they

4    made of their pixels after the pixels had been used on the

5    advertisers' websites?

6         **MS. PARK:**  No, Your Honor.  I think I was -- my hope

7    was to offer Your Honor a concrete example of the documents

8    that must exist, even just taking the attorney representation

9    on how they're using the data.

10         **THE COURT:**  All right.  I understand what you're

11   arguing.

12         Anything further?

13         **MS. PARK:**  No, Your Honor.  Thank you.

14         **THE COURT:**  All right, thank you.

15         Thank you all.  I'm going to reflect further on the

16   issues in light of counsel's arguments.  So the matter is taken

17   under submission.  Thank you very much for your arguments.  I

18   think I understand the issues better than I did when I took the

19   bench this morning.  I anticipate ruling -- I'll certainly make

20   every attempt to rule expeditiously.  I anticipate ruling

21   probably early next week.  Thank you all.

22         **ALL COUNSEL:**  Thank you, Your Honor.

23         **THE CLERK:**  Court's adjourned.

24      **(This proceeding adjourned at 10:43 a.m.)**

25

52

## CERTIFICATION

I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings in the
above-entitled matter.

_____                    <u>October 30, 2023</u>

            Signed                                            Dated


                *TONI HUDSON, TRANSCRIBER*

# EXHIBIT 9



1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

3          HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

4

5   BERNADINE GRIFFITH,

6                    Plaintiffs,

7          vs.                          Case No. CV 23-964-SB

8   TIKTOK, INC., et al,

9                    Defendants.
                                              /
10

11

12

13              REPORTER'S TRANSCRIPT OF
             MANDATORY SCHEDULING CONFERENCE
                Friday, September 8, 2023
14                    10:00 a.m.
               LOS ANGELES, CALIFORNIA
15

16

17

18

19

20

21         TERRI A. HOURIGAN, CSR NO. 3838, CCRR
              FEDERAL OFFICIAL COURT REPORTER
22          350 WEST FIRST STREET, ROOM 4311
             LOS ANGELES, CALIFORNIA  90012
23                  (213) 894-2849

24

25

```
 1                    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4        BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
          LINCENBERG RHOW PC
 5        BY:  EKWAN E. RHOW
               MARC E. MASTERS
 6             Attorneys at Law
          1875 Century Park East, 23rd Floor
 7        Los Angeles, California  90067

 8        GLANCY PRONGAY and MURRAY LLP
          BY:  JONATHAN M. ROTTER
 9        Attorney at Law
          1925 Century Park East, Suite 2100
10        Los Angeles, California  90067

11        SUSMAN GODFREY LLP
          BY:  MICHAEL GERVAIS
12             Attorney at Law
          1900 Avenue of the Stars, Suite 1400
13        Los Angeles, California  90067

14
      FOR THE DEFENDANT:
15
          WILSON SONSINI GOODRICH and ROSATI PC
16        BY:  VICTOR H. JIH
               SOPHIA MANCALL-BITEL
17             Attorneys at Law
          1900 Avenue of the Stars, 28th Floor
18        Los Angeles, California  90067

19

20

21

22

23

24

25
```

1          LOS ANGELES, CALIFORNIA; FRIDAY, SEPTEMBER 8, 2023

2                          10:10 a.m.

3                           --oOo--

4

5

6          THE COURTROOM DEPUTY:  All rise.  This United States

7    District Court is again in session.  The Honorable Stanley

8    Blumenfeld, Jr., United States District Court Judge presiding.

9          Calling Item No. 6, 23-cv-964-SB, *Bernadine Griffith*

10   *versus TikTok, Inc., et al.*

11         Counsel, your appearances starting with plaintiff.

12         MR. RHOW:  Good morning, Your Honor.  Ekwan Rhow on

13   behalf of the plaintiff.

14         THE COURT:  Actually, why don't you introduce the

15   entire team?

16         MR. RHOW:  Thank you, Your Honor.

17         To my right is Michael Gervais, Jonathan Rotter, and

18   Marc Masters.

19         MR. JIH:  Good morning, Your Honor.  Victor Jih,

20   along with Sophie Mancall-Bitel on behalf of defendants.

21         THE COURT:  Good morning.  This matter is here for a

22   continued mandatory scheduling conference.

23         I did give each side 15 minutes to present to the Court

24   the basic contours of the case so the Court can better

25   understand what is at issue.

1          I did receive PowerPoint slides from both the plaintiff

2     as well as the defense.

3          So we will go ahead and we will start with the

4     plaintiff, so if you wish to proceed.

5          I do intend to hold the parties within 15 minutes, so

6     you may proceed, counsel.

7               MR. RHOW:  Understood, Your Honor.

8          Your Honor, we have -- I assume you can see the

9     PowerPoint presentation on the screen.

10          I think the goal of this presentation is really to walk

11     through an overview of the case, an overview of exactly what

12     the TikTok SDK does, and the manner in which intercepts and

13     collects private information.

14          What is this case about?

15          Your Honor, in the news, perhaps you have seen

16     information about various class actions, including one that

17     this team did, attacking the fact that TikTok and its App

18     collects data and private information from TikTok users.

19          This lawsuit is about a different subject.

20          This lawsuit is about another backdoor that TikTok uses

21     to collect private data, private information from non-TikTok

22     users on non-TikTok websites.

23          So you have seen, for example, government agencies, even

24     the state of Montana banning the App, but this is a backdoor

25     that still allows TikTok to continue collecting private data

1    about U.S. citizens.

2         So the key -- and the focus, again, of class action is

3    non-TikTok users, their confidential data, their lack of

4    consent, non-TikTok websites.

5         Why is this important?

6         The press is ripe with articles about the collection of

7    this data.

8         As indicated, governmental agencies and states have

9    banned the App, but again, by virtue of this back door, TikTok

10   is able to continue collecting data that could end up in the

11   hands of the Chinese government.

12        It has been collected on oversea servers, no dispute

13   about that; therefore, that is the concern and the focus of

14   this particular class action.

15        How does TikTok go about collecting and intercepting the

16   data?

17        It does so through what is called an SDK.

18        An SDK means software development kit.

19        I think it's a general term and in this case, you will

20   see what both parties agree is the SDK is a piece of code.

21        It's a piece of code that gets embedded really in two

22   places.

23        It gets embedded on the website of -- the third-party

24   website, the non-TikTok website, but it also gets embedded on

25   the users, the non-TikTok users' computer on the browser on his

1   or her computer.  That is what the first bullet point

2   indicates.

3          This code gets embedded on the non-TikTok users'

4   computer.  But virtue of that code -- I will show it

5   graphically in a second -- by virtue of the embedded code, the

6   pixel as both sides have been calling it, that code allows

7   TikTok to intercept a communication that is going from the

8   non-TikTok user to the non-TikTok website to intercept that

9   data, collect it, and send it straight to TikTok.

10          The data is collected without consent.  These are not

11   TikTok users.  These are not users of the App.

12          It is the opposite.  These are folks who have no idea

13   there is any connection to TikTok, as they are not on a TikTok

14   website and have not provided consent for this interception and

15   collection of private data.

16          As I will explain later, the manner in which this SDK is

17   deployed, it even circumvents third-party cookie settings and

18   incognito mode settings on a browser.

19          The SDK, let me explain at a high level, Your Honor, how

20   the SDK works.

21          It really has two components.  The primary engine,

22   though, is the pixel.  The pixel, that piece of code, that is

23   embedded on the user's browser on his or her computer.

24          So we used an example here -- Your Honor, respectfully

25   we used sexy lingerie as an example of something that one might

1    want to keep private, if he or she is searching for that.

2          So if you look to the left, in the upper left of the

3    screen, that is the user searching on his or her computer and

4    in this case, it was the Etsy website, that is one of the

5    examples from the complaint, searching for sexy lingerie.

6          At that moment, as I will explain later, as that person

7    is searching private confidential data that that user has not

8    consented to any collection or interception, is then sent to

9    Etsy, and in the process of it being sent, the pixel intercepts

10   that data and sends that to TikTok.

11         That is the red line, Your Honor, going from the

12   communication between the user, the non-TikTok user, and the

13   non-TikTok website.

14         The red line is the interception of that confidential

15   data and the transmission of that data to TikTok.

16         Another component of the SDK is what is called an Events

17   API, API meaning application programming interface, and that

18   really compliments the primary engine and ensures that both

19   TikTok and Etsy have all of that information.

20         But to be clear, it's the pixel that is creating that

21   interception of that data.

22         Now, a lot of what I just told you, Your Honor, comes

23   partly from our own technical analysis, but it comes directly

24   from the internal literature that TikTok uses to advertise this

25   feature to non-TikTok websites.

1          I'm not going to go through this whole slide, but this

2     is an example of internal literature explaining the pixel,

3     literature explaining Events API.

4          I'm going to explain later how TikTok, not only explains

5     how the SDK works, but actively encourages non-TikTok websites

6     to use this SDK.

7          Why do these non-TikTok websites install the TikTok SDK?

8          Well, again, TikTok's internal literature explains it.

9     It says that the pixel, the SDK, and I'm just reading from the

10    highlighted section, can help you measure traffic on your

11    website, measure ad campaign performance, optimize your

12    campaigns, and find new customers.

13         As it indicates on this particular page, the data may

14    also be used to personalize ad campaigns for people on TikTok,

15    but also improve TikTok's ad delivery system.

16         That is important, Your Honor, because underlying

17    this --

18              THE REPORTER:  Please slow down.

19              MR. RHOW:  I am sorry.

20         Underlying this, is an ad delivery system pursuant to

21    which TikTok facilitates ads being placed on non-TikTok

22    websites, such as Etsy.

23         There is clear economical and financial incentive for

24    TikTok to maximum usage these pixels and to encourage

25    non-TikTok websites to use the SDK.

1          What is the private data being intercepted?

2          What is the private data being collected?

3          Again, the internal TikTok literature indicates exactly

4   what that is, and this is just an example of some of the data

5   being collected.

6          It includes items you are placing in your cart.  If it's

7   sexy lingerie, if it's other things of a private nature, TikTok

8   will know what you are putting into your cart.

9          TikTok will know what you are searching for.

10         TikTok will know what you are in fact buying.

11         TikTok will know how much you are spending on these

12  particular items.

13         TikTok will know how long you are spending on specific

14  pages, and what pages you actually are searching on.

15         These are just examples of some of the items and private

16  data that is being collected without consent.

17         In addition to what I just mentioned, TikTok is also

18  collecting, by virtue of those intercepted communications,

19  other personal identifying information, such as e-mails, phone

20  numbers, IP addresses, and other data points from which a

21  person can be profiled and from which a person can be

22  identified.

23         I will go into that later how this identity graphing

24  works.  That is the ultimate goal for TikTok, both by

25  collecting information from its own users and collecting

1    information from the rest of the United States.

2         Because, at the end of the day, for TikTok, what it

3    wants to do is tie all of the various data points that I

4    indicated to users, to e-mails, to phone numbers, to browsing

5    history, and creating a composite, Your Honor, of you, of me,

6    whether or not we have ever seen a single TikTok video.  That

7    is the ultimate goal.

8         Now, the breadth of TikTok's data collection is

9    important here, and this will affect the Rule 26 scheduling,

10   which I will get to later, but this issue of how many websites

11   are these SDKs embedded on, is the very first document request

12   we have ever made to defendants, and it is the one document

13   request they refuse to answer.

14        Because the public literature already indicates that

15   this SDK is found on hundreds, perhaps thousands of non-TikTok

16   websites, the sensitivities associated with those websites are

17   immense; they include churches, they include healthcare related

18   companies, they could include governmental entities, so you

19   could imagine, Your Honor, that the sensitivity that arises

20   from Etsy can be compounded to the extent we're dealing with

21   health-related information or financial information.

22        This again, comes from public sources and disclosures

23   that TikTok has made.

24        THE COURT:  Counsel, I don't want you to speed up

25   your speech, but you have five minutes.

1          MR. RHOW:  Understood.  Thank you, Your Honor.

2          What is TikTok's role here other than obviously making

3     the SDK available?

4          Their goal is very intentional.

5          Their goal in providing this pixel, their goal in

6     intercepting and collecting data is clear from the nature and

7     manner in which they set up the pixel.

8          Because, if it is true that TikTok does not care about

9     non-TikTok users' personal information, it would have been easy

10    for them to insert source code that would not let them collect

11    the non-TikTok users' information.

12         That would have been a very simple thing to do.  They

13    chose not to do that.

14         In fact, if you look at their internal literature, their

15    description of the SDK indicates that their best practice that

16    they recommend to these non-TikTok websites is collect all of

17    this information, as much of it as possible, send it to us,

18    pursuant to the pixel.

19         In addition, the default configuration, and I know that

20    TikTok would go into the configuration, the default

21    configuration that exists allows for first-party cookies.

22         Guess what, Your Honor, that pixel, it's not supposed to

23    be a first-party cookie, because the information is not getting

24    sent just to Etsy, it's getting sent to TikTok directly, but

25    when you allow this configuration to exist, you are

1    inadvertently authorizing the interception and transmission of

2    your data, not to Etsy, that is a first-party cookie, but to

3    TikTok.  That is the default configuration that exists.

4         The recommended configuration they ask for, and this is

5    the internal literature, it that it be both pixel and Events

6    API to maximize that collection.

7         What is the -- how are they benefiting from this

8    non-TikTok -- from this information from non-TikTok users?

9         This is a very important slide, Your Honor, because one

10   of the representations that have been made to us in the meet

11   and confer is that as to the non-TikTok users' data, it's

12   deleted.  We don't use it.

13        That is a direct representation from the meet and confer

14   letters.

15        This is Public Statement No. 1 from a TikTok

16   spokesperson, who said the exact opposite.

17        She says:  We in fact do collect it.  We put it into

18   aggregated reports.  We send them to advertisers.

19        So it is not true, unless this spokesperson for TikTok

20   was not -- was not aware of the truth.

