Ekwan E. Rhow (CA SBN 174604)
   erhow@birdmarella.com
Marc E. Masters (CA SBN 208375)
   mmasters@birdmarella.com
Christopher J. Lee (CA SBN 322140)
   clee@birdmarella.com
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM,
LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Jonathan M. Rotter (CA SBN 234137)
Kara M. Wolke (CA SBN 241521)
Gregory B. Linkh (pro hac vice)
GLANCY PRONGAY & MURRAY,
LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067-2561
Telephone: (310) 201-9150
jrotter@glancylaw.com
kwolke@glancylaw.com
glinkh@glancylaw.com

*Attorneys for Plaintiffs*

Kalpana Srinivasan (CA SBN 237460)
Steven Sklaver (CA SBN 237612)
Michael Gervais (CA SBN 330731)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars
14th Floor
Los Angeles, CA 90067
Telephone: (310) 789-3100
ksrinivasan@susmangodfrey.com
ssklaver@susmangodfrey.com
mgervais@susmangodfrey.com

Y. Gloria Park (*pro hac vice*)
SUSMAN GODFREY L.L.P.
One Manhattan West
50th Floor
New York, NY 10001
Telephone: (212) 336-8330
gpark@susmangodfrey.com

John W. McCauley (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
jmccauley@susmangodfrey.com

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

BERNADINE GRIFFITH; et al., individually and on behalf of all others similarly situated,

        Plaintiffs,

vs.

TIKTOK, INC., a corporation; BYTEDANCE, INC., a corporation

        Defendants.

Case No. 5:23-cv-00964-SB-E

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR RECONSIDERATION OF THE ORDER DENYING MOTION FOR CLASS CERTIFICATION, OR FOR LEAVE TO FILE A RENEWED MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

JUDGE: Hon. Stanley Blumenfeld, Jr.
DATE: October 25, 2024
COURTROOM:
    U.S. Courthouse
    350 West 1st Street
    Los Angeles, CA 90012
    Courtroom 6C

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

YOU ARE HEREBY NOTIFIED THAT on October 25, 2024 at 8:30 a.m. in Courtroom 6C of this Court, Plaintiffs will and hereby do move for reconsideration of the Order Denying Plaintiffs' Motion for Class Certification (ECF 242), or for leave to file a renewed motion for class certification. This motion is made pursuant to Federal Rule of Civil Procedure 23(c)(1)(C), and Local Civil Rule 7-18.

This Motion is based on this Notice of Motion, the concurrently filed Memorandum of Points and Authorities in Support of the Motion, the Declaration of Jonathan Rotter and its accompanying exhibits, the pleadings and other materials filed in this action, and such other and further evidence or argument that the Court may consider at or before the hearing on this motion.

This Motion is made following the conference of counsel pursuant to Local Civil Rule 7-3 which took place on September 16, 2024, at which the parties were unable to resolve the substantive issues addressed in this Motion.

DATED: September 23, 2024     Respectfully submitted,

Glancy Prongay & Murray LLP

By: */s/ Jonathan Rotter*
Jonathan Rotter

Attorneys for Plaintiffs

# **TABLE OF CONTENTS**

I.  INTRODUCTION ......................................................................................... 1

II.  LEGAL STANDARD ................................................................................. 2

III.  ARGUMENT .............................................................................................. 3

    A.  Defendants Collected Plaintiffs' Data—And Produced The Ordered Sample Of Their Collection After The Class Certification Motion ...... 3

        1.  The Late-Produced Data Contains Further Common Evidence Of Data Collection ................................................................... 4

            a.  Defendants Delayed Data Production Until After The Class Certification Briefing ............................................... 4

            b.  The Delayed Data Proves Class-wide Liability ............... 7

    B.  Analysis of Defendants' Late-Produced Data Demonstrates Typicality ......................................................................................... 9

    C.  "Identifying Every Single Class Member" Is Not An Element Of The Claims, But Defendants Can Do So ..................................................... 10

    D.  Systematic Analysis Of The Late-Produced Data Shows That Defendants Collected Sensitive Information From At Least The Vast Majority Of Class Members ................................................................. 13

    E.  Systematic Analysis Of The Late-Produced Data Shows That Defendants Intercepted The Contents Of Class Members' Communications ................................................................................. 16

    F.  Systematic Analysis Of The Late-Produced Data Shows That Class Members Have A Property Interest In Their Web-Browsing Data (Conversion and Larceny Claims) ..................................................... 18

    G.  Disgorgement, Statutory Damages, Punitive and Nominal Damages . 19

    H.  The Court Should Certify At Least Under Rule 23(b)(2) .................... 19

    I.  The Court Should Certify Alternative Subclasses With Further Limitations ....................................................................................... 20

    J.  Alternatively, The Court Should Grant Leave To File A Renewed Motion And Sufficient Time To Complete Relevant Work ............... 22

IV.  CONCLUSION ........................................................................................ 22

# <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Armstrong v. Davis,*
   275 F.3d 849 (9th Cir. 2001)....................................................................................2

*Bateman v. U.S. Postal Serv.,*
   231 F.3d 1220 (9th Cir. 2000)..................................................................................2

*Blackie v. Barrack,*
   524 F.2d 891 (9th Cir. 1975)....................................................................................3

*Bliesner v. Comm'n Workers of Am.,*
   464 F.3d 910 (9th Cir. 2006)....................................................................................2

*Brodsky v. Apple Inc.,*
   445 F. Supp. 3d 110 (N.D. Cal. 2020) ..................................................................16

*Brown v. Google LLC,*
   2022 WL 17961497, (N.D. Cal. Dec. 12, 2022) ...................................................13

*Brown v. Google LLC,*
   685 F.Supp.3d 909 (N.D. Cal. 2023) ....................................................................16

*Bruno v. Quten Rsch. Inst.,* LLC,
   280 F.R.D. 524 ......................................................................................................21

*Calhoun v. Google LLC,*
   526 F. Supp. 3d 605 (N.D. Cal. 2021) ..................................................................12

