UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BERNADINE GRIFFITH et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TIKTOK, INC. et al.,<br><br>Defendants. | Case No. 5:23-cv-00964-SB-E<br><br>ORDER DENYING MOTION TO RETAX COSTS [DKT. NO. 410] |

This putative class action challenging Defendants' collection of data from nonusers of the TikTok app has been aggressively litigated by both sides, reaching more than 400 docket entries in less than two years. Plaintiffs have invested enormous resources into this case, even after denial of class certification, prompting Defendants to do the same. Following the grant of summary judgment for Defendants on Plaintiffs' remaining claims, the clerk's office taxed costs against Plaintiffs in the amount of $460,941.65. Dkt. No. 409. Plaintiffs now move to retax costs, arguing that the Court should exercise its discretion to refuse to award costs altogether, stay the award pending appeal, or reduce the allowed costs. The Court finds this matter suitable for decision without oral argument and vacates the May 9, 2025 motion hearing. Fed. R. Civ. P. 78; L.R. 7-15. Because Plaintiffs have not met their burden to show that the cost award should be disturbed, their motion is denied.

I.

Rule 54(d)(1) provides that costs "should be allowed to the prevailing party" unless a court order or other rule provides otherwise. Fed. R. Civ. P. 54(d)(1). This rule "creates a presumption in favor of awarding costs to a prevailing party, but vests in the district court discretion to refuse to award costs." *Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572, 591 (9th Cir. 2000) (en banc).

The Ninth Circuit has construed Rule 54(d)(1) as "establish[ing] that costs are to be awarded as a matter of course in the ordinary case," *id*. at 593, and the burden is on the losing party to show why costs should not be awarded, *Save Our Valley v. Sound Transit*, 335 F.3d 932, 945 (9th Cir. 2003). Reasons that may justify denying costs include: (1) a losing party's limited financial resources, (2) misconduct by the prevailing party; (3) the chilling effect of imposing high costs on future civil rights litigants; (4) that the issues in the case were close and difficult; (5) the prevailing party's nominal or partial recovery; (6) the losing party's good faith; and (7) that the case presented a landmark issue of national importance. *Champion Produce, Inc. v. Ruby Robinson Co., Inc.*, 342 F.3d 1016, 1022 (9th Cir. 2003).

If the court departs from Rule 54(d)'s presumption by refusing to allow costs, it must specify reasons for its refusal. *Ass'n of Mexican-Am. Educators*, 231 F.3d at 591–93. On the other hand, "a district court need not give affirmative reasons for awarding costs; instead, it need only find that the reasons for denying costs are not sufficiently persuasive to overcome the presumption in favor of an award." *Save Our Valley*, 335 F.3d at 945. Because "[t]he presumption itself provides all the reason a court needs for awarding costs," "when a district court states no reason for awarding costs, [the Ninth Circuit] will assume it acted based on that presumption." *Id*.

II.

Plaintiffs principally argue that the Court should exercise its discretion to deny costs altogether. They invoke four of the reasons the Ninth Circuit has identified as possible bases for departing from the presumption, arguing that: (1) this case involves a landmark issue of national importance; (2) Plaintiffs' case had merit, and the issues were close and difficult; (3) taxing costs could chill future meritorious class actions; and (4) the significant economic disparity between the parties makes cost-shifting inequitable. None of these arguments is persuasive.

First, Plaintiffs overstate the significance of this action. In *Escriba v. Foster Poultry Farms, Inc.*, the Ninth Circuit affirmed the district court's finding that the case "presented issues of substantial importance" where the federal agency responsible for administering compliance with the relevant labor laws had written a letter explaining that cases like *Escriba* were important to the public interest. 743 F.3d 1236, 1248 (9th Cir. 2014). Plaintiffs identify no similar government recognition of the importance of their case. To the contrary, while Plaintiffs correctly note the concerns of the public and of multiple government officials

about Defendants' data collection practices, including the collection of nonusers' data, the government itself has acted to ban the TikTok app within the United States. Plaintiffs cite to language in the Supreme Court's recent decision upholding that ban. *See, e.g.*, *TikTok Inc. v. Garland*, 145 S. Ct. 57, 68–69 (2025) ("Data collection and analysis is a common practice in this digital age. But TikTok's scale and susceptibility to foreign adversary control, together with the vast swaths of sensitive data the platform collects, justify differential treatment to address the Government's national security concerns."). While Plaintiffs are correct that Defendants' data collection is a matter of substantial importance, they have not shown that their unsuccessful putative class action was necessary to the public interest, particularly in light of the government's own separate action.[1]