21        It is not true that they are not collecting it.

22        To the contrary, they are maintaining it, they are using

23   it, they are putting it into reports to benefit themselves.

24        The other ways in which TikTok benefits is improving the

25   predicted algorithms.  But the ultimate goal, as I mentioned,

1    Your Honor, is what TikTok wants to do, both through its App,

2    both through all of its data collection, but particularly,

3    through this back door is to create an identity graph.

4           That is the goal.

5           For every person in the United States, take all of this

6    various data, identify the person, and then create a composite.

7           That is what identity graphing is.  That is exactly what

8    their own ads -- when they send out requests for employees,

9    their ads, their help wanted ads indicate, if you read the job

10   description, this is from a couple of months ago, that they

11   want to collect online/off line activity to create an identity

12   graph.

13          This is the ironic part, they write, in a privacy

14   compliant way.

15          That what this class action raises, Your Honor.  There

16   is no dispute, because TikTok admits, they are trying to do an

17   identity graph.  There is not a dispute because TikTok admits

18   that they are collecting this data.

19          The reason we filed this lawsuit, it is far from privacy

20   compliant; it's illegal.

21          THE COURT:  I do have just a few questions, very

22   briefly.

23          Are there any actions -- state actions, government

24   actions or private actions with regard to pixels or the other

25   issues being challenged in this Court against TikTok or any

```
 1   other company, as far as you know?
 2             MR. RHOW:  I can't speak for that which I don't
 3   know.  We clearly were the first to file, as to TikTok, on
 4   this.
 5        I'm not aware of subsequent lawsuits dealing with the
 6   pixel.
 7        I'm not aware of subsequent lawsuits in which TikTok has
 8   been named vis-a-vis these issues.
 9        As to your second question, are there other websites --
10   I'm sorry -- other websites that have done that?
11        I believe Google has been subject to something similar,
12   where code, in terms of an SDK, gets embedded and you will see
13   in our motion to dismiss papers, we do cite to some of the
14   underlying opinions that relate to that and support really of
15   our claims here.
16        I do believe Google has faced cases where -- similar to
17   this, I will say that -- at a very high level.
18        I will be honest, Your Honor, I haven't fully analyzed,
19   we are aware of those, in general.
20             THE COURT:  You have indicated that the goal for
21   TikTok is essentially to create an identity graph.
22        What is the purpose that you are alleging for TikTok's
23   creating this identity graph?
24             MR. RHOW:  To some extent, you would have to ask
25   TikTok if the Chinese government is involved, and there is a
```

1    next of that, the Chinese government's goal with that data,

2    obviously are to track United States citizens on what they are

3    doing, and to use that information in some way adverse to the

4    interests of the United States.

5           But in terms of the benefit to TikTok, by doing identity

6    graphs, they can more tailor their ad campaigns, their ad

7    delivery system.

8           There is clearly financial benefits to them to

9    understanding the identities of these various folks.

10          THE COURT:  All right.  So you are contending that

11   primarily there is a financial benefit to TikTok, but there

12   potentially is an ancillary benefit in the event the

13   information is being improperly used by the Chinese government,

14   as to which you have no information.

15          MR. RHOW:  Correct, Your Honor.

16          Even in the underlying prior class action that we did,

17   which did get resolved, we weren't able to depose the members

18   of the Chinese government.

19          I would note on that point, the reason we raise it, it's

20   not just obviously from the tremendous amount of press, it's

21   the fact that until very recently, the information that was

22   being collected was being stored in servers outside the United

23   States.

24          There has been a representation made that very recently,

25   the servers are now in Texas.  I don't know if that is true, I

 1    would love to take discovery on that, but certainly we see the

 2    issue, which is, until very recently, we know that a lot of the

 3    data was moved overseas and is still there.

 4            There is no representation that that data has ever been

 5    deleted.  It is sitting on an outside server without guard in

 6    terms of whether it's the Chinese government or other folks and

 7    agents overseas.

 8            THE COURT:  Let me hear from TikTok's counsel.

 9            Before you get started, Mr. Jih, you may or may not be

10    familiar with another TikTok case that this Court presided

11    over, fairly recently.

12            And I hope, Mr. Jih, that you are aware that Magistrate

13    Judge Kim, who was presiding over the discovery, awarded

14    approximately $300,000 in sanctions against TikTok for

15    discovery abuses.

16            And I have no reason to believe, you, as their counsel,

17    will engage in any wrongdoing.

18            But be aware that the Court is aware that your client

19    has a history, and a concerning history.

20            So, let that, at least, guide you to an appropriate

21    extent so that the same mistakes that were made in that case,

22    do not reoccur.

23            My comments shouldn't be abused by plaintiff's counsel

24    to try to seize upon what the Court has stated in order to gain

25    leverage in the discovery process.

17

1      I will be on the lookout for that if it comes to the
2 Court's attention.
3      The Magistrate Judge will be doing the discovery in this
4 case.
5      There were also, in that case, were concerning behavior
6 by the plaintiffs as well.
7      History, best not repeat itself, in this case.
8      This Court will have no hesitation supporting whatever
9 appropriate sanctions, either to counsel, to the parties,
10 whatever is appropriate, if I see any wrongdoing.
11      I expect all sides to be as forthright as the rules,
12 both the spirit and the letter of the rules require, consistent
13 with all counsels' professional obligations.
14      If it's brought to my attention that that is not
15 occurring, you could expect you will be before me.
16      Mr. Jih?
17      MR. JIH:  Thank you, Your Honor.  I'm aware of the
18 concern, and I do appreciate the concern.
19      Certainly, we fully intend to fully and go beyond our
20 duty to comply with everything that we need to, Your Honor, to
21 rebuild that reputation, Your Honor.
22      In terms of the issues before the Court today, if you
23 compare the two presentations, one thing that becomes very
24 obvious is that thankfully the facts in terms of how TikTok's
25 code actually works is not really in dispute.

1      There are a lot of liberties taken in terms of things
2    around it.  I'm going to isolate what I think the main disputes
3    areas are, but the actual functionality of the pixel, and, you
4    know, how it works, how it operates, we both actually agree on,
5    and it comes from publicly available sources, because TikTok
6    has fully disclosed and the documentation they are relying on
7    is the same that we are relying on.
8              THE COURT:  Make sure you are slowing things down
9    considerably, please.
10              MR. JIH:  I will.
11              THE COURT:  Please proceed with your presentation,
12    please.
13              MR. JIH:  I only have eight slides.  The first was
14    the title page, so No. 2.
15      When we talk about the SDK, TikTok's SDK, as plaintiff's
16    acknowledged, SDK is a generic term that remain and be used by
17    different people in different ways.
18      The complaint, though, makes clear that this case is
19    about the, quote, unauthorized interception collection, saving
20    and use of non-TikTok users, what they claim highly personal
21    data, whenever they visit a website with the TikTok SDK
22    installed.
23      Then, in their discovery they have sent to us, they have
24    also defined it as all similar TikTok software used --
25              THE COURT:  Slower, please.

UNITED STATES DISTRICT COURT

1          MR. JIH:  All similar TikTok software used by

2    third-party websites.

3          So with that in mind, there are actually three things, I

4    just want to make sure we are all on the same page on, that

5    TikTok provides to third parties, advertisers.

6          One, there is a pixel that they talked about, and the

7    Events API.

8          But there is another one, just so we get it out there

9    and there is no confusion, that TikTok calls its SDK.

10          But that, Your Honor, is not at issue in the case,

11    because it deals with Apps on your phone and it's allowing

12    TikTok users to sign in to another person's App using their

13    TikTok credentials, like sometimes Google does or you could use

14    your Apple credentials to create an account on other website;

15    or it allows functionality, where can you go from something and

16    share something to your TikTok account.

17          We understand that, not to be at issue, because it only

18    involves TikTok users.

19          You can only do this if you are a TikTok user, and it's

20    not something installed on third-party websites, it's something

21    completely different.

22          Even though it's called an SDK, our understanding is

23    that's not what this lawsuit is about.

24          THE COURT:  Have you spoken to the other side about

25    that?

1          MR. JIH:  We have talked about the confusion over

2     the SDK and that terminology, and I think from their

3     presentation, it's very clear that they agree with us, the

4     focus is on pixel, and Events API.

5          THE COURT:  Continue, please.

6          MR. JIH:  Now, on those two, those two are designed

7     as tools for advertisers on the TikTok platform to be able to

8     get some understanding into whether those ads are effective,

9     whether or not they do anything for the advertiser.

10          The pixel and the Events API are different in this

11     respect, and they acknowledge this in their presentation.

12          The pixel is a piece of code that gets loaded when you

13     load a website.  It's embedded in pages on a website.

14          The Events API has nothing to do with the website.  What

15     that is, as their own drawing suggests, is a direct

16     communication between an advertiser and TikTok.

17          It's a server to server, as some have described.  It has

18     nothing to do with what is loaded on the website.

19          An example might be this:  If Build-a-Bear wants to know

20     if TikTok ads are effective in getting people to buy different

21     Build-a-Bears, or particular bears, I have actually never done

22     it.

23          It might give information to TikTok and say, hey, here

24     is a list of everyone who bought a bear in the last month and

25     their e-mail addresses.

1        TikTok can take that information, see if any of the

2  e-mail addresses match, and say, hey, it looks like X percent

3  of them are TikTok users, and it looks like X percent saw the

4  ad or the campaign that you put on TikTok.

5        But that kind server to server, what we call an Events

6  API, is a direct communication between the advertiser and

7  TikTok, that doesn't involve installation on a website.  It's

8  not on a website.  It's direct communication that has to be

9  configured directly.

10        Our understanding, based on the scope of the complaint,

11  I think the plaintiff's presentation sort of acknowledges this

12  too, is that is not really what the crux of the issue is,

13  because their complaint is focused on what happens when you

14  load a web page, which is why they define the case as one about

15  what happens with websites with an SDK installed.

16        The Events API is never installed on a website.

17        I think they described it as something that goes with

18  the pixel, but it doesn't seem like that itself is the focus of

19  any the claims or somehow there is anything wrong with an

20  advertiser directly sharing the information with appropriate

21  safeguards with TikTok.

22        So we understand the case to be about the pixel.

23        What the pixel does -- I should go to the prior page for

24  a second.  There is one thing I want to point out, if you look

25  at the drawing that we have here on the left, it shows that if

1   someone goes to Build-a-Bear, if the pixel is installed, there

2   will be communications to Build-a-Bear, and the separate

3   communication to TikTok.

4        The idea is when you load that web page, basically it's

5   almost like sending two carrier pigeons out at the same time,

6   so whatever TikTok gets is what Build-a-Bear gets, depending on

7   how it's set up.

8        The reason I point that out is because the plaintiff's

9   picture, the way they drew it, that red line about sexy

10  lingerie goes to the middle of the line.

11       I understand why they do it, because one of the issues

12  is whether or not there is interception of a communication

13  while it's in transit.

14       But even though that might be a legal dispute, factually

15  it really isn't in question, because they acknowledged we're

16  not going out to try to capture packets in the wild, it's

17  something loaded on a website, and it's what that web page in

18  the computer of the user sends to TikTok at the same time it

19  sends to the website owner.

20       So I just want to point that out will be a point of

21  dispute, but I think it's more about characterization than it

22  is about the facts.

23       We will go to the next page.

24       The pixel, itself, we call the base code.  This isn't

25  one of those cases where we need to go to a clean room and do

1    source code review.

2         The base code of the pixel is published online.  Anyone

3    can see it.

4         The way the pixel works, if you take that code that you

5    can look up on the TikTok website, and put it on your website,

6    and that's all you do, if whenever that page is loaded, TikTok

7    will receive a couple of basic pieces of information.

8         It will know IP address of the person who's using it,

9    who tried to access a particular website.

10         It will have what they call a user agent.  All the user

11    agent means, it's tech terminology for browser.  Are you using

12    Chrome, are you using Safari, are you using -- I don't all of

13    the ones, and what operating system you are using.  Are you

14    using Safari on Windows 11, are you using Safari on Windows 10?

15    That's what the user agent refers to.

16         And third, the URL you are trying to visit.  That

17    information, by the way, is what happens and is communicated

18    with every single request you make on the Internet, because

19    that is built into how the Internet works.

20         It has to know where you are trying to go or what

21    information you are trying to get, which is the URL.

22         It has to know who is doing it, so we can respond, that

23    is the IP address, and it has to know how you are doing it,

24    what browser you are using, so it can make sure it communicates

25    with you in a way you can then display it or understand it.

1        THE COURT:  Slower.

2        MR. JIH:  TikTok, if you install the pixel and do

3   nothing else, it will get what is always sent with any Internet

4   transmission, IP address, URL, and user agent.

5        That, by itself, can be helpful to an advertiser, but

6   not really.  You need more information.

7        So if we go to the next slide.

8        THE COURT:  Before you move on to the next slide,

9   let me make sure I understand.

10       In the absence of the pixel, TikTok wouldn't get the IP

11  address, the user agent, or the URL?

12       MR. JIH:  That's correct.

13       THE COURT:  All right.  Workshop might get it, but

14  TikTok would not.

15       MR. JIH:  Right.

16       THE COURT:  Continue.

17       MR. JIH:  Yes.  As I pointed out, the TikTok pixel

18  itself is publicly available, the code, you can see it called a

19  piece of Javascript that comes from TikTok.

20       That Javascript will change, depending on the website,

21  because it depends on how that website owner configures the

22  pixel.

23       So in terms of that Javascript, anyone, depending on the

24  website, that settings or the configurations may change, it

25  could change it any time they want.

25

1          So as a result, the Javascript that gets pulled up, will

2     be customized, so to speak.

3          In order for the pixel to disclose any additional

4     information, you have to configure it, and by you, I'm

5     referring to the website owner.

6          Not only does the website owner have to install it or

7     put it on their page, so they make the decision to use it, but

8     they make very important decisions in terms of what information

9     is communicated.

10          Specifically, there are some settings, which also appear

11     in their presentation, there is something called automatic

12     advanced matching.