*Calhoun v. Google,* LLC,
   ___ F.4th __, No. 22-16993, 2024 WL 3869446 (9th Cir. Aug. 20, 2024)......1, 12

*Carpenter v. United States,*
   585 U.S. 29  (2018) ...............................................................................................19

*Charlebois v. Angels Baseball, LP,*
   2011 WL 2610122 (C.D. Cal. June 30, 2011) ......................................................21

*Ellis v. Costco Wholesale Corp.*,
   285 F.R.D. 492 (N.D. Cal. 2012) ........................................................................ 3

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ............................................................................... 4

*Grodzitsky v. Am. Honda Motor Co.*,
   2017 WL 960462 (C.D. Cal. Mar. 10, 2017) ....................................................... 2

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ............................................................................. 10

*In re Facebook, Inc. Internet Tracking Litigation*,
   956 F.3d 589 (9th Cir. 2020) ............................................................................. 14

*In re First All. Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006) ............................................................................. 13

*In re Google RTB Consumer Privacy Litig.*,
   606 F.Supp.3d 935 (N.D. Cal. 2022) ................................................................. 16

*In re Meta Pixel Healthcare Litig.*,
   647 F.Supp.3d 778 (N.D. Cal. 2022) ................................................................. 16

*Just Film, Inc. v. Buono*,
   847 F.3d 1108 (9th Cir. 2017) ........................................................................... 10

*Kamar v. Radio Shack Corp.*,
   254 F.R.D. 387 (C.D. Cal. 2008) ....................................................................... 21

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................................. 19

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir.) ................................................................................ *passim*

*Riley v. California*,
   573 U.S. 373 (2014) ........................................................................................... 20

*Rodriguez v. Google LLC*,
    2024 WL 38302 (N.D. Cal. Jan. 3, 2024) ..................................................... 13, 18

*Rosales v. El Rancho Farms*,
    No. CIV-F-09-0707 AWI, 2012 WL 2684979 (E.D. Cal. July 6, 2012) ............... 2

*Ruiz Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ........................................................................ 3, 20

*Smith v. Maryland*,
    442 U.S. 735 (1979) ............................................................................................. 19

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ............................................................................... 10

*Stobaugh v. Wood*,
    50 F.3d 16 (9th Cir. 1995) ..................................................................................... 2

*Terrill v. Electrolux Home Prods.*,
    *Ind.*, 274 F.R.D. 698 (S.D. Ga. 2011) .................................................................... 3

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ...................................................................... 8, 9, 17, 18

*United States v. Jones*,
    565 U.S. 400 (2012) ............................................................................................. 20

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv.
    Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*,
    593 F.3d 802 (9th Cir. 2010) ................................................................................. 3

*Wolph v. Acer Am. Corp.*,
    272 F.R.D. 477 (N.D. Cal. 2011) ......................................................................... 20

STATUTES

18 U.S.C. § 2510 ........................................................................................... 16, 17

Cal. Civ. Code § 1798.140(v)(1) ............................................................................ 12

## RULES

Fed. R. Civ. P. 23(c)(1)(C) ......................................................................... 1, 2

Fed. R. of Evid. 401 ....................................................................................... 7, 8

Fed. R. Civ. P. 23 .............................................................................................. 3

## OTHER AUTHORITIES

5 *Newberg on Class Actions,* § 24.25 at 24–105 (3d ed.1992) ................................ 10

*Class Certification in the Age of Aggregate Proof*,
    84 N.Y.U. L. Rev. 97 (2009)......................................................................... 17, 20

Wright & Miller, Fed. Prac. & Proc. § 1759 at 130-31 (2008) ................................ 21

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs bring this motion seeking reconsideration of the Order Denying Motion for Class Certification (ECF 242) ("Order"), or for leave to file a renewed motion for class certification.  Plaintiffs now have access to approximately ***48 times*** more data than the miniscule sub-hour sample Defendants had produced at the time of Plaintiffs' Motion for Class Certification ("Motion"), and the Order relied on the earlier lack of information in the sub-hour sample. Plaintiffs have now extracted more information from the late-produced data (which is still limited to a snapshot of just two days), including entries showing specific data collected as to some Plaintiffs.

Plaintiffs were diligent in attempting to obtain that data, which Defendants had been ordered to produce ***eight months*** before they finally did so.  And in the short time since Defendants made the additional data available, Plaintiffs have been diligent in obtaining expert analysis of it. While there has been insufficient time to complete that analysis, Plaintiffs' expert's findings to date support reconsideration of class certification, including providing further evidence that Defendants collected data from Plaintiffs.[1]

Further, on August 20, 2024, after the hearing on the motion for class certification, the Ninth Circuit published its decision in *Calhoun v. Google*, LLC, ___ F.4th __, No. 22-16993, 2024 WL 3869446 (9th Cir. Aug. 20, 2024), which supports Plaintiffs' arguments here concerning the types of data that give rise to liability and the notion that collection over large numbers of websites is inherently invasive.

The Court should reconsider the Order, or grant leave to file a renewed motion for class certification with sufficient time for Plaintiffs to analyze the late-provided

---

[1]  As explained in Plaintiffs' Motion to Continue Deadlines and Modify Case Management Order, ECF 243, Plaintiffs now also have access to 20 times more document discovery than Defendants had produced at the time of Plaintiffs' Motion for Class Certification, which Plaintiffs have not had an adequate opportunity to review.

1   information.

2   **II.    LEGAL STANDARD**

3        "An order that grants or denies class certification may be altered or amended

4   before final judgment." Fed. R. Civ. P. 23(c)(1)(C). The Court has "broad discretion

5   to determine whether a class should be certified, and to revisit that certification

6   throughout the legal proceedings before the court." *Armstrong v. Davis*, 275 F.3d

7   849, 872 n.28 (9th Cir. 2001).  Accordingly, the motion for reconsideration standard

8   is not applicable. *See Grodzitsky v. Am. Honda Motor Co.*, 2017 WL 960462, at *3

9   (C.D. Cal. Mar. 10, 2017) (declining to apply reconsideration standard where

10  plaintiffs' renewed motion for class certification sought "to redress the shortcomings

11  in the[] arguments for class certification previously identified by the Court").