Second, Plaintiffs overstate the closeness and difficulty of this case. While the Court ruled on some issues for which there was no binding Ninth Circuit law directly on point, the predominant factor driving up the cost and scope of this case was not the novelty of the legal issues but rather Plaintiffs' determination to obtain certification of a nationwide class with tens of millions of members. That focus contributed to their failure to survive summary judgment. *See* Dkt. No. 385 at 4 ("Plaintiffs have litigated this case as a putative class action, focusing on Defendants' practices as a whole rather than on Plaintiffs' browsing activity. . . . As a result, much of the evidence before the Court involves Defendants' collection of data from other internet users, which is at most tangentially relevant to Plaintiffs' claims."). Plaintiffs' missteps—including relying on deeply flawed expert analysis and waiting until they lost on an issue before seeking to obtain relief they could have sought much sooner—also increased the difficulty and cost of the litigation. *See, e.g.*, Dkt. No. 337 at 5–6 ("Only after the Court denied their motion did Plaintiffs belatedly seek a five-month extension and renew their motion for discovery sanctions, which the magistrate judge had denied seven and a half weeks earlier."). While this litigation involved a few close issues, Plaintiffs have not shown that the case, which they lost on summary judgment based on the absence of evidence to support their claims, was so unusually difficult that it warrants a departure from Rule 54(d)'s presumption. *Cf. White & White, Inc. v. Am. Hosp. Supply Corp.*, 786 F.2d 728, 732 (6th Cir. 1986) (affirming denial of costs where "the matter consumed 80 trial days, required 43 witnesses, produced

---

[1] Plaintiffs' argument that "several factually and legally similar cases" have resulted in settlements or survived summary judgment also casts doubt on their claim that this action is uniquely important. Dkt. No. 420 at 3 (reply).

800 exhibits, generated almost 15,000 pages of transcript, and begat a 95-page opinion”).

Third, Plaintiffs have not shown that shifting costs would chill future meritorious actions. That factor generally arises in civil rights cases. *See, e.g.*, *Stanley v. Univ. of S. California*, 178 F.3d 1069, 1080 (9th Cir. 1999) (remanding for district court to reconsider decision not to retax costs in part because “the imposition of such high costs on losing civil rights plaintiffs of modest means may chill civil rights litigation in this area”). Plaintiffs cite a single district court decision that—while *denying* a motion to retax costs—opined that “class actions often involve relatively small monetary claims by each plaintiff, and taxing substantial litigation costs on individual Plaintiffs here may chill potential plaintiffs’ willingness to assume the monetary risk.” *Hamilton v. TBC Corp.*, No. 17-CV-1060-DMG, 2020 WL 5982391, at *3 (C.D. Cal. Feb. 13, 2020). Plaintiffs’ argument rests solely on the nature of class actions in general and boils down to a contention that class actions should be exempt from Rule 54(d)’s presumption of cost-shifting. Plaintiffs cite no authority to justify such a broad rule.

Fourth, Plaintiffs have not met their burden to show an economic disparity that warrants denial of cost-shifting. Courts “analyze economic disparities within the larger context of the parties’ financial situations, especially the plaintiff’s ability to pay any awarded costs.” *T.P. v. Walt Disney Parks & Resorts U.S. Inc.*, No. 15-CV-05346-CJC, 2022 WL 1054935, at *2 (C.D. Cal. Mar. 3, 2022). Plaintiffs observe that Defendants are enormous, multi-billion dollar corporations, but they provide no evidence of their own—or their counsel’s—resources. Plaintiffs quote the reference in *Association of Mexican-American Educators* to the plaintiffs being “a group of individuals and nonprofit organizations” but omit what immediately follows: “The record demonstrates that their resources are limited.” 231 F.3d at 593. Plaintiffs have not suggested that they are unable to pay the costs nor produced evidence that doing so would be particularly burdensome. The Court previously noted that their claim to be “ordinary individuals” who lacked the resources to pay for data storage was “in some tension with their approach to this case—even after denial of class certification, they obtained new expert reports totaling nearly 300 pages from experts who are being compensated at rates of between $750 and $1,075 per hour.” Dkt. No. 283 at 4. Moreover, Rule 54(d) does not carve out an exception to cost-shifting when individuals sue large corporations—a common occurrence that does not make a case extraordinary. *See In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, No. 13-ML-2438-PSG, 2018 WL 11354865, at *2 (C.D. Cal. Sept. 11, 2018) (“[C]ourts in this District routinely tax