13          The website owner gets to decide and tells TikTok,

14     should you check the page or check the website that they are

15     looking at and scan for any e-mails or addresses or phone

16     numbers -- I'm sorry, e-mails or phone numbers, in order to

17     help with the matching.

18          If they don't select that to "on," then TikTok pixel

19     won't do it.

20          If they select it to "on" the TikTok pixel will look at

21     the page.  They will say, oh, are you providing a phone number,

22     are you providing an e-mail address?

23          On cookies, it also -- the website owner has to decide

24     am I going to allow you to use first party or only third party

25     cookies.

1          One thing I will note that there is a difference in the

2     way they described it.

3          What makes a cookie a first-party cookie versus a

4     third-party cookie is not who can read it or access it.

5          I think if you have had any similar cases, any expert

6     can access the contents of a cookie.  It may not mean much to

7     you, anyone can look and read at a cookie.

8          The issue is who places the cookie, who is responsible

9     for the cookie, who determines what goes in the cookie.

10         So the trend in the industry is for a move towards

11     first-party cookies as opposed to third-party cookies, because

12     that's the person, the visitor has any interaction or

13     relationship with.

14         The responsibility is shifting to the website owner to

15     place the cookie, and be responsible for what is in it and to

16     get permission from the user.

17              THE COURT:  Mr. Jih, at the risk of having you speed

18     up, which you need to slow down, you have five minutes, so

19     please make sure that you are slowing down, not speeding up.

20              MR. JIH:  Okay.  The other thing that needs to be

21     configured are the events or the triggers that are the events

22     that the pixel will then send information to TikTok.

23         It could be add payment info, add to cart, et cetera.

24     Along with the events the website owner has to configure the

25     parameters, meaning what data to pass on.

1          Do you want to pass on the product name?

2          Do you want to pass on a number?

3          Do you want to pass on an amount?

4          It all depends on what the website owner, in this case,

5     an advertiser, cares to know more about.

6          They can change it on the fly; they can change it on a

7     whim, they could not use it.

8          The one thing I will disagree with plaintiff's

9     presentation, this information doesn't just happen and

10    automatically get collected.

11         It can't be without it being configured by the website

12    owner.  They have to do some programming to say how purchasing

13    looks on their website, or else it doesn't send the

14    information.

15         All of this has to be programmed.

16         As a result, because TikTok can't know how the website

17    owner is going to use it, or whether it's sensitive or not, we

18    make very clear that the website owner and advertiser has to

19    make sure they are being transparent and lawful.

20         So they say we're trying to push certain features, sure,

21    but we're simultaneously pushing the obligation that they are

22    aware of, both at what you are sending us, because you are

23    deciding what you want to send us, make sure you are complying.

24         Go to the next page.

25              THE COURT:  And is there essentially a default

1  setting such that if someone doesn't have a clue about how to

2  program this and doesn't have a programmer, that it

3  automatically defaults to various settings, as I understood the

4  plaintiffs to suggest?

5           MR. JIH:  It defaults, like I said, to the

6  information that always goes, it defaults to allowing

7  first-party cookies, but without configuring events and without

8  defining parameters, no information is sent.

9        You could have a cookie placed, but you won't actually

10  be able to send any information without defining the events you

11  care about, and setting the parameters of the information that

12  is being sent.

13       So someone who doesn't know how to do it, nothing other

14  than the three things I told, Your Honor, gets sent.

15           THE COURT:  So it actually does require a level of

16  knowledge and sophistication to make purposeful setting

17  decisions, otherwise, you are suggesting that the information

18  that is being sent out to TikTok is of no value?

19           MR. JIH:  Correct, or limited to your URL, IP

20  address, and user agent.

21           THE COURT:  Continue, please.

22           MR. JIH:  The next slide shows, by the way, we're

23  being completely transparent on how websites use or do not use

24  the pixel.

25       If you have a tech background, you can always inspect

1    the source code and find it, that is what the experts do.

2         TikTok created a tool that you can install on your

3    Chrome browser called the TikTok pixel helper.

4         Any page you go on to, and in this case we did an

5    example of going on to Build-a-Bear, you click on that

6    extension, that helper, it will immediately tell you if the

7    pixel is being used for TikTok, and what information is being

8    passed on to TikTok.

9         So, in this case, it says there is a TikTok pixel, there

10   is one that was found.

11        The Build-a-Bear pixel shows page view and it also shows

12   event in terms of the content that was viewed, in this case a

13   blob fish.

14        It goes further and tells you exactly what parameters

15   are passed.

16        Here, we have the content ID, I assume the product ID,

17   content type, quantity, it costs $22 in US dollars.

18        All of those parameters are set by the website owner

19   based on what they care about.

20        And then they decide, okay, we're going to send this

21   information to TikTok, but only if they decide, yes, that is

22   the information we want to send to TikTok.

23        Go to the next page.

24        What TikTok then does --

25             THE COURT:  Counsel, I'm going to give you another

1   two minutes.  You are out of time, but I have asked you some

2   questions.

3          MR. JIH:  All right.  What we try to do is take all

4   of this data and match it to a TikTok user.

5          We're trying to figure out if the person who bought this

6   blob fish on Build-a-Bear is actually a TikTok user, and then

7   further, if they saw one of the ads.

8          The way we do that, is we take the information that is

9   provided by the website owner and try to make a match.

10          If there is an e-mail match, that is great, if there is

11   a phone number match, we do that, if there is a website ID,

12   meaning like a Build-a-Bear ID that they tell us information

13   about, maybe we try to match that.

14          We try to place a cookie to see if we can match it with

15   information we have of the TikTok user, and the browser

16   information.

17          Somewhat -- sometimes we can tell, for sure, it's a

18   TikTok user, sometimes it's a little bit more probablistic.

19          One thing I will point out, our ability to match is

20   limited somewhat because most people use TikTok on their

21   phones.  They are not using it on their laptops, you can't.

22          So as a result, we can't do things like Facebook does,

23   for example, where it's basically the same device.

24          A lot of times it's same the device.  In fact I would

25   say of all the noise we get from this, less than a third, we

1   can match.

2        One thing I will say, they say all we have to do is not

3   collect this information for non-TikTok users.

4        If we think about it for a moment, that is impossible,

5   because we need that information to determine if they are a

6   TikTok user.  That's the way we figure out if the information

7   we're getting is noise or if it's information that is useful to

8   the advertiser.

9        There is no way to do that without knowing that.  There

10  is no way we can say you are a TikTok user or not.

11             THE COURT:  Because you are out of time, in 30 or so

12  seconds, explain to me the commercial purpose for matching and

13  determining whether there is a match.

14             MR. JIH:  The commercial purpose is to determine the

15  efficacy of an ad and advertiser may have used on the TikTok

16  platform.

17        This idea -- everything they say about identity matching

18  or about, you know, the other one, they were saying about

19  targeted advertising, makes no sense in this case, because we

20  only show ads to TikTok users.

21        So the only things that we're trying to target are

22  TikTok users.

23        The identity profile they are talking about, their own

24  slide says is to better deliver ads.  The only ads we have are

25  on the TikTok platform.

1    THE COURT:  So just to boil this down, so first of

2    all, is TikTok actually providing to potential users --

3    potential advertisers the information of effectiveness or

4    efficacy of advertising on the TikTok site?

5    MR. JIH:  That's the purpose of these tools, if they

6    use it, we can give them information in an aggregated sense,

7    maybe of saying only this many people we can even match to a

8    TikTok user.  It's not specific information, it could be

9    general or more targeted saying this many bought a bob fish,

10   depending on what they want to know.

11   THE COURT:  In terms of the regular business

12   practice of TikTok, is TikTok regularly providing information

13   to advertisers that provides the matching information that you

14   are contending its purpose is used for?

15   MR. JIH:  For TikTok users, absolutely.

16   For non-TikTok users, other than that aggregated sense

17   and we couldn't match them, no, because we don't know who they

18   are.

19   THE COURT:  So I am Build-a-Bear workshop, are you

20   providing me -- I'm advertising on your TikTok site, are you

21   regularly providing me or providing me with information that

22   would enable me to determine the efficacy of my advertising on

23   TikTok?

24   Obviously, it could be coincidental that you have a

25   match, but are you providing me with that information?

1          MR. JIH:  Depending on what you configure the pixel

2    to gather, we then provide analytics based on that information.

3          But if you don't configure it, we can't tell you, for

4    example, what happens with blob the bob fish or something like

5    that.

6          THE COURT:  Do you prominently disclose to potential

7    advertisers if this, then that?  If you place the settings a

8    certain way to enable us to obtain this information, then we

9    will provide you with data that you could then use to determine

10   the efficacy of advertising with us?

11         MR. JIH:  Yeah.  It's actually on every page they

12   sort of even copied in their presentation.

13         It says, we do it matching to give you better

14   information about users to see if we get a match.

15         On the TikTok pixel helper, it even makes very clear,

16   and obviously advertisers can use that well, it says be careful

17   what you share and don't send sensitive information.  Choose

18   the information you want us to analyze.

19         THE COURT:  I take it, Mr. Jih, that the user, that

20   is consumer, has no input in this?

21         MR. JIH:  I disagree.

22         The responsibility affecting the three websites at issue

23   in this case, the responsibility is on the website owner to

24   disclose how they are using three tools or what they are using,

25   and in all three instances they do.

1        I think the users, and this is the trend for first-party

2   cookies, the user has to have an interaction with the website

3   owner.

4        The website owner needs to disclose how they are using

5   other vendors or other analytical tools on their site.

6        THE COURT:  If I'm being asked this question, as I

7   am thinking of buying a product from Build-a-Bear, and I say, I

8   don't want you to give any of my information out.

9        How do they implement that if they have a variety of

10  consumers, some of whom opt in or opt out?

11       MR. JIH:  Well, I think that is why Build-a-Bear,

12  you see nowadays, as soon as you go to a website, it has this

13  consent saying, we use cookies, do you want that or not?

14       At some level, it's up to the website owner and the user

15  to decide if you are not giving me the option, then just don't

16  go to the website.

17       We don't get in the middle of that, because we can't get

18  in the middle of that.

19       THE COURT:  From a technological standpoint, TikTok

20  undoubtedly understands this.

21       So if you have consumers, some of whom agree and some of

22  whom disagree, there is no practical way or is there for

23  Build-a-Bear to provide information only as it applies to the

24  people who agree to have the pixel fully loaded, if you will,

25  going to TikTok?

1          MR. JIH:  There absolutely is.  Depending on how the

2     website wants to program itself, it could decide for the users

3     that don't consent, that they have a certain process flow and

4     the users who do give consent have a certain process flow.

5          It depends on the website design of whether or not the

6     information implicated is sensitive or not; it may not be.

7          THE COURT:  Have you done a reasonable investigation

8     thus far with your client to understand the analytics, meaning,

9     the percentage, for example, of websites that provide full

10    access to TikTok, so that it could provide the matching data

11    relative to those that don't, and then also those that fit

12    somewhere in the middle?

13         MR. JIH:  It's hard.  There is no conception of all

14    because it really depends on the website and what they offer.

15    What "all" looks like is very unique.

16         But we certainly have talked to the client about the

17    fact who uses a pixel can change at any moment and also talked

18    about the fact of exactly how they can configure it.

19         We are actually about to produce the other side, even

20    though they can check any website themselves, a list of the top

21    100 advertisers who have used a pixel in the last 30 days, so

22    they at least have a list to explore, but the actual

23    configuration just depends on the time and the website.

24         THE COURT:  If you could answer this question, yes

25    or no, please, because we are going to conclude this.

1          Does TikTok have some understanding as to the percentage

2   of advertisers who provide sufficient information so that

3   TikTok can conduct the matching?

4          MR. JIH:  That question -- the way it's asked, I

5   don't know how to answer it.

6          I can tell you of all of the data we get, we can only

7   match less than one-third.

8          THE COURT:  All right.  Let us turn -- you could

9   stay where you are -- we're going to turn very quickly to case

10  management order issues.

11         So right now, the parties have requested the date of

12  July of 2025.  We are not going that far, and the defense has

13  said December 9th of 2024.

14         So have the parties further met and conferred to see if

15  they can reach an agreement that accommodates the Court's

16  concern, perhaps, gives you a little bit more time, but not the

17  amount of time you are seeking?

18         Have the parties done that, Mr. Jih?

19         MR. JIH:  We have been trying.

20         The impasse is we don't think we need that much time.

21         As the defense, the big impasse issue is how long before

22  they have to make their class certification motion.

23         They want to do it almost a year later than what the

24  Court's default rules provide, whereas we want to follow the

25  default of 120 days.  That is the big impasse.

1          Our belief, as you can see from the presentations, the

2     basics of how it functions and whether or not we can decide

3     across a bunch of websites, that basically can do that motion

4     sooner rather than later.  That is our view.

5          THE COURT:  All right.

6          Let me then hear from plaintiff's counsel, very briefly,

7     on that issue, tell me what your revised request is, assuming

8     there is a revised request, and I will take the matter under

9     consideration.

10         MR. RHOW:  Your Honor, if I may, I think the

11    statement Mr. Jih just made about his disclosure of a sampling

12    of the third-party websites that use the code, should be the

13    starting point to the schedule.

14         Because one month after we filed our lawsuit, we sent --

15    the first document request said:  Please identify documents

16    sufficient -- sorry, we want documents sufficient to identify

17    all of these third-party websites.

18         Their response, to be clear, Your Honor, was we will do

19    it.

20         We will produce documents sufficient to show all -- all

21    third-party websites that use or have used the pixel or Events

22    API.

23         Now, we're hearing and in meet and confer, they said

24    they would only give us a sampling, and now we're hearing it's

25    the top 100.

1    That is the problem with even putting together a

2    schedule.

3         THE COURT:  Mr. Rhow, let me just cut to the chase.

4         I don't set schedules on the assumption that parties are

5    going to engage in bad faith and not comply with discovery

6    obligations.