12       Nonetheless, Plaintiffs meet the reconsideration standard, which requires: "(a)

13  a material difference in fact or law from that presented to the Court that, in the

14  exercise of reasonable diligence, could not have been known to the party moving for

15  reconsideration at the time the Order was entered, or (b) the emergence of new

16  material facts or a change of law occurring after the Order was entered, or (c) a

17  manifest showing of a failure to consider material facts presented to the Court before

18  the Order was entered."  L.R. 7-18.

19       A district court's denial of a motion for reconsideration is reviewed for abuse

20  of discretion. *Bliesner v. Comm'n Workers of Am.*, 464 F.3d 910, 915 (9th Cir. 2006).

21  A district court abuses its discretion if it does not apply the correct law or if it rests

22  its decision on a clearly erroneous finding of material fact. *Bateman v. U.S. Postal*

23  *Serv.*, 231 F.3d 1220, 1223 (9th Cir. 2000); *Stobaugh v. Wood*, 50 F.3d 16 (9th Cir.

24  1995) (reversing denial of motion for reconsideration for error of law).

25       In the alternative, Plaintiffs seek leave to file a renewed motion for class

26  certification along with supplemental technical expert analysis, which is justified by

27  the existence of new evidence. *Rosales v. El Rancho Farms*, No. CIV-F-09-0707

28

AWI, 2012 WL 2684979, at *6 (E.D. Cal. July 6, 2012) (motion for reconsideration of denial of class certification granted in part, based upon new evidence, giving plaintiff leave to file a second motion for class certification); *Terrill v. Electrolux Home Prods., Ind.*, 274 F.R.D. 698, 700-01 (S.D. Ga. 2011) (granting motion for leave to file second motion for class certification where plaintiffs offered new evidence, belatedly obtained due to defendants' failure to produce discovery by set deadlines).

The Ninth Circuit favors narrowing classes to denying certification outright where certification would be proper for the narrowed class. Thus, "the district court may construe the class definition more narrowly, or otherwise conform its interpretation of the class definition with the prevailing theory of liability." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1139 (9th Cir. 2016).

## III.    ARGUMENT

Defendants' late-produced data shows that Plaintiffs' theory of liability turns on class-wide evidence and permits a class-wide answer.

### A.    Defendants Collected Plaintiffs' Data—And Produced The Ordered Sample Of Their Collection *After* The Class Certification Motion

The Order noted that "because the named Plaintiffs have not produced evidence of any data collected from them, it is not even clear that they have suffered any cognizable injury . . . ."  Order at 15.[2] While this merits question was not yet

---

[2] "The possibility that a plaintiff will be unable to prove his allegations" is not "a basis for declining to certify a class which apparently satisfies [Rule 23]." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010) (quoting *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975)).   The type of evidence with which Plaintiffs intended to prove their own claims is the same type of evidence Plaintiffs proposed to put forward on behalf of the class.  That is all that is required: "in peeking at the merits to determine whether commonality is present, '[t]he court may not go so far . . . as to judge the validity of these claims.'" *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 506–07 (N.D. Cal. 2012) (quoting *United Steel*, 593 F.3d at 808-09). "The district court is required to examine the merits of the underlying claim in this context, only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually

---

even at issue at class certification, Plaintiffs respectfully urge that the Court overlooked contrary evidence. After the class certification briefing, Defendants produced additional evidence confirming that they collected data from the named Plaintiffs (and millions of other class members).

### 1. The Late-Produced Data Contains Further Common Evidence Of Data Collection

To the extent the Court had in mind that Plaintiffs had to identify specific examples of collected data on Defendants' servers, the data Defendants were ordered to produce in November 2023, but did not actually produce until after the class certification briefing, contains precisely evidence of that type as to Plaintiffs Griffith and Watters. Ex. 1,[3] September 20, 2024 Expert Report of Dr. Zubair Shafiq ("Shafiq Report") at ¶¶ 59-63.

Notably, in response to Plaintiffs originally seeking a class certification motion deadline of October 17, 2024 (ECF 27 at 25 of 33), the Court noted that it does not "set schedules on the assumption that parties are going to engage in bad faith and not comply with discovery obligations. I set schedules on the reverse assumption." Ex. 5, Sept. 8, 2023 Hrg. Tr., at 38. Unfortunately, Defendants did not produce data the Court ordered them to produce on the schedule the Court ordered them to produce it.

### a. Defendants Delayed Data Production Until After The Class Certification Briefing

Defendants delayed their production of sample data for nearly a year, until after the Class Certification briefing. That data, consisting of more than 2 billion web browsing events for non-TikTok users from the two sample dates Defendants chose, can be used to prove both Plaintiffs' and the classes' claims. *See* Ex. 1 at ¶¶ 53-102.

A year ago, on September 19, 2023, Defendants stated that they would provide

---

prevail on the merits of their claims." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011).

[3] All references to exhibits are those to the Declaration of Jonathan Rotter submitted concurrently herewith unless otherwise noted.

a one-day sample of the non-TikTok user data that they collected, generated, or processed on September 11, 2023.  ECF 74-2, Ex. 4, p. 19-21.  After Defendants reneged on that commitment, Plaintiffs moved to compel, ECF 74, and on November 27, 2023, the Court ordered production, **by December 11, 2023**, of non-TikTok user data that Defendants collect, generate, and process on a single day.  ECF 78.[4]  Defendants failed to comply, so Plaintiffs moved to compel again.  ECF 96. At the March 15, 2024 hearing on that motion, the Court found that Defendants "didn't do what you should have done in compliance with the other [November 27, 2023] order.  You now say you can't do it, belatedly, because the data is trashed."  ECF 118 at 37:1-3.