costs in favor of corporate defendants against individual plaintiffs.") (cleaned up). In the absence of any evidence of Plaintiffs' financial situation, the Court will not deny costs simply because of Defendants' wealth. *See T.P.*, 2022 WL 1054935, at *2 (rejecting economic-disparity argument where plaintiffs "have not submitted any evidence regarding the financial condition or alleged inability" to pay the costs).

Although Plaintiffs enumerate only the four arguments above, they also reference elsewhere in their briefing Defendants' "discovery gamesmanship," including delays in the production of much of the information Plaintiffs sought. Dkt. No. 410-1 at 2, 13–14. The Court agrees that litigation misconduct may be relevant to its exercise of discretion. *See Escriba*, 743 F.3d at 1248 (noting that enumerated factors are "not an exhaustive list of good reasons for declining to award costs, but rather a starting point for analysis") (cleaned up). As previously noted, "Plaintiffs' frustration [with Defendants' delayed production] does not appear to be wholly unmerited." Dkt. No. 337 at 5. Had Plaintiffs been blameless in the escalation of costs in this litigation, the Court might find it appropriate to deny cost-shifting. But Plaintiffs fully embraced the expansive and expensive approach to this lawsuit—insisting on pursuing class-wide evidence and costly experts even after class certification was denied, and engaging in extensive motion practice (including multiple untimely requests and an unsuccessful motion for reconsideration). Plaintiffs' untimeliness resulted in the striking of their motion for spoliation sanctions, Dkt. No. 283, and the Court declines to effectively grant Plaintiffs relief on the back end for discovery misconduct they did not adequately pursue at the appropriate time.

For all these reasons, Plaintiffs have not met their burden to show that this is an extraordinary case warranting departure from the usual presumption that "costs are to be awarded as a matter of course." *Ass'n of Mexican-Am. Educators*, 231 F.3d at 593.

III.

Alternatively, Plaintiffs ask the Court to defer deciding on costs until after appeal. "If an appeal on the merits of the case is taken, the court may rule on the claim for fees, may defer its ruling on the motion, or may deny the motion without prejudice, directing . . . a new period for filing after the appeal has been resolved." Fed. R. Civ. P. 54(d) advisory committee's note to 1993 amendment. In determining whether to stay an application to tax costs pending appeal, court apply the typical factors for a stay pending appeal: "(1) whether the stay applicant has

made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Newman v. Underhill*, No. 5:23-CV-00033-SP, 2024 WL 1647218, at *1 (C.D. Cal. Mar. 29, 2024) (cleaned up).

Plaintiffs have not made "a strong showing" that they are likely to prevail on appeal. Indeed, they make no showing at all, instead merely suggesting that "the appeal presents significant issues that may result in the panel vacating or reversing the Court's judgment at least in part, especially in light of the unsettled issues of law noted by the Court." Dkt. No. 410-1 at 10.[2] And the second factor is wholly missing—Plaintiffs concede that they "may not be irreparably harmed absent a stay," but argue that Defendants also would not be harmed by a stay due to their wealth. *Id*. These failures are fatal. "The first two factors of the traditional standard [for a stay pending appeal] are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Even if Defendants would not be harmed by a stay, Plaintiffs have not shown that the public interest so overwhelmingly requires a stay that Plaintiffs should be excused from satisfying the two "most critical" factors. Plaintiffs' request for a stay is denied.

IV.

Finally, Plaintiffs argue that if the cost award is not denied or stayed, it should be reduced. The cost award consists of two components: (1) $49,681.65 for deposition fees; and (2) $411,260 for e-discovery production costs. Dkt. No. 409. Plaintiffs challenge only the latter as excessive.