7         I set schedules on the reverse assumption.

8         I have already communicated, I think, fairly clearly

9    what the Court's expectations are with regards to discovery.

10        I'm going to be watchful of TikTok, but I'm also going

11   to be watchful of the plaintiff.

12        Let me explain to you the concern the Court had in the

13   other case with regard to TikTok.

14        There was serious concerns where they were sanctioned

15   heavily.  Also, serious expressed by Judge Kim that were borne

16   out, as far as I'm concerned, that the plaintiffs were really

17   overreaching in the discovery that they were seeking.

18        Once again, TikTok should not misunderstand the Court,

19   I'm not suggesting that they can use what I just said as

20   leverage in any kind of effort to withhold information.

21        I'm expecting TikTok to be forthright, and if they

22   engage in the behavior that they engaged in the prior case,

23   they are going to feel much more pain than they even felt in

24   the previous case.

25        But I'm also expecting the plaintiffs to operate in good

1    faith as well, and get what you actually need.

2         Don't shoot for the moon, get what you actually need to

3    prosecute your case.

4         That is as much as I'm going to say here, and I'm going

5    to expect and demand all counsel to behave themselves and to

6    cooperate appropriately, and hue their professional and ethical

7    responsibilities.

8         Assume TikTok has gotten the message, and assume you

9    have gotten the message.

10        Now, answer the Court's question.

11        MR. RHOW:  Your Honor, assuming we get that

12   information timely, I think we could move up the schedule.

13        The big delta between the two sides is that they have

14   expert discovery and class certification all overlapping with

15   each other.

16        Part of the reason -- I don't mean to go back to this

17   issue -- the reason we asked this document request first was an

18   effort to case manage and be efficient, because once we know

19   the scope and breadth of the issue, discovery can occur, then

20   expert discovery can occur, then class certification can occur

21   because certification issues are intertwined with the breadth

22   of the class, the breadth and scope of the usage of the pixel

23   and how it operates.

24        They are all intertwined, so what we try to do,

25   respectfully, even with this initial discovery, is case manage

```
 1   and be efficient, so I think we could move it up, Your Honor.
 2   I would have to go back and, you know, be prepared --
 3              THE COURT:  This is your opportunity, so either you
 4   are going to weigh in right at this moment or you are not,
 5   bearing in mind, counsel, I set class certification hearings in
 6   every case, and I set schedules in every case, even for
 7   complicated cases; this is not a unicorn of a case.
 8          It doesn't actually seem that it's terribly complicated.
 9   I don't mean to suggest that it is a simple case, but it does
10   not seem to be the most complex case that has been presented
11   before this Court.
12          So, you can either give me revised dates, or I will go
13   on what you have previously given me.  You could be rest
14   assured I'm not going to give you what you have requested.
15              MR. RHOW:  Understood, Your Honor.
16          As long as various stages proceed sequentially, I think
17   we could move things up by six months.
18          I think the trial right now is set 24 months out, so
19   this would take us to the end of 2024, in terms of the
20   completion of the case.
21              THE COURT:  All right.  I will take what I have
22   learned and what I have just now heard about the requested
23   schedule under advisement, and you can expect I'm going to be
24   issuing a case management order in short order.
25          I do appreciate the presentations, they were well done
```