The Court then Ordered Defendants to produce "**on or before April 15, 2024**: (1) documents reflecting all raw data of domestic non TikTok users collected by Defendants at any time during the **24-hour day of March 14, 2024**; and (2) documents reflecting all uses of the data referenced in (1) . . . ." ECF 117 (first emphasis added).  Defendants then produced data that was (1) incomplete, and (2) from March 28, 2024 instead of the ordered date, having spoliated the March 14 data. Ex. 4, at 12-14. Accordingly, Plaintiffs moved again to enforce the Court's Order for evidentiary sanctions.  ECF 148.  The Court denied the motion, noting that "[s]ome of Defendants' discovery-related representations to Plaintiffs and to the Court have not been entirely consistent.  Nevertheless, it now appears that Defendants substantially have complied with the Minute Order, filed March 18, 2024, by, inter alia, **making available to Plaintiffs the 'documents' the Magistrate Judge previously ordered 'produce[d].'**" ECF 161 (emphasis added).

While inspecting the data on Defendants' premises would have been

---

[4] Plaintiffs also sought all the data Defendants collected on non-TikTok users, but Defendants refused and continued to delete that data during the course of this litigation.  Plaintiffs sought relief for that deletion.  *See* Plaintiffs' Motion for Sanctions for Data Spoliation, ECF 204.

---

impractical given the types of analysis that are necessary to perform, Plaintiffs, mindful of having just been admonished by this Court of "overreaching," and of the Court's encouragement to "cooperate reasonably and to complete the discovery ordered by the magistrate judge," ECF 142 at 2, prepared to do so.[5] But Defendants did not actually make that data available to Plaintiffs.  Instead, on May 10, 2024, Defendants mysteriously informed Plaintiffs that the data could not be made available to inspect during a source code inspection that was then being scheduled, "but are open to arranging an alternate date for the inspection of the remaining data." Ex. 4 at 22. The parties engaged in further logistical correspondence concerning inspection, and it was not until June 4, 2024, that TikTok disclosed that the March 28, 2024 raw data "has been deleted and is not recoverable," Ex. 4 at 16, once again spoliating evidence.

On June 7, 2024, Defendants informed Plaintiffs that they would produce processed data (as distinguished from the spoliated raw data) from March 28, as well as both raw and processed data from May 21. *Id*.  On June 10, 2024, Plaintiffs requested a date certain for the production of the March 28 and May 21 data, and did so again on June 21, June 27, and June 30.  Ex. 4 at 9-10. On July 1, 2024, Defendants finally responded, stating that they hoped to have a timeline by July 2, 2024.  Ex. 4 at 8-9. On July 12, Defendants reported having completed processing the May 21 data  for production and continuing work on the March 28 data.  Ex. 4 at 7-8. Defendants started to produce the May 21 sample data on July 19, 2024, and the March 28 data on August 1, 2024, but due to Defendants' vendor's settings and a corrupt data file, the full data set was not actually available to Plaintiffs until August 7, 2024.  Ex. 1 at ¶111; *see also* Ex. 4 at 1-5. Meanwhile, briefing on class certification had closed on July 26, 2024.  *See* ECF 199. Since the data has been

---

[5] Plaintiffs were attempting to obtain the data, or an appropriate evidentiary sanction for the destruction of the data, the lack of which this Court noted in both Orders. ECF 242 at 15, ECF 248 at 2.

1    available, Plaintiffs' expert has worked diligently to analyze it, and completing the

2    analysis will take another 2 to 4 weeks.  *Id*. at ¶¶ 112-114.

3        The findings from the late-produced data is ***on top of*** Plaintiffs' prior showing

4    of data collection by demonstrating how the Pixel and Events API collect data from

5    websites on which they are installed, ECF 179-2 (Declaration of Dr. Zubair Shafiq)

6    at ¶¶ 38-66, 76-86, and that Plaintiffs visited websites on which the Pixel and Events

7    API were installed, ECF 177-2 (Declaration of Bernadine Griffith) at ¶¶ 4-6, 177-3

8    (Declaration of Patti Shih) ¶¶ 4-6, 177-4 (Declaration of Jacob Watters) at ¶¶ 4-5.

9    Federal Rule of Evidence 401 provides that "[e]vidence is relevant if: (a) it has any

10   tendency to make a fact more or less probable than it would be without the evidence;

11   and (b) the fact is of consequence in determining the action." Evidence of how the

12   Pixel and Events API operate, and that the Plaintiffs visited websites with that

13   software installed, makes it "more [] probable" that their data was collected by

14   Defendants. And Plaintiffs must prove their claims by a preponderance of the

15   evidence, which means the jury "must be persuaded by the evidence that the claim

16   . . . is more probably true than not true."  Ninth Circuit Model Civil Jury Instruction

17   1.6.  Thus, evidence that the Pixel and Events API were functioning on websites

18   plaintiffs visited, along with the evidence that Defendants "uniformly and

19   automatically collects certain categories of data from visitors to websites that use the

20   Pixel" and Events API, ECF 179-2 at ¶¶ 10-14, 30-66, is evidence that Defendants

21   collected Plaintiffs' and non-TikTok users' data, even beyond what can be seen

22   directly from the two-day sample data.  *See* Ex. 1 at ¶¶ 64-65.

23           **b.    The Delayed Data Proves Class-wide Liability**

24       The two days of sample data—while still only a miniscule amount of data that

25   Defendants collected on Plaintiffs and other non-TikTok users during the relevant

26   time period—provides evidence that can be used to prove classwide liability

27   throughout the class period.  Extrapolating from the two-day sample, the fact-finder

28

can infer that Defendants collect identifying and sensitive information on virtually every TikTok non-user. *See* Ex. 1 at ¶¶ 68-97. Plaintiffs have identified data from two of the proposed class representatives in the two-day sample set, and due to their deletion of the vast majority of class member data, Defendants cannot argue that they have not collected data from the third proposed class representative.

In *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 457 (2016), the Supreme Court "rejected any categorical exclusion of representative or statistical evidence." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir.) (*en banc*), *cert. denied*, 143 S. Ct. 424 (2022)). Such an exclusion "would make little sense" because [a] representative or statistical sample, like all evidence, is a means to establish or defend against liability." *Tyson Foods*, 577 U.S. at 454-55.