Section 1920 enumerates the costs that may be taxed in favor of a prevailing party, including in relevant part "the costs of making copies of any materials where the copies are necessarily obtained for use in the case." 28 U.S.C. § 1920(4). Local Rule 54-3.10(g)—the provision under which Defendants claimed these costs—states that taxable document preparation costs include "[t]he cost of physically replicating or reproducing material necessarily obtained for use in the case (including copies obtained to be produced in discovery) in any format in which such material is required to be produced and with any required

[2] In their reply, Plaintiffs urge the Court to wait until May 19, when their appellate brief is due, to review their filing and consider the closeness of the issues. Dkt. No. 420 at 5. The time for Plaintiffs to present their arguments to this Court was when they filed the instant motion in March.

characteristics (such as metadata or manipulability) intact." The rule also provides that the party seeking costs "must provide a consolidated itemization of copying costs, setting forth with specificity, particularity, and clarity the distinct tasks and services performed. Only costs associated with copying documents or reproducing other material for actual use in the case are allowed." L.R. 54-3.10.

In their fee application, Defendants originally requested more than $672,000 in document production costs. They supported this request with partially redacted invoices and a declaration from a partner at their vendor, who explained the two categories of costs for which Defendants sought to recover: (1) creating image copies of documents for production in the format required by the parties' stipulated discovery order, including optimizing image resolution, converting images to TIFF, and generating files with the required metadata fields; and (2) creating native copies of documents, including creating slipsheets, compiling native files, and generating load files with the required metadata fields. Dkt. No. 397 at 99 of 143. The vendor charged Defendants $400 per gigabyte (GB) for the former and $100 per GB for the latter. *Id.* After Plaintiffs identified some duplication in the data provided and claimed reductions based on the volume of data, Defendants agreed to reduce their request by more than a third to $411,260, the amount the clerk's office awarded.

Plaintiffs raise five arguments for further reducing the award of e-discovery costs.

First, Plaintiffs argue that because Defendants improperly delayed production of most of the e-discovery until August and September 2024, which made it less useful to Plaintiffs, it would be inequitable to force Plaintiffs to pay for the production. Plaintiffs cite no authority to support this argument. While other remedies were available for discovery misconduct, Plaintiffs identify no basis for denying the actual taxable costs Defendants incurred to produce the documents Plaintiffs requested simply because the discovery would have been more useful to Plaintiffs if produced earlier.

Second, Plaintiffs contend that the materials supporting Defendants' costs request were insufficiently specific to confirm that all the billed costs were taxable. In particular, Plaintiffs argue that the use of "including" to describe the services encompassed in the costs of image production and native production leaves it

ambiguous whether additional nontaxable services were also included in the bills.[3] Although the vendor's declaration could have been more precise, it is not so vague that the Court is left "unable to determine what specific items [the invoices] relate[] to," as Plaintiffs suggest. *United States v. Jiaherb, Inc.*, No. 14-CV-2484-RSWL, 2020 WL 11232287, at *3 (C.D. Cal. June 19, 2020). Moreover, Defendants produce a declaration identifying nontaxable costs for which they do not seek recovery, such as processing data at the ingestion stage and creating threaded internal chat PDFs. Dkt. No. 419-1 ¶¶ 2, 4. On this record, Plaintiffs have not shown that Defendants' costs should be reduced or denied for inadequate documentation.

Third, Plaintiffs argue that the cost of document production, which was charged by the gigabyte, was inflated by the needlessly large file sizes of documents Defendants produced. The overwhelming majority of the discovery consisted of messages on Defendants' internal messaging system, Lark. Defendants initially produced standalone Lark messages in text files. Later, they reproduced the chats in threads (i.e., with the messages connected in their respective conversations) as PDF images, which caused the files to become approximately five times larger. But it is undisputed that Defendants produced the threaded PDFs at Plaintiffs' insistence, Dkt. No. 419-1 ¶ 4, and that they have already reduced their costs at Plaintiffs' request to account for duplication. Defendants also provide evidence that threading and converting the files to PDFs "increased the file size based on the increased number of messages and the differences in these file types, such as the inclusion of graphical renditions of message replies, emoji reactions, and message author and date and time." *Id.* ¶ 5. Plaintiffs have not shown how Defendants should have produced the files to make them smaller; they merely argue that Defendants have not adequately explained why the files were so large. In the absence of evidence that the costs Defendants seek to recover were not actually incurred to produce the discovery Plaintiffs

[3] Plaintiffs also emphasize that the vendor claimed to bill for "generating load files with the required metadata fields," Dkt. No. 397 at 99 of 143, even though most of Defendants' production did not include certain required metadata fields. To the extent Plaintiffs are contending that the discovery was inadequate, the time to challenge it has passed. To the extent Plaintiffs intend to cast doubt on the billing, they have not shown that the vendor's charges were nontaxable. In any event, Defendants explain that the files compiled outside of Defendants' internal messaging platform were produced with the metadata available, Dkt. No. 419-1 ¶ 5, and Plaintiffs have not shown otherwise.

requested in the form the parties had agreed to, Plaintiffs have not shown that a reduction is warranted.