**UNITED STATES DISTRICT COURT**

```
 1   and they were useful.

 2          Thank you.  Have a good weekend, everyone.

 3              MR. RHOW:  Thank you, Your Honor.

 4              MR. JIH:  Thank you, Your Honor.

 5

 6              (The proceedings concluded at 11:02 a.m.)

 7                              *  *  *

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              **CERTIFICATE OF OFFICIAL REPORTER**

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5

6              I, TERRI A. HOURIGAN, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the Central District of California, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code that the

10   foregoing is a true and correct transcript of the

11   stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page format is in

13   conformance with the regulations of the judicial conference of

14   the United States.

15

16   Date: 19th day of September, 2023.

17

18

19                            /s/ TERRI A. HOURIGAN

20   _____
                  TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
21                     Federal Court Reporter

22

23

24

25

| $ | 9 | A (cont.) | allows (cont.) | ATTORNEY1 |
|---|---|---|---|---|

**$**

**$22** [1] - 30:1
**$300,000** [1] - 17:8

**/**

**/s** [2] - 42:19

**1**

**1** [1] - 13:11
**10** [1] - 23:25
**100** [3] - 36:2, 37:6, 38:4
**10:10** [1] - 4:2
**11** [1] - 23:25
**11:02** [1] - 41:8
**15** [2] - 4:23, 5:5
**19th** [1] - 42:16

**2**

**2** [1] - 19:3
**2023** [3] - 1:14, 4:1, 42:16
**2024** [2] - 36:19, 40:21
**2025** [1] - 36:18
**213** [1] - 1:25
**23-cv-964-SB** [1] - 4:9
**24** [1] - 40:20
**26** [1] - 11:5
**28** [1] - 42:9

**3**

**30** [2] - 31:20, 36:3
**350** [1] - 1:24
**3838** [2] - 1:23, 42:20

**4**

**4311** [1] - 1:24

**6**

**6** [1] - 4:9

**7**

**753** [1] - 42:9

**8**

**8** [2] - 1:14, 4:1
**894-2849** [1] - 1:25

**9**

**90012** [1] - 1:24
**9th** [1] - 36:19

**A**

**a.m** [2] - 4:2, 41:8
**A1** [1] - 2:5
**A2** [1] - 2:11
**A3** [1] - 2:17
**A4** [1] - 2:23
**ability** [1] - 31:3
**able** [4] - 6:9, 16:12, 20:19, 28:20
**above-entitled** [1] - 42:12
**absence** [1] - 24:21
**absolutely** [2] - 32:24, 35:7
**abused** [1] - 17:16
**abuses** [1] - 17:8
**access** [4] - 23:20, 26:14, 26:15, 35:16
**accommodates** [1] - 36:21
**account** [2] - 20:2, 20:4
**acknowledge** [1] - 20:23
**acknowledged** [2] - 19:5, 23:1
**acknowledges** [1] - 21:22
**action** [4] - 6:2, 6:13, 14:11, 16:11
**actions** [5] - 5:16, 14:19, 14:20
**actively** [1] - 9:1
**activity** [1] - 14:7
**actual** [2] - 18:20, 36:4
**ad** [8] - 9:7, 9:10, 9:11, 9:16, 16:2, 21:14, 31:24
**add** [2] - 27:8
**addition** [2] - 10:13, 12:15
**additional** [1] - 25:13
**address** [6] - 23:19, 24:8, 24:15, 24:22, 26:7, 29:4
**ADDRESS** [8] - 2:5, 2:5, 2:11, 2:11, 2:17, 2:17, 2:23, 2:23
**ADDRESS-A1** [1] - 2:5
**ADDRESS-A2** [1] - 2:11
**ADDRESS-A3** [1] - 2:17
**ADDRESS-A4** [1] - 2:23
**ADDRESS-B1** [1] - 2:5
**ADDRESS-B2** [1] - 2:11
**ADDRESS-B3** [1] - 2:17
**ADDRESS-B4** [1] - 2:23
**addresses** [4] - 10:16, 21:11, 21:13, 25:25
**admits** [2] - 14:12, 14:13
**ads** [10] - 9:17, 14:4, 14:5, 20:20, 21:6, 30:16, 32:4, 32:8
**advanced** [1] - 25:22
**adverse** [1] - 15:24
**advertise** [1] - 8:21
**advertiser** [1] - 20:21, 21:3, 21:17, 22:6, 24:16, 27:15, 28:3, 31:17, 31:24
**advertisers** [9] - 13:14, 19:18, 20:19, 32:12, 32:22, 33:14, 33:23, 36:2, 36:8
**advertising** [5] - 32:3, 32:13, 33:3, 33:5, 33:17
**advisement** [1] - 40:25
**affect** [1] - 11:5
**affecting** [1] - 34:4
**agencies** [2] - 5:23, 6:7
**agent** [6] - 23:21, 23:22, 24:1, 24:15, 24:22, 29:5
**agents** [1] - 17:1
**aggregated** [3] - 13:14, 32:15, 32:25
**ago** [1] - 14:6
**agree** [5] - 6:19, 18:21, 20:15, 35:2, 35:5
**agreement** [1] - 36:21
**ahead** [1] - 5:3
**al** [1] - 4:10
**algorithms** [1] - 13:21
**alleging** [1] - 15:18
**allow** [2] - 12:21, 26:9
**allowing** [2] - 19:24, 28:16
**allows** [4] - 5:25, 7:4, 12:17, 20:2
**almost** [2] - 22:16, 37:4
**amount** [3] - 16:15, 27:13, 36:23
**analysis** [1] - 8:20
**analytical** [1] - 34:11
**analytics** [2] - 33:10, 35:14
**analyze** [1] - 33:25
**analyzed** [1] - 15:14
**ancillary** [1] - 16:7
**ANGELES** [4] - 1:15, 1:24, 4:1, 42:3
**answer** [4] - 11:9, 36:5, 36:11, 39:12
**API** [10] - 8:14, 8:25, 13:2, 19:20, 20:16, 20:22, 21:1, 21:17, 22:2, 38:1
**App** [1] - 13:22
**app** [5] - 5:17, 5:24, 6:8, 7:9, 19:25
**APP02** [1] - 2:9
**APP03** [1] - 2:15
**APP04** [1] - 2:21
**appear** [1] - 25:20
**APPEARANCES** [1] - 2:1
**appearances** [1] - 4:11
**Apple** [1] - 20:1
**application** [1] - 8:14
**applies** [1] - 35:4
**appreciate** [2] - 18:10, 41:2
**appropriate** [4] - 17:13, 17:25, 18:2, 22:6
**appropriately** [1] - 39:9
**apps** [1] - 19:24
**areas** [1] - 18:19
**arises** [1] - 11:15
**articles** [1] - 6:6
**associated** [1] - 11:12
**assume** [4] - 5:8, 29:25, 39:10, 39:11
**assuming** [2] - 37:13, 39:13
**assumption** [2] - 38:8, 38:11
**assured** [1] - 40:16
**attacking** [1] - 5:17
**attention** [2] - 17:19, 18:6
**Attorney** [4] - 2:4, 2:10, 2:16, 2:22
**ATTORNEY1** [1] - 2:4
**ATTORNEY2** [1] - 2:10
**ATTORNEY3** [1] - 2:16
**ATTORNEY4** [1] - 2:22
**authorizing** [1] - 12:22
**automatic** [1] - 25:21
**automatically** [2] - 27:20, 28:13
**available** [3] - 11:24, 18:22, 25:4
**awarded** [1] - 17:7
**aware** [9] - 13:16, 15:1, 15:3, 15:14, 17:6, 17:11, 18:9, 28:6

**B**

**B1** [1] - 2:5
**B2** [1] - 2:11
**B3** [1] - 2:17
**B4** [1] - 2:23
**backdoor** [2] - 5:20, 5:24
**background** [1] - 29:10
**bad** [1] - 38:9
**banned** [1] - 6:8
**banning** [1] - 5:24
**base** [2] - 23:10, 23:13
**based** [3] - 21:21, 30:2, 33:10
**basic** [2] - 4:24, 23:18
**basics** [1] - 37:8
**Bear** [12] - 21:6, 22:12, 22:13, 22:17, 29:15, 29:20, 30:15, 30:21, 33:2, 34:13, 34:17, 35:4
**bear** [1] - 21:10
**bearing** [1] - 40:6
**Bears** [1] - 21:7
**bears** [1] - 21:8
**becomes** [1] - 18:15
**behalf** [2] - 4:13, 4:20
**behave** [1] - 39:8
**behavior** [2] - 17:22, 39:1
**belief** [1] - 37:7
**benefit** [4] - 13:19, 16:1, 16:6, 16:7
**benefiting** [1] - 13:3

benefits [2] - 13:20, 16:3
Bernadine [1] - 4:9
best [2] - 12:11, 17:24
better [3] - 4:24, 32:8, 33:20
between [4] - 8:10, 21:3, 21:17, 39:15
beyond [1] - 18:11
big [3] - 37:2, 37:6, 39:15
bit [2] - 31:2, 36:22
Bitel [1] - 4:20
blob [3] - 29:22, 30:15, 33:12
Blumenfeld [1] - 4:8
bobfish [2] - 32:18, 33:12
boil [1] - 32:10
borne [1] - 38:20
bought [3] - 21:10, 30:14, 32:18
breadth [4] - 11:4, 39:21, 39:23, 39:24
briefly [2] - 14:18, 37:12
brought [1] - 18:6
browser [7] - 6:24, 7:16, 7:21, 23:22, 24:9, 29:13, 30:24
browsing [1] - 10:25
Build [13] - 21:6, 21:7, 22:12, 22:13, 22:17, 29:15, 29:20, 30:15, 30:21, 33:2, 34:13, 34:17, 35:4
Build-a-Bear [12] - 21:6, 22:12, 22:13, 22:17, 29:15, 29:20, 30:15, 30:21, 33:2, 34:13, 34:17, 35:4
Build-a-Bears [1] - 21:7
built [1] - 24:5
bullet [1] - 6:25
bunch [1] - 37:9
business [1] - 32:20
buy [1] - 21:7
buying [2] - 10:6, 34:13
BY [4] - 2:4, 2:10, 2:16, 2:22

## C

California [1] - 42:8
CALIFORNIA [5] - 1:2, 1:15, 1:24, 4:1, 42:4

campaign [2] - 9:7, 21:15
campaigns [3] - 9:8, 9:10, 16:2
capture [1] - 23:2
care [3] - 12:4, 28:21, 30:3
careful [1] - 33:23
cares [1] - 27:15
carrier [1] - 22:16
cart [3] - 10:2, 10:4, 27:8
case [34] - 4:24, 5:11, 5:14, 6:18, 8:2, 17:4, 17:14, 17:21, 17:22, 17:24, 19:7, 19:23, 21:25, 22:8, 27:14, 29:14, 29:19, 29:22, 32:3, 34:4, 36:15, 38:17, 39:1, 39:3, 39:6, 39:20, 40:2, 40:8, 40:9, 40:11, 40:12, 40:22, 41:1
Case [1] - 1:7
CASENUM [1] - 1:7
cases [4] - 15:12, 23:11, 26:15, 40:9
CCRR [1] - 1:23
Central [1] - 42:8
CENTRAL [1] - 1:2
certain [4] - 28:5, 33:15, 35:9, 35:10
certainly [3] - 16:21, 18:11, 35:22
CERTIFICATE [1] - 42:1
certification [5] - 37:3, 39:16, 39:22, 39:23, 40:7
certify [1] - 42:8
cetera [1] - 27:8
challenged [1] - 14:21
change [6] - 25:6, 25:9, 25:10, 27:16, 35:23
characterization [1] - 23:7
chase [1] - 38:7
check [3] - 25:24, 36:1
Chinese [6] - 6:10, 15:21, 15:22, 16:8, 16:12, 17:1
choose [1] - 33:24
chose [1] - 12:9
Chrome [2] - 23:23, 29:12
churches [1] - 11:13

circumvents [1] - 7:15
cite [1] - 15:9
citizens [2] - 6:1, 15:23
CITY1 [1] - 2:6
CITY2 [1] - 2:12
CITY3 [1] - 2:18
CITY4 [1] - 2:24
claim [1] - 19:9
claims [2] - 15:10, 22:5
class [5] - 5:16, 6:2, 6:13, 14:11, 16:11, 37:3, 39:16, 39:22, 39:24, 40:7
clean [1] - 23:11
clear [8] - 8:17, 9:19, 12:2, 19:7, 20:15, 28:3, 33:22, 37:23
clearly [3] - 14:24, 16:3, 38:12
click [1] - 29:15
client [3] - 17:11, 35:14, 35:22
clue [1] - 28:11
Code [1] - 42:9
code [18] - 6:19, 6:20, 7:1, 7:2, 7:3, 7:4, 7:20, 12:6, 15:7, 18:17, 20:24, 23:10, 23:12, 23:13, 23:15, 25:4, 29:11, 37:17
coincidental [1] - 33:7
collect [7] - 5:21, 7:7, 12:6, 12:12, 13:13, 14:7, 31:12
collected [6] - 6:11, 7:8, 9:23, 10:1, 10:12, 16:17, 27:20
collecting [9] - 5:25, 6:9, 6:14, 10:14, 10:21, 12:2, 13:17, 14:14
collection [7] - 6:6, 7:13, 8:6, 11:4, 13:2, 13:23, 19:8
collects [2] - 5:13, 5:18
comments [1] - 17:16
commercial [2] - 31:21, 31:23
communicated [3] - 24:3, 25:19, 38:12
communicates [1] - 24:10
communication [7] - 7:5, 8:10, 21:3, 21:17,

21:19, 22:14, 22:23
communications [2] - 10:14, 22:13
companies [1] - 11:14
company [1] - 14:22
compare [1] - 18:15
complaint [4] - 8:3, 19:7, 21:21, 21:24
completely [2] - 20:8, 29:8
completion [1] - 40:21
complex [1] - 40:12
compliant [2] - 14:10, 14:16
complicated [2] - 40:8, 40:10
compliments [1] - 8:15
comply [2] - 18:12, 38:9
complying [1] - 28:8
component [1] - 8:13
components [1] - 7:19
composite [2] - 11:1, 14:2
compounded [1] - 11:16
computer [6] - 6:24, 6:25, 7:2, 7:21, 8:1, 23:4
conception [1] - 35:19
concern [5] - 6:12, 18:10, 36:22, 38:16
concerned [1] - 38:20
concerning [2] - 17:12, 17:22
concerns [1] - 38:18
conclude [1] - 36:6
concluded [1] - 41:8
conduct [1] - 36:9
confer [3] - 13:7, 13:9, 38:2
conference [2] - 4:22, 42:13
Conference/ Sentencing [1] - 1:13
conferred [1] - 36:20
confidential [6] - 6:3, 8:5, 8:12
configuration [7] - 12:15, 12:16, 12:17, 12:21, 12:24, 12:25,

36:4
configurations [1] - 25:9
configure [5] - 25:14, 27:9, 33:9, 33:11, 35:24
configured [3] - 21:20, 27:6, 27:21
configures [1] - 25:7
configuring [1] - 28:17
conformance [1] - 42:13
confusion [2] - 19:22, 20:13
connection [1] - 7:11
consent [7] - 6:4, 7:8, 7:12, 10:12, 34:19, 35:9, 35:10
consented [1] - 8:6
considerably [1] - 19:1
consideration [1] - 37:14
consistent [1] - 18:5
consumer [1] - 34:2
consumers [2] - 34:16, 35:2
contending [2] - 16:5, 32:23
content [3] - 29:21, 29:25, 30:1
contents [1] - 26:16
continue [5] - 5:25, 6:9, 20:17, 25:2, 29:6
continued [1] - 4:22