That is because the "permissibility [of such evidence] turns not on the form a proceeding takes—be it a class or individual action—but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action." *Id*. at 455 (citing Fed. Rules Evid. 401, 403, and 702). Indeed, "[i]n many cases, a representative sample 'is the only practicable means to collect and present relevant data' establishing a defendant's liability." *Id*. at 455. As is applicable to this case, "where representative evidence is relevant in proving a plaintiff's individual claim, that evidence cannot be deemed improper merely because the claim is brought on behalf of a class." *Id*. And indeed, here, Plaintiffs do not contend that Defendants only collected their data on March 28, 2024 and May 21, 2024, but rather, that they did so *for years*. Accordingly, "[p]laintiffs frequently offer expert evidence, including statistical evidence or class-wide averages, to prove that they meet the prerequisites of Rule 23(b)(3)." *Olean*, 31 F.4th at 665.

Moreover, a "district court is not free to prefer its own views about [the disputed subject matter] over the statistical evidence submitted by the plaintiffs . . . ."

1   *Id.* at 678. "Therefore, a district court cannot decline certification merely because it
2   considers plaintiff's evidence relating to the common question to be unpersuasive
3   and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Id.*
4   at 667.  Thus, where an expert presented a study presenting averages for the class,
5   the question of whether the "expert's 'study was unrepresentative or inaccurate was
6   'itself common to the claims made by all class members.'" *Id.* at 668 (quoting *Tyson*
7   *Foods*, 577 U.S. at 457).

8       **B.       Analysis of Defendants' Late-Produced Data Demonstrates Typicality**

9           Defendants' late-produced March 28 and May 21 sample data also confirm
10  that the named Plaintiffs are typical of the class. In his merits report, Dr. Shafiq has
11  demonstrated this in two ways.

12
13                                                                . Ex. 1 (Shafiq Report) at ¶¶
14  20, 101.
15
16
17                              *See id.* at ¶¶ 53-63 (
18
19                                                          And that is from a small snapshot
20  of just two days' data collection—which is all that Defendants have produced.

21          Second, the websites with TikTok Pixel or Events API installed that the three
22  named Plaintiffs visited are also prevalent in the March 28 and May 21 sample data
23  produced by Defendants. In other words, other non-TikTok users visited and had
24  their data collected from the same websites that the named Plaintiffs visited. *Id.* at ¶¶
25  20, 52-63, 102.

26          That evidence establishes typicality under Rule 23. Typicality "does not mean
27  that the claims of the class representative[s] must be identical or substantially

28

identical to those of the absent class members." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (quoting 5 *Newberg on Class Actions,* § 24.25 at 24–105 (3d ed.1992)) (rejecting argument that a class representative was needed for each type of discrimination claim alleged).   Rather, "[t]ypicality focuses on the class representative's *claim—but not the specific facts from which the claim arose—*and ensures that the interest of the class representative 'aligns with the interests of the class.'" *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (rejecting argument that plaintiff, whose account had not been debited, was not typical of other class members whose accounts were debited because she was nonetheless subject to the same overall course of misconduct) (emphasis added) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

"The requirement of typicality is not primarily concerned with whether each person in a proposed class suffers the same type of damages; rather, *it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class*." *Id*. (emphasis added).

C.   **"Identifying Every Single Class Member" Is Not An Element Of The Claims, But Defendants Can Do So**

Plaintiffs did not propose to prove the classes' claims by demonstrating that Defendants could identify every non-TikTok user by name, although they can likely do so (at least to the extent Defendants have retained the collected data).  Ex. 1 at ¶¶ 38-88; *see also* Ex. 3 (September 20, 2024 Report of Bruce Schneier) at ¶ 115.  It is Plaintiffs' approach to common evidence, not any other conception of what the claim requires, that must be evaluated, because "a district court cannot decline certification merely because it considers plaintiff's evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Olean*, 31 F.4th at 667.  Plaintiffs proposed to prove their claims by showing the collection of the content *uniformly* collected: Dr. Shafiq has determined

that TikTok sets PageView as a default event, then uniformly and automatically collects Timestamp, IP Address, User Agent, Cookies, URLs, Event Information, and Content Information. Ex. 1 at ¶ 46. All seven categories are collected nearly 100% of the time. *Id.* at ¶ 47.

While it is not necessary for Plaintiffs to be right about whether their common evidence will succeed in proving their claim at the class certification stage, Plaintiffs nevertheless believe their evidence will.  Relevant to the privacy claims, California law defines "Personal information" to include: "information that identifies, relates to, describes, is ***reasonably capable of being associated with, or could reasonably be linked, directly or indirectly***, with a particular consumer or household. Personal information includes, but is not limited to, the following if it identifies, relates to, describes, is reasonably capable of being associated with, or could be reasonably linked, directly or indirectly, with a particular consumer or household:

> (A) Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers.

> . . .

> (C) Characteristics of protected classifications under California or federal law.

> (D) Commercial information, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies.

> . . .

> (F) Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding

a consumer's interaction with an internet website application, or advertisement.

(G) Geolocation data.

. . .

(I) Professional or employment-related information.

. . .

(K) Inferences drawn from any of the information identified in this subdivision to create a profile about a consumer reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

(L) Sensitive personal information."

Cal. Civ. Code § 1798.140(v)(1); *see Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 622 (N.D. Cal. 2021) (rejecting, based on the foregoing definitions, argument that "personal information" did not include cookies, browsing history, POST communications, IP address and User-Agent information).

The data at issue here is similar to that collected in *Calhoun v. Google, LLC*, 2024 WL 3869446, where the Ninth Circuit recently reversed a grant of summary judgment. *Calhoun* involved all data that was synced from Google Chrome browsers, including the user's unique, persistent cookie identifiers, the user's browsing history in the form of the contents of the user's GET requests, and information relating to the substance, purport, or meaning of the website's portion of the communication with the user, and IP address and User-Agent information. *Id*. at *2. And that data was, necessarily, collected from a variety of different websites, with different levels of sensitivity, and with a variety of different disclosures concerning each website.