Fourth, Plaintiffs contend that Defendants "should not be permitted to recover costs for the inefficient and idiosyncratic manner in which they chose to produce threads of Lark chats," which often included piecemeal portions of threads. Dkt. No. 410-1 at 16–18. But Defendants have already reduced their costs request to account for duplication, and Plaintiffs have not shown that the presence of an unspecified amount of duplicated content in the production of millions of pages of chats justifies reducing the cost award.

Finally, Plaintiffs argue that the rates charged by Defendants' vendor are unreasonable, relying on online pricing survey results reflecting that a plurality of respondents stated that "the per GB cost to process electronically stored information based on volume at ingestion for 250 GB or less" is between $25 and $75 per GB. https://complexdiscovery.com/buyers-guide/ediscovery-pricing-overview-winter-2024/ (last visited May 5, 2025). Defendants point out two problems with this argument. First, the website disclaims that the survey's "non-scientific nature means it should be used as a guide rather than a definitive pricing standard." *Id*. Second, it purports to reflect rates for processing data *at ingestion*, a separate task (with a lower cost) for which Defendants do not seek recovery. *See* Dkt. No. 419-1 ¶ 2 ("The invoices paid to [the vendor] additionally included line items for processing data at the ingestion stage, which was charged at a lower rate than production services, but Defendants did not seek to tax those costs.").

Plaintiffs also assert that their discovery vendor has offered "comparable services to image and produce documents at a rate of $0.03 per page," Dkt. No. 410-1 at 19, and they cite cases for the proposition that "the going rate for TIFF conversion is $0.02 per page," *Sanofi v. Glenmark Pharms., Inc. USA*, No. 1:14-CV-00264, 2018 WL 6427870, at *3 (D. Del. Dec. 7, 2018), whereas Defendants' effective per-page production cost is $0.13 per page. Plaintiffs also point out that Defendants' cited cases approving higher rates for TIFF conversion are 10 years old and that costs have apparently dropped with advances in technology. *See, e.g.*, *CSP Techs., Inc. v. Sud-Chemie AG*, No. 4:11-CV-00029, 2015 WL 2405528, at *5 (S.D. Ind. May 20, 2015) (awarding costs for TIFF conversion at $850 per GB based on the amount charged even though rates had subsequently dropped to $550 per GB).

However, the rates charged to Defendants were not for TIFF conversion alone, and Defendants plausibly explain that "Plaintiffs' discovery requests called

for a wide array of documents, from low resolution txt files to high resolution images and powerpoints, which could not be processed at the same per-page rate." Dkt. No. 419 at 9–10. Moreover, there is no dispute that Defendants were billed and paid the rates of $400 per GB and $100 per GB for the vendor's services, which the vendor represents "reflects a good-faith valuation of the services rendered." Dkt. No. 397 ¶¶ 4–5. Defendants did not know at the time they contracted for those services that the costs would ultimately be shifted to Plaintiffs. In the absence of more specific evidence that the rates Defendants paid for the specific tasks at issue were unreasonable, Plaintiffs have not shown that the cost award should be reduced based on market rates for other arguably similar tasks.

In sum, the cost award in this case is large, but it does not appear disproportionate to the ambitious approach employed by Plaintiffs in attempting to bring a class action on behalf of tens of millions of class members. The taxable costs represent only a limited portion of the enormous expenses Defendants incurred successfully defending this action. Plaintiffs' specific arguments for reducing the taxable costs are unavailing, and the sum awarded does not appear otherwise manifestly unjust.

V.

Because Plaintiffs have not shown that the award of costs to Defendants should be disallowed, stayed, or reduced, their motion is denied.

Date: May 5, 2025



Stanley Blumenfeld, Jr.
United States District Judge