contours [1] - 4:24
contrary [1] - 13:18
cookie [14] - 7:15, 12:19, 12:23, 26:13, 26:14, 26:16, 26:17, 26:18, 26:19, 26:25, 28:19, 30:23
cookies [8] - 12:17, 26:8, 26:10, 26:21, 28:17, 34:9, 34:19
cooperate [1] - 39:9
copied [1] - 33:19
correct [4] - 16:10, 24:23, 29:4, 42:10
costs [1] - 30:1
COUNSEL [1] - 2:1
counsel [11] - 4:11, 5:6, 11:20, 17:2, 17:9, 17:16, 18:1, 30:9, 37:12, 39:8, 40:7
counsels' [1] - 18:5
COUNTY [1] - 42:3
couple [2] - 14:6, 23:18

**COURT** [37] - 1:1, 1:23, 4:14, 4:21, 11:20, 14:17, 15:16, 16:5, 17:2, 18:25, 19:13, 20:11, 20:17, 24:12, 24:19, 24:24, 25:2, 27:2, 28:10, 28:25, 29:6, 30:9, 31:20, 32:10, 32:20, 33:2, 33:13, 34:1, 34:12, 34:25, 35:13, 36:5, 36:14, 37:11, 38:7, 40:5, 40:23
**Court** [16] - 4:7, 4:8, 4:23, 4:24, 14:21, 17:4, 17:11, 17:17, 17:25, 18:14, 38:16, 38:22, 40:13, 42:7, 42:20
**Court's** [5] - 17:19, 36:21, 37:4, 38:12, 39:12
**COURTROOM** [1] - 4:6
**create** [4] - 13:24, 14:1, 14:7, 15:17
**created** [1] - 29:12
**creates** [1] - 20:2
**creating** [3] - 8:17, 11:1, 15:19
**credentials** [2] - 19:25, 20:1
**CRR** [1] - 42:20
**crux** [1] - 21:23
**CSR** [2] - 1:23, 42:20
**customers** [1] - 9:8
**customized** [1] - 25:12
**cut** [1] - 38:7

## D

**data** [38] - 5:18, 5:21, 5:25, 6:3, 6:7, 6:9, 6:15, 7:6, 7:8, 7:13, 8:5, 8:8, 8:12, 8:18, 9:9, 9:22, 9:23, 9:25, 10:12, 10:16, 10:24, 11:4, 12:2, 12:23, 13:7, 13:23, 14:1, 14:14, 15:23, 16:23, 16:24, 19:9, 27:10, 30:13, 33:16, 35:16, 36:12
**date** [1] - 36:17
**Date** [1] - 42:16
**dates** [1] - 40:14
**days** [2] - 36:3, 37:6
**dealing** [2] - 11:16, 15:1

**deals** [1] - 19:23
**December** [1] - 36:19
**decide** [7] - 25:23, 26:8, 30:4, 30:5, 34:21, 35:8, 37:8
**deciding** [1] - 28:7
**decision** [1] - 25:17
**decisions** [2] - 25:18, 29:2
**default** [6] - 12:15, 12:16, 12:24, 28:10, 37:5
**defaults** [3] - 28:13, 28:15, 28:16
**DEFENDANT** [4] - 1:8, 2:9, 2:15, 2:21
**defendants** [2] - 4:20, 11:8
**Defendants** [1] - 1:9
**defense** [3] - 5:2, 36:18, 37:2
**define** [1] - 21:25
**defined** [1] - 19:12
**defining** [2] - 28:17, 28:20
**deleted** [2] - 13:7, 16:24
**deliver** [1] - 32:8
**delivery** [3] - 9:11, 9:16, 16:3
**delta** [1] - 39:15
**demand** [1] - 30:1
**depose** [1] - 16:12
**DEPUTY** [1] - 4:6
**described** [3] - 21:4, 22:3, 26:12
**description** [2] - 12:11, 14:6
**design** [1] - 35:11
**designed** [1] - 20:18
**determine** [4] - 31:14, 31:23, 33:5, 33:16
**determines** [1] - 26:18
**determining** [1] - 31:22
**development** [1] - 6:17
**device** [2] - 31:7, 31:8
**difference** [1] - 26:11
**different** [6] - 5:19, 19:6, 20:8, 20:22, 21:7
**direct** [4] - 13:9, 21:2, 21:17, 21:19
**directly** [4] - 8:20, 12:20, 21:20, 22:6

**disagree** [3] - 27:18, 34:3, 35:3
**disclose** [2] - 25:13, 33:13, 34:5, 34:10
**disclosed** [1] - 18:23
**disclosure** [1] - 37:16
**disclosures** [1] - 11:18
**discovery** [13] - 16:21, 17:7, 17:8, 17:18, 17:20, 19:11, 38:9, 38:13, 38:21, 39:16, 39:21, 39:22, 40:2
**dismiss** [1] - 15:9
**display** [1] - 24:10
**dispute** [6] - 6:11, 14:12, 14:13, 18:17, 22:25, 23:7
**disputes** [1] - 18:19
**District** [4] - 4:7, 4:8, 42:7, 42:8
**DISTRICT** [3] - 1:1, 1:2, 1:3
**DIVISION** [1] - 1:2
**document** [4] - 11:7, 11:8, 37:20, 39:19
**documentation** [1] - 18:23
**documents** [3] - 37:21, 37:24
**dollars** [1] - 30:1
**done** [5] - 15:6, 21:8, 35:13, 36:24, 41:2
**door** [2] - 6:8, 13:24
**down** [5] - 9:14, 18:25, 27:3, 27:4, 32:10
**drawing** [2] - 21:2, 22:11
**drew** [1] - 22:20
**duty** [1] - 18:12

## E

**e-mail** [4] - 21:11, 21:13, 26:7, 30:19
**E-MAIL1** [1] - 2:7
**E-MAIL2** [1] - 2:13
**E-MAIL3** [1] - 2:19
**E-MAIL4** [1] - 2:25
**e-mails** [4] - 10:15, 10:25, 25:25, 26:1
**easy** [1] - 12:5
**economical** [1] - 9:19
**effective** [2] - 20:20, 21:7
**effectiveness** [1] -

32:12
**efficacy** [4] - 31:24, 32:13, 33:5, 33:17
**efficient** [2] - 39:20, 40:3
**effort** [2] - 38:24, 39:20
**eight** [1] - 19:2
**either** [2] - 18:1, 40:14
**Ekwan** [1] - 4:12
**embedded** [9] - 6:20, 6:22, 6:23, 7:1, 7:3, 7:21, 11:7, 15:8, 20:25
**employed** [1] - 7:15
**employees** [1] - 14:4
**enable** [2] - 33:5, 33:15
**encourage** [1] - 9:20
**encourages** [1] - 9:1
**end** [3] - 6:9, 10:23, 40:21
**engage** [3] - 17:10, 38:9, 39:1
**engaged** [1] - 39:1
**engine** [2] - 7:19, 8:15
**ensures** [1] - 8:15
**entire** [1] - 4:15
**entities** [1] - 11:14
**entitled** [1] - 42:12
**essentially** [2] - 15:17, 28:10
**et** [2] - 4:10, 27:8
**ethical** [1] - 39:9
**Etsy** [7] - 8:2, 8:7, 8:16, 9:18, 11:16, 12:20, 12:23
**event** [2] - 16:7, 29:21
**events** [14] - 8:25, 13:1, 19:20, 20:16, 20:22, 21:1, 21:16, 22:2, 27:6, 27:9, 28:17, 28:20, 37:25
**exact** [1] - 13:12
**exactly** [5] - 5:11, 9:24, 14:3, 29:23, 35:24
**example** [10] - 5:23, 7:22, 7:23, 8:24, 9:25, 21:6, 29:15, 31:7, 33:11, 35:15
**examples** [2] - 8:3, 10:11
**exist** [1] - 12:21
**exists** [2] - 12:17, 12:24
**expect** [4] - 18:3,

18:7, 39:8, 40:25
**expectations** [1] - 38:13
**expecting** [2] - 38:25, 39:4
**expert** [3] - 26:15, 39:15, 39:22
**experts** [1] - 29:11
**explain** [5] - 7:14, 7:17, 8:25, 31:21, 38:16
**explained** [1] - 8:4
**explaining** [2] - 8:24, 8:25
**explains** [2] - 9:1, 9:4
**explore** [1] - 36:3
**expressed** [1] - 38:19
**extension** [1] - 29:16
**extent** [3] - 11:16, 15:20, 17:14

## F

**Facebook** [1] - 31:6
**faced** [1] - 15:12
**facilitates** [1] - 9:17
**fact** [8] - 5:17, 10:6, 12:10, 13:13, 16:16, 31:8, 35:23, 35:24
**facts** [2] - 18:16, 23:8
**factually** [1] - 22:25
**fairly** [2] - 17:5, 38:12
**faith** [2] - 38:9, 39:5
**familiar** [1] - 17:4
**far** [5] - 14:15, 14:22, 35:14, 36:18, 38:20
**feature** [1] - 8:22
**features** [1] - 28:5
**FEDERAL** [1] - 1:23
**Federal** [2] - 42:6, 42:20
**felt** [1] - 39:2
**few** [1] - 14:17
**figure** [2] - 30:14, 31:15
**file** [1] - 14:24
**filed** [2] - 14:15, 37:19
**financial** [4] - 9:19, 11:17, 16:3, 16:6
**FIRM1** [1] - 2:3
**FIRM2** [1] - 2:9
**FIRM3** [1] - 2:15
**FIRM4** [1] - 2:21
**first** [14] - 6:25, 11:7, 12:17, 12:19, 12:23,

14:24, 19:2, 26:9, 26:21, 28:16, 32:10, 34:8, 37:20, 39:19
**FIRST** [1] - 1:24
**first-party** [6] - 12:17, 12:19, 12:23, 26:21, 28:16, 34:8
**first0party** [1] - 26:13
**fish** [2] - 29:22, 30:15
**fit** [1] - 35:17
**five** [2] - 11:21, 27:3
**flow** [2] - 35:9, 35:10
**fly** [1] - 27:16
**focus** [4] - 6:2, 6:12, 20:15, 22:4
**focused** [1] - 21:24
**folks** [3] - 7:10, 16:4, 17:1
**follow** [1] - 37:5
**FOR** [4] - 2:3, 2:9, 2:15, 2:21
**foregoing** [1] - 42:10
**format** [1] - 42:12
**forthright** [2] - 18:3, 38:25
**FRIDAY** [1] - 4:1
**Friday** [1] - 1:14
**full** [1] - 35:15
**fully** [5] - 15:14, 18:11, 18:23, 35:5
**functionality** [2] - 18:20, 20:3
**functions** [1] - 37:8

## G

**gain** [1] - 17:17
**gather** [1] - 33:10
**general** [3] - 6:18, 15:15, 32:18
**generic** [1] - 19:5
**GEORGE** [1] - 1:3
**Gervais** [1] - 4:17
**given** [1] - 40:15
**goal** [10] - 5:10, 10:20, 11:3, 11:25, 12:1, 13:21, 13:25, 15:16, 15:22
**Google** [3] - 15:7, 15:12, 20:1
**government** [8] - 5:23, 6:10, 14:19, 15:21, 16:8, 16:13, 17:1
**government's** [1] - 15:22
**governmental** [2] - 6:7, 11:14

**graph** [5] - 13:24, 14:8, 14:13, 15:17, 15:19
**graphically** [1] - 7:2
**graphing** [2] - 10:19, 14:3
**graphs** [1] - 16:2
**great** [1] - 30:19
**Griffith** [1] - 4:9
**guard** [1] - 16:25
**guess** [1] - 12:18
**guide** [1] - 17:13

## H

**hands** [1] - 6:10
**hard** [1] - 35:19
**health** [1] - 11:17
**health-related** [1] - 11:17
**healthcare** [1] - 11:13
**hear** [2] - 17:2, 37:11
**heard** [1] - 40:24
**Hearing** [1] - 1:13
**hearing** [2] - 38:2, 38:3
**hearings** [1] - 40:7
**heavily** [1] - 38:19
**held** [1] - 42:11
**help** [3] - 9:6, 14:5, 26:2
**helper** [3] - 29:13, 29:16, 33:22
**helpful** [1] - 24:16
**hereby** [1] - 42:8
**hesitation** [1] - 17:25
**high** [2] - 7:17, 15:13
**highlighted** [1] - 9:6
**highly** [1] - 19:9
**history** [4] - 10:25, 17:12, 17:24
**hold** [1] - 5:5
**honest** [1] - 15:14
**Honor** [30] - 4:12, 4:16, 4:19, 5:7, 5:8, 5:15, 7:22, 8:9, 8:19, 9:12, 11:1, 11:15, 11:22, 12:18, 13:5, 13:22, 14:11, 16:10, 18:9, 18:12, 18:13, 19:23, 28:24, 37:15, 37:23, 39:13, 40:3, 40:17, 41:5, 41:6
**HONORABLE** [1] - 1:3
**Honorable** [1] - 4:7
**hope** [1] - 17:2
**HOURIGAN** [4] - 1:23, 42:6, 42:19,

42:20
**hue** [1] - 39:9
**hundreds** [1] - 11:11

## I

**ID** [4] - 29:25, 30:20, 30:21
**idea** [3] - 7:10, 22:15, 32:1
**identified** [1] - 10:18
**identify** [3] - 14:1, 37:20, 37:22
**identifying** [1] - 10:15
**identities** [1] - 16:4
**identity** [10] - 10:19, 13:24, 14:3, 14:7, 14:13, 15:17, 15:19, 16:1, 32:1, 32:7
**illegal** [1] - 14:16
**imagine** [1] - 11:15
**immediately** [1] - 29:16
**immense** [1] - 11:13
**impasse** [3] - 37:1, 37:2, 37:6
**implement** [1] - 34:15
**implicated** [1] - 35:12
**important** [5] - 6:5, 9:12, 11:5, 13:5, 25:18
**impossible** [1] - 31:13
**improperly** [1] - 16:8
**improve** [1] - 9:11
**improving** [1] - 13:20
**inadvertently** [1] - 12:22
**Inc** [1] - 4:10
**incentive** [1] - 9:19
**include** [3] - 11:13, 11:14
**includes** [1] - 10:2
**including** [1] - 5:16
**incognito** [1] - 7:16
**indicate** [1] - 14:5
**indicated** [3] - 6:7, 10:24, 15:16
**indicates** [6] - 6:25, 9:9, 9:24, 11:10, 12:11
**industry** [1] - 26:20
**info** [1] - 27:8
**information** [65] - 5:13, 5:16, 5:18, 5:21, 8:16, 10:15, 10:21,

10:22, 11:17, 12:5, 12:7, 12:13, 12:19, 13:4, 15:24, 16:7, 16:9, 16:16, 21:9, 21:12, 22:6, 23:18, 24:3, 24:6, 24:17, 25:14, 25:18, 27:7, 27:19, 27:24, 28:16, 28:18, 28:20, 28:21, 29:2, 29:17, 30:5, 30:6, 30:17, 30:21, 30:24, 30:25, 31:12, 31:14, 31:15, 31:16, 32:12, 32:15, 32:17, 32:21, 32:22, 33:4, 33:8, 33:10, 33:15, 33:20, 33:24, 33:25, 34:14, 35:4, 35:12, 36:8, 38:24, 39:14
**initial** [1] - 40:2
**input** [1] - 34:2
**insert** [1] - 12:6
**inspect** [1] - 29:10
**install** [4] - 9:3, 24:13, 25:16, 29:12
**installation** [1] - 21:18
**installed** [5] - 19:10, 20:7, 22:1, 22:2, 22:12
**instances** [1] - 34:7
**intend** [2] - 5:5, 8:11
**intentional** [1] - 11:25
**interaction** [2] - 26:22, 34:9
**intercept** [2] - 7:5, 7:6
**intercepted** [2] - 9:22, 10:14
**intercepting** [2] - 6:14, 12:2
**interception** [7] - 7:12, 8:6, 8:11, 8:18, 12:22, 19:8, 22:23
**intercepts** [2] - 5:12, 8:7
**interests** [1] - 15:25
**interface** [1] - 8:14
**internal** [6] - 8:21, 8:24, 9:4, 9:24, 12:10, 13:1
**Internet** [3] - 24:4, 24:5, 24:14
**intertwined** [2] - 39:23, 40:1
**introduce** [1] - 4:14
**invence** [1] - 8:14
**investigation** [1] -

35:13