And as to any conception of Plaintiffs' claims that requires direct capture of PII, Dr. Shafiq determined that, █████████████████████████

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 █████████████████ *Id.* at ¶ 72(b). Likewise, it is not necessary for the claim of any

7 class member that Defendants obtain "sensitive" browsing information on every

8 website visit.

9     **D.**    **Systematic Analysis Of The Late-Produced Data Shows That**

10         **Defendants Collected Sensitive Information From At Least The Vast**

11         **Majority Of Class Members**

12     Commonality does "not require complete congruence."

13 *In re First All. Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006). While this Court noted

14 that the putative class encompasses members who "visited hundreds of thousands of

15 different websites with varying disclosures about data collection" and "did not all

16 take the same steps to safeguard their privacy," Order at 9, other courts have not

17 considered this an impediment to class certification. For example, in *Rodriguez v.*

18 *Google LLC*, 2024 WL 38302 (N.D. Cal. Jan. 3, 2024), a class was certified as to "all

19 Google users who had their 'Web & App Activity' ('WAA') and/or 'supplemental

20 Web & App Activity' ('sWAA') switched off." That class "constitute[d] millions of

21 users." *Id*. at *3. Similarly, in *Brown v. Google LLC*, 2022 WL 17961497, (N.D.

22 Cal. Dec. 12, 2022), an injunctive relief class was certified as to Google Chrome

23 users that used "Incognito" mode. It was undisputed that that class also contained

24 millions of members. *Id.* at *15. As each class contained millions of members, the

25 respective members necessarily did not all take the same steps to safeguard their

26 privacy. Further, given the millions of class members in each of those classes, the

27 respective class members must have, either with WAA or sWAA off (*Rodriguez*), or

28

in Incognito Mode (*Brown*), visited hundreds of thousands of websites with varying disclosures about data collection.

Likewise, while it was not a class certification decision, *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) ("*Facebook Tracking*") specifically mentioned the "seven million websites" that used the Facebook plug-in at issue, *id*. at 603, but did not require that they be evaluated website by website, even for a single plaintiff.  This strongly suggests that no such requirement exists, and that mass collection across a large number of websites necessarily includes sensitive data. That conclusion is further supported by United States Supreme Court caselaw, discussed below, on which *Facebook Tracking* relied.

And if there was any doubt that the websites with the Pixel/Events API include sensitive data, Dr. Shafiq has now analyzed the recently-produced March 28 and May 21 data using the Interactive Advertising Bureau's (IAB's) standard content taxonomy. Specifically, he used the IAB taxonomy to classify the URLs found in Defendants' data that was





1     ( ████████████████████████████

2  Ex. 1 at ¶91. Dr. Shafiq's analysis demonstrates Defendants' classwide collection of

3  sensitive data.

4     **E.**    **Systematic Analysis Of The Late-Produced Data Shows That**

5             **Defendants Intercepted The Contents Of Class Members'**

6             **Communications**

7     For the wiretap claims, the only relevant question about the "nature" of the

8  information is whether it constitutes "content" information as defined by the caselaw,

9  *cf*. Order at 7 ("the viability of Plaintiffs' claims depends on the nature of the

10  information sent to Defendants" which "varies widely by website and by class

11  member"). ECPA defines the term "contents" as "any information concerning the

12  substance, purport, or meaning of that communication." 18 U.S.C. § 2510. "The

13  analysis for a violation of CIPA is the same as that under the federal Wiretap Act."

14  *Brodsky v. Apple Inc*., 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

15     URLs collected by TikTok are clearly "content" when they contain

16  information identifying particular webpages or search queries, *In re Meta Pixel*

17  *Healthcare Litig*., 647 F.Supp.3d 778, 795 (N.D. Cal. 2022) ("descriptive URLs" that

18  "include both the 'path' and the 'query string'" are "contents" under ECPA); *In re*

19  *Google RTB Consumer Privacy Litig.*, 606 F.Supp.3d 935, 949 (N.D. Cal. 2022)

20  (ECPA "contents" include "URL of the page where the impression will be shown"

21  and "referrer URL that caused navigation to the current page"); *Brown v. Google*

22  *LLC*, 685 F.Supp.3d 909, 936 (N.D. Cal. 2023) (search queries are like "the contents

23  of a letter"), and often contain search queries in the body of the URL itself. That is

24  the case here. Ex. 1 at ¶¶ 62-63, 65-66, 91-93.

25  ████████████████████████████████████████

26  ████████████████████████████████████████

27  ████████████████████████████████████████

28

*Id*. at ¶¶ 93. It is thus highly likely, *i.e.*, proven by a preponderance of the evidence, that Defendants collect search terms from the vast majority of class members. *Id*. at ¶ 94.

Dr. Shafiq has also described two other categories of data which qualifies as "contents" under CIPA and ECPA. The first, which Dr. Shafiq terms "Event Information," includes "information about standard and custom events in the POST requests, 'AddToCart,' 'Click,' and a unique identifier of the event or action in the 'message_id' field of the POST request." Declaration of Zubair Shafiq, dated June 21, 2024 [ECF No. 178] at ¶ 64. The second, which Dr. Shafiq terms "Content Information," includes "substantive information about the webpage's content that a website visitor is viewing, including the title of a webpage, the description of a webpage as well as the product or item name, category, and identifier." *Id*. at ¶ 65. The Event Information and Content Information categories are collected on 97.2% to 100% of websites, *id*. at ¶ 78, and include titles, descriptions, and events. Essentially, the Content Information and Event Information categories provide data about the precise sequence of actions for what a class member is doing, viewing, and clicking on a webpage. Thus, these categories reveal, as ECPA and CIPA require, the "substance, purport, or meaning" of the website visited. 18 U.S.C. § 2510. The collection of these "contents" on a uniform basis demonstrates a common issue. *Id*.

"When, as here, 'the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—[an alleged] failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification.'" *Tyson Foods*, 577 U.S. at 457 (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 107 (2009)). In other words, "[i]n determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not

whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666-67 (emphasis added). "Therefore, a district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Id*. at 667. Where an expert presented a study presenting averages for the class, the question of whether the "expert's 'study was unrepresentative or inaccurate was 'itself common to the claims made by all class members.'" *Id*. at 668 (quoting *Tyson Foods*, 577 U.S. at 457).