**involve** [1] - 21:18
**involved** [1] - 15:21
**involves** [1] - 20:6
**IP** [6] - 10:16, 23:19, 24:8, 24:15, 24:21, 29:4
**ironic** [1] - 14:9
**isolate** [1] - 18:19
**issue** [12] - 4:25, 11:6, 16:22, 19:23, 20:5, 21:23, 26:17, 34:4, 37:2, 37:12, 39:19, 39:21
**issues** [6] - 14:20, 15:4, 18:14, 22:22, 36:16, 39:23
**issuing** [1] - 41:1
**Item** [1] - 4:9
**items** [3] - 10:2, 10:8, 10:11
**itself** [6] - 17:24, 22:4, 23:10, 24:16, 25:3, 35:8

## J

**Javascript** [4] - 25:5, 25:8, 25:11
**JIH** [27] - 4:19, 18:9, 19:2, 19:14, 20:13, 20:18, 24:13, 24:23, 25:1, 25:3, 27:5, 28:15, 29:4, 29:7, 30:12, 31:23, 32:14, 32:24, 33:9, 33:18, 34:3, 34:17, 35:7, 35:19, 36:10, 36:25, 41:6
**Jih** [8] - 4:19, 17:3, 17:6, 18:8, 27:2, 34:1, 36:24, 37:16
**JOB** [1] - 1:14
**job** [1] - 14:5
**Jonathan** [1] - 4:17
**Jr** [1] - 4:8
**JUDGE** [1] - 1:3
**Judge** [4] - 4:8, 17:7, 17:20, 38:19
**judicial** [1] - 42:13
**July** [1] - 36:18

## K

**keep** [1] - 7:24
**key** [1] - 6:2
**Kim** [2] - 17:7, 38:19
**kind** [2] - 21:16, 38:24
**kit** [1] - 6:17

**knowing** [1] - 31:18
**knowledge** [1] - 29:1

## L

**lack** [1] - 6:3
**laptops** [1] - 31:5
**last** [2] - 21:10, 36:2
**Law** [4] - 2:4, 2:10, 2:16, 2:22
**lawful** [1] - 28:4
**lawsuit** [5] - 5:19, 5:20, 14:15, 20:10, 37:19
**lawsuits** [2] - 15:1, 15:3
**learned** [1] - 40:24
**least** [2] - 17:13, 36:3
**left** [3] - 7:25, 22:11
**legal** [1] - 22:25
**less** [2] - 31:9, 36:13
**letter** [1] - 18:4
**letters** [1] - 13:10
**level** [4] - 7:17, 15:13, 28:25, 34:20
**leverage** [2] - 17:18, 38:24
**liberties** [1] - 18:18
**limited** [2] - 29:4, 31:3
**line** [5] - 8:9, 8:11, 14:7, 22:20, 22:21
**lingerie** [4] - 7:23, 8:3, 10:3, 22:21
**list** [3] - 21:10, 36:1, 36:3
**literature** [8] - 8:21, 8:24, 9:4, 9:24, 11:10, 12:10, 13:1
**load** [3] - 20:25, 21:24, 22:15
**loaded** [5] - 20:24, 21:5, 23:3, 23:17, 35:5
**look** [7] - 7:25, 12:10, 22:10, 23:16, 26:5, 26:17, 28:7
**looking** [1] - 25:25
**lookout** [1] - 17:18
**looks** [4] - 21:13, 21:14, 27:23, 35:21
**LOS** [4] - 1:15, 1:24, 4:1, 42:3
**love** [1] - 16:21

## M

**Magistrate** [2] - 17:6, 17:20
**mail** [4] - 21:11,

21:13, 26:7, 30:19
**MAIL1** [1] - 2:7
**MAIL2** [1] - 2:13
**MAIL3** [1] - 2:19
**MAIL4** [1] - 2:25
**mails** [4] - 10:15, 10:25, 25:25, 26:1
**main** [1] - 18:19
**maintaining** [1] - 13:18
**manage** [2] - 39:20, 40:2
**management** [2] - 36:16, 41:1
**Mancall** [1] - 4:20
**Mancall-Bitel** [1] - 4:20
**mandatory** [1] - 4:22
**manner** [3] - 5:12, 7:14, 12:3
**Mark** [1] - 4:18
**Masters** [1] - 4:18
**match** [15] - 21:13, 30:13, 30:18, 30:19, 30:20, 30:22, 30:23, 31:3, 31:10, 31:22, 32:16, 33:1, 33:8, 33:21, 36:13
**matching** [8] - 25:22, 26:2, 31:21, 32:1, 32:22, 33:20, 35:16, 36:9
**matter** [3] - 4:21, 37:14, 42:12
**maximize** [1] - 13:2
**maximum** [1] - 9:20
**mean** [4] - 26:16, 39:18, 40:11
**meaning** [4] - 8:14, 27:10, 30:20, 35:14
**means** [2] - 6:16, 23:22
**measure** [2] - 9:6, 9:7
**meet** [3] - 13:6, 13:9, 38:2
**members** [1] - 16:12
**mentioned** [2] - 10:13, 13:21
**message** [2] - 39:10, 39:11
**met** [1] - 36:20
**Michael** [1] - 4:17
**middle** [4] - 22:21, 34:23, 34:24, 35:18
**might** [4] - 7:23, 21:9, 22:25, 24:24
**mind** [2] - 19:16, 40:7
**minutes** [5] - 4:23,

5:5, 11:21, 27:3, 30:10
**mistakes** [1] - 17:14
**misunderstand** [1] - 38:22
**mode** [1] - 7:16
**moment** [5] - 8:4, 31:13, 35:23, 40:6
**Montana** [1] - 5:24
**month** [2] - 21:10, 37:19
**months** [3] - 14:6, 40:19, 40:20
**moon** [1] - 39:6
**morning** [3] - 4:12, 4:19, 4:21
**most** [2] - 31:3, 40:12
**Motion** [1] - 1:13
**motion** [3] - 15:8, 37:3, 37:9
**move** [3] - 24:19, 26:20, 39:14, 40:3, 40:18
**moved** [1] - 16:23
**MR** [39] - 4:12, 4:16, 4:19, 5:7, 9:15, 11:22, 14:23, 15:20, 16:10, 18:9, 19:2, 19:14, 20:13, 20:18, 24:13, 24:23, 25:1, 25:3, 27:5, 28:15, 29:4, 29:7, 30:12, 31:23, 32:14, 32:24, 33:9, 33:18, 34:3, 34:17, 35:7, 35:19, 36:10, 36:25, 37:15, 39:13, 40:17, 41:5, 41:6

## N

**name** [1] - 27:11
**named** [1] - 15:4
**nature** [2] - 10:3, 12:2
**need** [8] - 18:12, 23:11, 24:17, 27:3, 31:14, 37:1, 39:5, 39:6
**needs** [2] - 27:5, 34:10
**never** [2] - 21:8, 22:2
**new** [1] - 9:8
**news** [1] - 5:15
**next** [7] - 15:22, 23:9, 24:17, 24:19, 28:9, 29:7, 30:7
**NO** [2] - 1:23, 42:20
**noise** [2] - 31:9, 31:16

**non** [26] - 5:21, 5:22, 6:3, 6:4, 6:23, 6:24, 7:1, 7:5, 7:6, 8:10, 8:11, 8:22, 9:2, 9:3, 9:17, 9:20, 11:11, 12:5, 12:7, 12:12, 13:3, 13:4, 13:7, 19:9, 31:12, 32:25
**non-TikTok** [26] - 5:21, 5:22, 6:3, 6:4, 6:23, 6:24, 7:1, 7:5, 7:6, 8:10, 8:11, 8:22, 9:2, 9:3, 9:17, 9:20, 11:11, 12:5, 12:7, 12:12, 13:3, 13:4, 13:7, 19:9, 31:12, 32:25
**note** [2] - 16:14, 26:11
**nothing** [4] - 21:1, 21:5, 24:14, 28:23
**nowadays** [1] - 34:18
**number** [3] - 26:6, 27:12, 30:20
**NUMBER1** [1] - 2:6
**NUMBER2** [1] - 2:12
**NUMBER3** [1] - 2:18
**NUMBER4** [1] - 2:24
**numbers** [4] - 10:16, 10:25, 26:1

## O

**obligation** [1] - 28:6
**obligations** [2] - 18:5, 38:10
**obtain** [1] - 33:15
**obvious** [1] - 18:16
**obviously** [5] - 11:23, 15:23, 16:15, 33:7, 33:23
**occur** [3] - 39:21, 39:22
**occurring** [1] - 18:6
**OF** [6] - 1:2, 1:12, 2:1, 42:1, 42:3, 42:4
**offer** [1] - 35:20
**OFFICIAL** [1] - 1:23, 42:1
**Official** [1] - 42:6
**once** [2] - 38:22, 39:20
**one** [20] - 5:16, 7:23, 8:2, 11:8, 13:5, 18:15, 19:19, 19:21, 21:25, 22:10, 22:22, 23:11, 26:11, 27:18, 29:20, 30:16, 31:11, 32:2, 36:13, 37:19

**ones** [1] - 23:24
**online** [2] - 14:7, 23:13
**oOo** [1] - 4:3
**operate** [1] - 39:4
**operates** [2] - 18:21, 39:25
**operating** [1] - 23:24
**opinions** [1] - 15:10
**opportunity** [1] - 40:5
**opposed** [1] - 26:21
**opposite** [2] - 7:10, 13:12
**opt** [2] - 34:16
**optimize** [1] - 9:7
**option** [1] - 34:21
**order** [6] - 17:17, 25:13, 26:1, 36:16, 41:1
**otherwise** [1] - 29:2
**outside** [2] - 16:17, 16:25
**overlapping** [1] - 39:16
**overreaching** [1] - 38:21
**oversea** [1] - 6:11
**overseas** [2] - 16:23, 17:1
**overview** [2] - 5:11
**own** [5] - 8:20, 10:21, 14:4, 21:2, 32:7
**owner** [18] - 23:5, 25:7, 25:15, 25:16, 25:23, 26:8, 26:24, 27:9, 27:14, 27:22, 28:2, 28:3, 30:2, 30:18, 34:5, 34:10, 34:20

## P

**packets** [1] - 23:2
**page** [18] - 9:9, 19:3, 19:17, 21:25, 22:9, 22:15, 23:3, 23:9, 23:17, 25:17, 25:24, 26:6, 28:9, 29:14, 29:20, 30:7, 33:18, 42:12
**pages** [3] - 10:10, 20:25
**pain** [1] - 39:2
**papers** [1] - 15:9
**parameters** [5] - 27:10, 28:18, 28:21, 29:23, 30:2
**part** [2] - 14:9, 39:18
**particular** [5] - 6:13,

9:9, 10:8, 21:8, 23:20
**particularly** [1] - 13:23
**parties** [8] - 5:5, 6:19, 18:1, 19:18, 36:17, 36:20, 36:24, 38:8
**partly** [1] - 8:20
**party** [17] - 6:22, 7:15, 12:17, 12:19, 12:23, 19:15, 20:7, 26:9, 26:14, 26:21, 28:16, 34:8, 37:17, 37:22, 37:25
**pass** [4] - 27:10, 27:11, 27:12, 27:13
**passed** [2] - 29:18, 29:24
**payment** [1] - 27:8
**people** [6] - 9:10, 19:6, 21:7, 31:4, 32:16, 35:5
**percent** [2] - 21:13, 21:14
**percentage** [2] - 35:15, 36:7
**performance** [1] - 9:7
**perhaps** [3] - 5:15, 11:11, 36:22
**permission** [1] - 27:1
**person** [8] - 8:4, 10:17, 13:25, 14:1, 23:19, 26:22, 30:14
**person's** [1] - 19:25
**personal** [3] - 10:15, 12:5, 19:9
**personalize** [1] - 9:10
**PHONE** [4] - 2:6, 2:12, 2:18, 2:24
**phone** [7] - 10:15, 10:25, 19:24, 25:25, 26:1, 26:6, 30:19
**phones** [1] - 31:4
**picture** [1] - 22:20
**piece** [5] - 6:19, 6:20, 7:20, 20:24, 25:4
**pieces** [1] - 23:18
**pigeons** [1] - 22:16
**pixel** [45] - 7:3, 7:20, 8:7, 8:17, 8:24, 9:5, 12:1, 12:3, 12:14, 12:18, 13:1, 15:2, 18:20, 19:19, 20:16, 20:22, 20:24, 22:4, 22:8, 22:9, 22:12, 23:10, 23:13, 23:15, 24:13, 24:21, 25:3, 25:7, 25:13, 26:3,

26:5, 27:7, 29:9, 29:13, 29:17, 29:19, 29:20, 33:9, 33:22, 35:5, 35:23, 36:2, 37:25, 39:24
**pixels** [2] - 9:20, 14:20
**place** [3] - 26:25, 30:23, 33:14
**placed** [2] - 9:17, 28:19
**places** [2] - 6:21, 26:17
**placing** [1] - 10:2
**plaintiff** [5] - 4:11, 4:13, 5:1, 5:4, 38:15
**PLAINTIFF** [2] - 1:5, 2:3
**plaintiff's** [7] - 17:16, 19:4, 21:22, 22:19, 27:18, 37:11, 38:20
**Plaintiffs** [1] - 1:6
**plaintiffs** [3] - 17:23, 28:14, 39:4
**platform** [3] - 20:19, 31:25, 32:9
**point** [6] - 16:14, 22:10, 22:19, 23:6, 37:18
**pointed** [1] - 25:3
**points** [2] - 10:16, 10:24
**possible** [1] - 12:13
**potential** [3] - 32:11, 32:12, 33:13
**potentially** [1] - 16:7
**PowerPoint** [2] - 5:1, 5:9
**practical** [1] - 35:3
**practice** [2] - 12:11, 32:21
**predicted** [1] - 13:21
**prepared** [1] - 40:4
**present** [1] - 4:23
**presentation** [9] - 5:9, 5:10, 20:15, 20:23, 21:22, 25:21, 27:19, 33:19, 37:7
**presentations** [2] - 18:15, 41:2
**presented** [1] - 40:12
**presided** [1] - 17:4
**presiding** [2] - 4:8, 17:7
**press** [2] - 6:6, 16:15
**previous** [1] - 39:3
**previously** [1] - 40:15
**primarily** [1] - 16:6
**primary** [2] - 7:19,

8:15
**privacy** [2] - 14:9, 14:15
**private** [13] - 5:13, 5:18, 5:21, 5:25, 7:13, 7:24, 8:5, 9:22, 9:23, 10:3, 10:11, 14:20
**probablistic** [1] - 31:2
**problem** [1] - 38:5
**proceed** [2] - 5:4, 5:6, 40:18
**proceedings** [2] - 41:8, 42:11
**process** [4] - 8:7, 17:18, 35:9, 35:10
**produce** [2] - 29:25, 35:25, 37:24
**product** [2] - 27:11, 34:13
**professional** [2] - 18:5, 39:9
**profile** [1] - 32:7
**profiled** [1] - 10:17
**program** [2] - 28:12, 35:8
**programmed** [1] - 27:25
**programmer** [1] - 28:12
**programming** [2] - 8:14, 27:22
**prominently** [1] - 33:13
**prosecute** [1] - 39:6
**provide** [7] - 33:10, 33:16, 35:4, 35:15, 35:16, 36:8, 37:5
**provided** [2] - 7:12, 30:18
**provides** [2] - 19:18, 32:22
**providing** [9] - 12:1, 26:6, 26:7, 32:11, 32:21, 33:3, 33:4, 33:8
**Public** [1] - 13:11
**public** [2] - 11:10, 11:18
**publicly** [2] - 18:22, 25:4
**published** [1] - 23:13
**pulled** [1] - 25:11
**purchasing** [1] - 27:22
**purpose** [5] - 15:18, 31:21, 31:23, 32:14, 32:23
**purposeful** [1] - 29:1
**pursuant** [3] - 9:16,

12:14, 42:9
**push** [1] - 28:5
**pushing** [1] - 28:6
**put** [4] - 13:13, 21:15, 23:16, 25:17
**putting** [3] - 10:4, 13:19, 38:5

## Q

**quantity** [1] - 30:1
**questions** [2] - 14:17, 30:11
**quickly** [1] - 36:15
**quote** [1] - 19:8

## R

**raise** [1] - 16:14
**raises** [1] - 14:11
**rather** [1] - 37:10
**reach** [1] - 36:21
**read** [3] - 14:5, 26:14, 26:17
**reading** [1] - 9:5
**really** [5] - 5:10, 6:20, 7:19, 8:15, 15:10, 18:17, 21:23, 23:1, 24:17, 35:20, 38:21
**Realtime** [1] - 42:6
**reason** [6] - 14:15, 16:14, 17:9, 22:19, 39:18, 39:19
**reasonable** [1] - 35:13
**rebuild** [1] - 18:13
**receive** [2] - 5:1, 23:18
**recently** [4] - 16:16, 16:19, 16:22, 17:5
**recommend** [1] - 12:12
**recommended** [1] - 12:25
**red** [3] - 8:9, 8:11, 22:20
**referring** [1] - 25:15
**refers** [1] - 24:1
**refused** [1] - 11:9
**regard** [2] - 14:20, 38:17
**regards** [1] - 38:13
**regular** [1] - 32:20
**regularly** [2] - 32:21, 33:4
**regulations** [1] - 42:13
**relate** [1] - 15:10
**related** [2] - 11:14,

11:17