## F.  Systematic Analysis Of The Late-Produced Data Shows That Class Members Have A Property Interest In Their Web-Browsing Data (Conversion and Larceny Claims)

Plaintiffs' economics expert, Dr. Russell Mangum, has established that there is a market for "obtaining some, but not necessarily all, of a consumer's online data." Ex. 2, September 20, 2024 report of Dr. Russell Mangum ("Mangum Report"), at ¶ 105. The market measures he analyzes provide monthly payments that are "not a function of time spent online or number of pages visited." *Id*. There is no differential payment based on the subject matter of the web browsing. *Id*. at ¶¶ 84-104. SavvyConnect only requires an individual to provide data for 7 days per month, and in both SavvyConnect and Screenwise (which was a market measure used in *Rodriguez*, 2024 WL 38302, at *2), participants can pause data collection, and none require browsing data from all of a user's devices. *Id*. at ¶ 105. By contrast, and leading to collection that is more thorough in certain respects, there is no such way to turn off Defendants' data collection. Dr. Mangum concludes that given "the consistency of the purpose of the TikTok SDK and the market measure programs, the fact that the market measures reflect collection of some but not necessarily all browsing data, and that users participate in the data collection programs of Screenwise and SavvyConnect," "the market value of the Plaintiff data collected by

the TikTok SDK is most consistent and economically comparable with the SavvyConnect and Screenwise programs." *Id.* at ¶ 107. Accordingly, Plaintiffs have demonstrated classwide evidence of a cognizable property interest.[6]

If there are some unusual class members who use the internet so infrequently as to not fall within Dr. Mangum's analysis, that does not preclude class certification. Rule 23 permits "the certification of a class that potentially includes more than a de minimis number of uninjured class members. *Olean*, 31 F.4th at 669. While there is no evidence of a significant number of such "uninjured" class members, if they existed, "the court may redefine the overbroad class to include only those members who can rely on the same body of common evidence to establish the common issue," *id.* at 669 n.14 (citing *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012)), and Plaintiffs request, in the alternative, that the Court do so.

## G.    Disgorgement, Statutory Damages, Punitive and Nominal Damages

Plaintiffs do not have new arguments specific to disgorgement, statutory damages, punitive damages, and nominal damages, but should the Court reconsider its Order, Plaintiffs' positions on those issues will still apply.

## H.    The Court Should Certify At Least Under Rule 23(b)(2)

Given the Court's discussion at the hearing of *Smith v. Maryland*, 442 U.S. 735 (1979), Plaintiffs note that *Carpenter v. United States*, 585 U.S. 29 (2018) declined to extend *Smith*, noting that "when *Smith* was decided in 1979, few could have imagined" modern technology's data trail, and holding that 127 days of cell-site location data "provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id.* at 311 (quoting *United States v. Jones*, 565

---

[6] While the Court found that unjust enrichment does not constitute an independent cause of action, ECF 242 at 19, Plaintiffs' invasion of privacy, intrusion upon seclusion, and ECPA claims nonetheless allow for recovery in the form of disgorgement of profits resulting from unjust enrichment. ECF 179-1 at 18 (citing authorities).

U.S. 400, 415 (2012) (opinion of Sotomayor, J.)).  Consistent with the observation in *Carpenter*, the web browsing data at issue in this case "can be used to infer sensitive information such as home/work address, gender, age, marital status, educational background, occupation, religious, political, and sexual associations as well as personality traits."  Ex. 1 at  ¶ 67.

That's why the Supreme Court in *Riley v. California*, 573 U.S. 373 (2014), noted, in holding a warrant required for a cell phone search, that "Internet search and browsing history. . . ***could reveal*** an individual's private interests or concerns— perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD." *Id*. at 395 (emphasis added). Again, Americans have an expectation of privacy in their internet search and browsing history because it "could reveal" their private interests or concerns.

Thus, for purposes of considering the certification of an injunctive relief class in this case, it is critical to recognize that a warrant is required whether or not the phone actually contains anything "sensitive."  The point is that the internet search and browsing history "could reveal" such information. *Id*. As discussed above, Dr. Shafiq has demonstrated that such sensitive data is regularly collected by Defendants. Thus, Defendants are violating class members' reasonable expectation of privacy in that information—***class-wide***. *See* Ex. 1 ¶¶ 36-41.

## I.    The Court Should Certify Alternative Subclasses With Further Limitations

"If necessary . . . , the district court may construe the class definition more narrowly, or otherwise conform its interpretation of the class definition with the prevailing theory of liability." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1139 (9th Cir. 2016); *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 483 (N.D. Cal. 2011) (narrowing class definition to cure overbreadth).  Courts in this district routinely redefine proposed classes where doing so will obviate concerns with class

certification. *See, e.g., Bruno v. Quten Rsch. Inst*., LLC, 280 F.R.D. 524, 534 (C.D. Cal. 2011) (limiting class definition where proposed class representative's claims were typical of some but not all of the claims in the proposed class definition); *Charlebois v. Angels Baseball, LP*, 2011 WL 2610122, at *3 (C.D. Cal. June 30, 2011) ("the Court is free to limit the class definition or give Plaintiffs leave to do so."); *Kamar v. Radio Shack Corp*., 254 F.R.D. 387, 391 (C.D. Cal. 2008) ("It is well within the court's authority to redefine Plaintiffs' proposed class", citing Wright & Miller, Fed. Prac. & Proc. § 1759 at 130-31 (2008)), *aff'd*, 375 F. App'x 734 (9th Cir. 2010).

For the reasons outlined above, Plaintiffs urge that their originally proposed classes are certifiable. However, if the Court believes narrowing to be necessary, the analysis of the late-produced data would support one or more of the following restrictions on the scope of the class, which Dr. Shafiq has shown are assessed systemically:

a. Defendants obtained unhashed email address or phone numbers;

b. Defendants obtained hashed email address or phone numbers;

c. Defendants obtained web browsing data from webpages classified as sensitive under the IAB taxonomy;

d. Defendants obtained web browsing data from websites that do not disclose data collection by Defendants in their privacy policies; and

e. Defendants obtained search queries.