**relationship** [1] - 26:23
**relative** [1] - 35:17
**relying** [2] - 18:23, 18:24
**remain** [1] - 19:5
**reoccur** [1] - 17:15
**repeat** [1] - 17:24
**reported** [1] - 42:11
**REPORTER** [3] - 1:23, 9:14, 42:1
**Reporter** [2] - 42:7, 42:20
**REPORTER'S** [1] - 1:12
**reports** [2] - 13:14, 13:19
**representation** [3] - 13:9, 16:19, 16:24
**representations** [1] - 13:6
**reputation** [1] - 18:13
**request** [7] - 11:7, 11:9, 24:4, 37:13, 37:20, 40:24
**requested** [3] - 36:17, 40:16, 40:25
**requests** [2] - 14:4, 39:19
**require** [2] - 18:4, 28:25
**resolved** [1] - 16:12
**respect** [1] - 20:23
**respectfully** [2] - 7:22, 40:2
**respond** [1] - 24:8
**response** [1] - 37:23
**responsibilities** [1] - 39:10
**responsibility** [3] - 26:24, 34:3, 34:5
**responsible** [2] - 26:18, 26:25
**rest** [2] - 10:22, 40:15
**result** [3] - 25:11, 28:1, 31:6
**reverse** [1] - 38:11
**review** [1] - 23:12
**revised** [3] - 37:12, 37:13, 40:14
**RHOW** [12] - 4:12, 4:16, 5:7, 9:15, 11:22, 14:23, 15:20, 16:10, 37:15, 39:13, 40:17, 41:5
**Rhow** [2] - 4:12, 38:7
**ripe** [1] - 6:6

rise [1] - 4:6
risk [1] - 27:2
role [1] - 11:23
room [1] - 23:11
ROOM [1] - 1:24
Rotter [1] - 4:17
RPR [1] - 42:20
Rule [1] - 11:5
rules [3] - 18:3, 18:4, 37:5

## S

Safari [3] - 23:23, 23:25
safeguards [1] - 22:7
sampling [2] - 37:16, 38:3
sanctioned [1] - 38:18
sanctions [2] - 17:8, 18:1
saving [1] - 19:8
saw [2] - 21:14, 30:16
scan [1] - 25:25
schedule [4] - 37:18, 38:6, 39:14, 40:25
schedules [3] - 38:8, 38:11, 40:8
scheduling [2] - 4:22, 11:5
scope [3] - 21:21, 39:21, 39:24
screen [2] - 5:9, 8:1
SDK [25] - 5:12, 6:16, 6:19, 7:15, 7:17, 8:13, 9:1, 9:2, 9:3, 9:5, 9:21, 11:11, 11:24, 12:11, 15:8, 19:4, 19:5, 19:10, 19:22, 20:9, 20:14, 22:1
SDKs [1] - 11:7
searching [6] - 7:24, 8:1, 8:3, 8:5, 10:5, 10:10
second [3] - 7:3, 15:5, 22:10
seconds [1] - 31:21
Section [1] - 42:9
section [1] - 9:6
see [13] - 5:8, 6:19, 15:8, 16:21, 18:2, 21:12, 23:14, 25:4, 30:23, 33:20, 34:18, 36:20, 37:7
seeking [2] - 36:23, 38:21
seem [2] - 40:10, 40:12

seeming [1] - 22:4
seize [1] - 17:17
select [2] - 26:3, 26:5
send [11] - 7:7, 12:13, 13:14, 14:4, 27:7, 27:23, 28:8, 28:20, 30:4, 30:6, 33:24
sending [2] - 22:16, 28:7
sends [3] - 8:8, 23:4, 23:5
sense [3] - 32:3, 32:16, 32:25
sensitive [3] - 28:2, 33:24, 35:12
sensitivities [1] - 11:12
sensitivity [1] - 11:15
sent [10] - 8:6, 8:7, 12:9, 19:11, 24:14, 28:18, 28:24, 29:3, 37:19
separate [1] - 22:13
September [2] - 1:14, 42:16
SEPTEMBER [1] - 4:1
sequentially [1] - 40:18
serious [2] - 38:18, 38:19
server [5] - 16:25, 21:4, 21:16
servers [3] - 6:11, 16:17, 16:20
session [1] - 4:7
set [9] - 12:3, 22:18, 28:22, 30:2, 38:8, 38:11, 40:7, 40:8, 40:20
setting [3] - 28:11, 28:21, 29:1
settings [6] - 7:15, 7:16, 25:9, 25:20, 28:13, 33:14
sexy [4] - 7:23, 8:3, 10:3, 22:20
share [3] - 20:3, 33:24
sharing [1] - 22:6
shifting [1] - 26:24
shoot [1] - 39:5
short [1] - 41:1
show [4] - 7:2, 29:21, 32:3, 37:24
shows [3] - 22:11, 29:7, 29:20
side [3] - 4:23, 20:11,

35:25
sides [3] - 7:4, 18:3, 39:15
sign [1] - 19:24
similar [5] - 15:7, 15:12, 19:12, 19:14, 26:15
simple [2] - 12:8, 40:11
simultaneously [1] - 28:6
single [2] - 11:2, 24:4
site [2] - 33:3, 34:11
sitting [1] - 16:25
six [1] - 40:19
slide [6] - 8:23, 13:5, 24:18, 24:19, 29:7, 32:8
slides [2] - 5:1, 19:2
slow [2] - 9:14, 27:3
slower [1] - 19:13, 24:12
slowing [2] - 18:25, 27:4
software [3] - 6:17, 19:12, 19:14
someone [2] - 22:12, 28:11, 28:23
sometimes [3] - 20:1, 31:1, 31:2
somewhat [2] - 31:1, 31:3
somewhere [1] - 35:18
soon [1] - 34:18
sooner [1] - 37:9
Sophie [1] - 4:20
sophistication [1] - 29:1
sorry [4] - 9:15, 15:6, 26:1, 37:21
sort [2] - 21:22, 33:19
source [3] - 12:6, 23:12, 29:11
sources [2] - 11:18, 18:22
specific [2] - 10:9, 32:17
specifically [1] - 25:20
speech [1] - 11:21
speed [2] - 11:20, 27:2
speeding [1] - 27:4
spending [2] - 10:7, 10:9
spirit [1] - 18:4
spoken [1] - 20:11

spokesperson [2] - 13:12, 13:15
stages [1] - 40:18
standpoint [1] - 34:25
Stanley [1] - 4:7
START [1] - 1:14
start [1] - 5:3
started [1] - 17:3
starting [2] - 4:11, 37:18
state [2] - 5:24, 14:19
STATE [1] - 42:4
STATE1 [1] - 2:6
STATE2 [1] - 2:12
STATE3 [1] - 2:18
STATE4 [1] - 2:24
statement [1] - 37:16
Statement [1] - 13:11
states [1] - 6:7
States [10] - 4:6, 4:8, 10:22, 13:25, 15:23, 15:25, 16:18, 42:7, 42:9, 42:14
STATES [1] - 1:1
Status [1] - 1:13
stay [1] - 36:15
stenographically [1] - 42:11
still [2] - 5:25, 16:23
stored [1] - 16:17
straight [1] - 7:7
STREET [1] - 1:24
subject [2] - 5:19, 15:7
subsequent [2] - 15:1, 15:3
sufficient [4] - 36:8, 37:21, 37:24
suggest [2] - 28:14, 40:11
suggesting [1] - 29:2, 38:23
suggests [1] - 21:2
support [1] - 15:10
supporting [1] - 17:25
supposed [1] - 12:18
system [4] - 9:11, 9:16, 16:3, 23:24

## T

tailor [1] - 16:2
target [1] - 32:5
targeted [2] - 32:2, 32:18
team [2] - 4:15, 5:17

tech [2] - 23:22, 29:10
technical [1] - 8:20
technological [1] - 34:25
term [2] - 6:18, 19:5
terminology [2] - 20:14, 23:22
terms [11] - 15:8, 16:1, 16:25, 18:14, 18:16, 18:18, 25:8, 25:18, 29:21, 32:20, 40:21
TERRI [4] - 1:23, 42:6, 42:19, 42:20
terribly [1] - 40:10
Texas [1] - 16:20
thankfully [1] - 18:16
THE [41] - 2:3, 2:9, 2:15, 2:21, 4:6, 4:14, 4:21, 9:14, 11:20, 14:17, 15:16, 16:5, 17:2, 18:25, 19:13, 20:11, 20:17, 24:12, 24:19, 24:24, 25:2, 27:2, 28:10, 28:25, 29:6, 30:9, 31:20, 32:10, 32:20, 33:2, 33:13, 34:1, 34:12, 34:25, 35:13, 36:5, 36:14, 37:11, 38:7, 40:5, 40:23
themselves [3] - 13:19, 36:1, 39:8
therefore [1] - 6:12
thinking [1] - 34:13
third [14] - 6:22, 7:15, 19:15, 19:18, 20:7, 24:2, 26:9, 26:14, 26:21, 31:9, 36:13, 37:17, 37:22, 37:25
third-party [9] - 6:22, 7:15, 19:15, 20:7, 26:14, 26:21, 37:17, 37:22, 37:25
thousands [1] - 11:11
three [5] - 19:16, 28:24, 34:4, 34:6
tie [1] - 10:24
TikTok [151] - 4:10, 5:12, 5:17, 5:18, 5:20, 5:21, 5:22, 5:25, 6:3, 6:4, 6:8, 6:14, 6:23, 6:24, 7:1, 7:4, 7:5, 7:6, 7:7, 7:9, 7:11, 8:8, 8:10, 8:11, 8:12, 8:16, 8:21, 8:22, 8:25, 9:2, 9:3, 9:10, 9:17,

UNITED STATES DISTRICT COURT

9:20, 9:24, 10:3, 10:5, 10:7, 10:9, 10:13, 10:20, 10:23, 11:2, 11:11, 11:19, 12:4, 12:5, 12:7, 12:12, 12:16, 12:20, 12:24, 13:3, 13:4, 13:7, 13:11, 13:15, 13:20, 13:22, 14:12, 14:13, 14:21, 14:24, 15:3, 15:17, 15:21, 16:1, 16:6, 17:4, 17:8, 18:22, 19:9, 19:10, 19:12, 19:14, 19:17, 19:22, 19:24, 19:25, 20:4, 20:6, 20:7, 20:19, 21:3, 21:6, 21:9, 21:12, 21:14, 21:15, 21:18, 22:7, 22:14, 22:17, 23:4, 23:16, 23:17, 24:13, 24:21, 24:25, 25:3, 25:5, 25:23, 26:3, 26:5, 27:7, 28:1, 29:3, 29:12, 29:13, 29:17, 29:18, 29:19, 30:5, 30:6, 30:8, 30:13, 30:15, 30:24, 31:1, 31:4, 31:12, 31:15, 31:19, 31:24, 32:4, 32:6, 32:9, 32:11, 32:13, 32:17, 32:21, 32:24, 32:25, 33:3, 33:6, 33:22, 34:25, 35:6, 35:16, 36:7, 36:9, 38:14, 38:17, 38:22, 38:25, 39:10

**TikTok's** [8] - 9:4, 9:11, 11:4, 11:23, 15:18, 17:2, 18:16, 19:4

**TIME** [1] - 1:14
**timely** [1] - 39:14
**Title** [1] - 42:9
**title** [1] - 19:3
**today** [1] - 18:14
**together** [1] - 38:5
**tool** [1] - 29:12
**tools** [4] - 20:19, 32:14, 34:6, 34:11
**top** [2] - 36:2, 38:4
**towards** [1] - 26:20
**track** [1] - 15:23
**traffic** [1] - 9:6
**TRANSCRIPT** [1] - 1:12
**transcript** [2] - 42:10, 42:12
**transit** [1] - 22:24
**transmission** [3] -

8:12, 12:22, 24:15
**transparent** [2] - 28:4, 29:8
**tremendous** [1] - 16:15
**trend** [2] - 26:20, 34:8
**trial** [1] - 40:20
**tried** [1] - 23:20
**triggers** [1] - 27:6
**true** [5] - 12:4, 13:15, 13:17, 16:20, 42:10
**truth** [1] - 13:16
**try** [7] - 17:17, 23:2, 30:12, 30:18, 30:22, 30:23, 40:1
**trying** [8] - 14:12, 24:2, 24:6, 28:5, 30:14, 32:5, 36:25
**turn** [2] - 36:14, 36:15
**two** [8] - 6:20, 7:19, 18:15, 20:18, 22:16, 30:10, 39:15
**type** [1] - 30:1

## U

**U.S** [2] - 1:3, 6:1
**ultimate** [3] - 10:20, 11:3, 13:21
**unauthorized** [1] - 19:8
**under** [2] - 37:14, 40:25
**underlying** [3] - 9:12, 15:9, 16:11
**Underlying** [1] - 9:16
**understood** [4] - 5:7, 11:22, 28:13, 40:17
**undoubtedly** [1] - 35:1
**unicorn** [1] - 40:9
**unique** [1] - 35:21
**UNITED** [1] - 1:1
**United** [10] - 4:6, 4:8, 10:22, 13:25, 15:23, 15:25, 16:17, 42:7, 42:9, 42:14
**unless** [1] - 13:15
**up** [12] - 6:9, 11:20, 12:3, 22:18, 23:16, 25:11, 27:3, 27:4, 34:20, 39:14, 40:3, 40:19
**upper** [1] - 7:25
**URL** [5] - 24:2, 24:7, 24:15, 24:22, 29:4
**US** [1] - 30:1
**usage** [1] - 39:24

**useful** [2] - 31:16, 41:3
**user** [23] - 8:1, 8:5, 8:10, 20:7, 23:4, 23:21, 24:1, 24:15, 24:22, 27:1, 29:5, 30:13, 30:15, 30:24, 31:2, 31:15, 31:19, 32:17, 34:1, 34:9, 34:20
**user's** [1] - 7:21
**users** [27] - 5:18, 5:22, 6:3, 6:24, 7:1, 7:6, 7:9, 10:21, 10:25, 13:4, 13:7, 19:9, 19:24, 20:6, 21:14, 31:12, 32:4, 32:6, 32:11, 32:24, 32:25, 33:20, 34:8, 35:8, 35:10
**users'** [2] - 12:5, 12:7
**uses** [3] - 5:20, 8:21, 35:23

## V

**value** [1] - 29:3
**variety** [1] - 34:15
**various** [6] - 5:16, 10:24, 14:1, 16:4, 28:13, 40:18
**vendors** [1] - 34:11
**versus** [2] - 4:10, 26:13
**Victor** [1] - 4:19
**video** [1] - 11:2
**view** [2] - 29:20, 37:10
**viewed** [1] - 29:21
**virtue** [4] - 6:8, 7:2, 7:3, 10:14
**vis** [2] - 15:4
**vis-a-vis** [1] - 15:4
**visit** [2] - 19:10, 24:2
**visitor** [1] - 26:22
**vs** [1] - 1:7

## W

**walk** [1] - 5:10
**wants** [4] - 10:23, 13:22, 21:6, 35:8
**watchful** [2] - 38:14, 38:15
**ways** [2] - 13:20, 19:6
**web** [3] - 21:24, 22:15, 23:3
**website** [51] - 6:22,

6:23, 7:6, 7:12, 8:2, 8:11, 9:7, 19:10, 20:2, 20:25, 21:1, 21:5, 21:18, 21:19, 22:2, 23:3, 23:5, 23:16, 23:20, 25:6, 25:7, 25:9, 25:15, 25:16, 25:23, 25:24, 26:8, 26:24, 27:9, 27:14, 27:21, 27:23, 28:1, 28:3, 30:2, 30:18, 30:20, 34:5, 34:9, 34:10, 34:18, 34:20, 34:22, 35:8, 35:11, 35:20, 36:1, 36:4
**websites** [23] - 5:22, 6:4, 8:22, 9:2, 9:3, 9:18, 9:21, 11:6, 11:12, 12:12, 15:5, 15:6, 19:15, 20:8, 22:1, 29:8, 34:4, 35:15, 37:9, 37:17, 37:22, 37:25
**weekend** [1] - 41:4
**weigh** [1] - 40:6
**WEST** [1] - 1:24
**whereas** [1] - 37:5
**whim** [1] - 27:17
**whole** [1] - 8:23
**wild** [1] - 23:2
**Windows** [2] - 23:25
**wish** [1] - 5:4
**withhold** [1] - 38:24
**works** [7] - 7:18, 9:1, 10:20, 18:17, 18:21, 23:15, 24:5
**workshop** [2] - 24:24, 33:2
**write** [1] - 14:9
**wrongdoing** [2] - 17:10, 18:2
**WU** [1] - 1:3

## X

**XYZ** [1] - 1:13

## Y

**year** [1] - 37:4

## Z

**ZIP1** [1] - 2:6
**ZIP2** [1] - 2:12
**ZIP3** [1] - 2:18
**ZIP4** [1] - 2:24