Plaintiffs' existing proposed classes and subclasses are sufficiently narrow even without the above additional limitations. *See* ECF 177; ECF 179-1 at pp.2-3. For example, Class 2 already contains the limitation that the Pixel and Events API are both in use, addressing any concern of browser settings affecting the functioning of the Pixel, because the Events API transmits data to Defendants without direct browser interaction.  And Class 3 already requires the class member to have web

browser or system settings turned on to block third-party cookies, addressing any concern that class members did not manifest lack of consent to the collection. Class 4 combines the limitations of Classes 2 and 3. And Class 5 addresses Defendants receiving search terms and results even where the website did not select "search" as an optional event in the Pixel configuration menu. But to the extent that the Court still has concerns about the breadth of Classes 2 through 5, the restrictions outlined in (a) through (e) above cut down the scope of the proposed class even further.

## J.    Alternatively, The Court Should Grant Leave To File A Renewed Motion And Sufficient Time To Complete Relevant Work

Plaintiffs have been disadvantaged by Defendants' late production of documents and data. As described by Dr. Shafiq, as a result of the tardy production, he has not had time to complete his analyses and requires an estimated two to four additional weeks to complete his analysis of the late-produced information. To the extent that the Court does not grant the other relief sought herein, Plaintiffs request leave to file a renewed motion for class certification with supplemental technical expert analysis, within one month of the Court's decision on this motion.

## IV.    CONCLUSION

Plaintiffs request that the Court grant reconsideration, certify both 23(b)(3) and 23(b)(2) classes, appoint Plaintiffs as class representatives, and proposed counsel as class counsel. Alternatively, Plaintiffs request leave to file a renewed motion for class certification and provide sufficient time for Plaintiffs' Expert, Dr. Shafiq, to complete the analysis of the late-produced data.

Dated: September 23, 2024            By:  /s/ Jonathan M. Rotter

Ekwan E. Rhow (CA SBN 174604)
Marc E. Masters (CA SBN 208375)
Christopher J. Lee (CA SBN 322140)
**BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM,
LLP**
1875 Century Park East, 23rd Floor

1      Los Angeles, California 90067-2561
       Telephone: (310) 201-2100
2      erhow@birdmarella.com
       mmasters@birdmarella.com
3      clee@birdmarella.com

4      Jonathan M. Rotter (CA SBN 234137)
       Kara M. Wolke (CA SBN 241521)
5      Gregory B. Linkh (*pro hac vice*)
       **GLANCY PRONGAY & MURRAY,**
6      **LLP**
       1925 Century Park East, Suite 2100
7      Los Angeles, California 90067-2561
       Telephone: (310) 201-9150
8      jrotter@glancylaw.com
       kwolke@glancylaw.com
9      glinkh@glancylaw.com

10     Kalpana Srinivasan (CA SBN 237460)
       Steven Sklaver (CA SBN 237612)
11     Michael Gervais (CA SBN 330731)
       **SUSMAN GODFREY L.L.P.**
12     1900 Avenue of the Stars, Suite 1400
       Los Angeles, CA 90067
13     Telephone: (310) 789-3100
       Facsimile: (310) 789-3150
14     ksrinivasan@susmangodfrey.com
       ssklaver@susmangodfrey.com
15     mgervais@susmangodfrey.com

16     Y. Gloria Park (pro hac vice)
       **SUSMAN GODFREY L.L.P.**
17     One Manhattan West
       50th Floor
18     Telephone: (212) 336-8330
       Facsimile: (310) 336-8340
19     gpark@susmangodfrey.com

20     John W. McCauley (*pro hac vice*)
       **SUSMAN GODFREY L.L.P.**
21     1000 Louisiana Street, Suite 5100
       Houston, TX 77002
22     Telephone: (713) 651-9366
       Facsimile: (713) 654-6666
23     jmccauley@susmangodfrey.com

24
25     *Attorneys for Plaintiffs*
26
27
28

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record Plaintiffs, hereby certifies that this brief contains 6,972 words, which complies with the word limit set forth in L.R. 11-6.1.

/s/ *Jonathan M. Rotter*
Jonathan M. Rotter

1

## CERTIFICATE OF SERVICE

2

This is to certify that on September 23, 2024, I caused a copy of the foregoing

3

document to be served by ECF on the following individuals:

4

5

Victor Jih
Kelly Yin
Shallen Torrez
WILSON SONSINI GOODRICH &
ROSATI, P.C.
1900 Avenue of The Stars, 28th Floor
Los Angeles, CA 90067
Telephone: (424) 446-6900
Facsimile: (866) 974-7329
Email: vjih@wsgr.com
kyin@wsgr.com
storrez@wsgr.com

Dylan Grace Savage
Thomas Wakefield
WILSON SONSINI GOODRICH &
ROSATI, P.C.
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (866) 974-7329
Email: dsavage@wsgr.com
twakefield@wsgr.com

Luis Li
WILSON SONSINI GOODRICH &
ROSATI, P.C.
953 East Third Street, Suite 100
Los Angeles, CA 90013
Telephone: (323)210-2900
Facsimile: (866) 974-7329
Email: luis.li@wsgr.com

Anthony J. Weibell
MAYER BROWN LLP
Two Palo Alto Square
3000 El Camino Real, Ste 2-300
Palo Alto, California 94306-2112
Telephone: (650) 331-2030
Facsimile: (650) 331-4530
Email: aweibell@mayerbrown.com

Sophia M. Mancall-Bitel
MAYER BROWN LLP
333 S. Grand Ave., 47th Floor
Los Angeles, CA 90071
Telephone: (213)229-9500
Facsimile: (213) 625-0248
Email:
smancallbitel@mayerbrown.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

*/s/ Jonathan M. Rotter*
Jonathan M. Rotter

25

26

27

28